Oliver J. H. Stiefel (OR Bar No. 135436)
(503) 227-2212 | oliver@crag.org
Meriel L. Darzen (OR Bar No. 113645)
(503) 525-2725 | meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, OR 97214
LEAD COUNSEL
*Applicants Pro Hac Vice*

Thomas E. Wheeler (CA Bar No. 304191)
(707) 446-9027 | tom@wildcalifornia.org
ENVIRONMENTAL PROTECTION INFORMATION CENTER
145 G. Street, Suite A
Arcata, CA 95521
LOCAL COUNSEL

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KLAMATH FOREST ALLIANCE**, a California non-profit corporation, **CONSERVATION CONGRESS**, a California non-profit corporation, **ENVIRONMENTAL PROTECTION INFORMATION CENTER**, a California non-profit corporation, and **MOUNT SHASTA BIOREGIONAL ECOLOGY CENTER**, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES FISH AND WILDLIFE SERVICE**, and **UNITED STATES FOREST SERVICE** <br><br> Defendants. | No. <br><br> (Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*) |

1

**GLOSSARY OF TERMS**

2

| APA | Administrative Procedure Act |
|---|---|
| BiOp | Biological Opinion |
| D | Dispersal Habitat |
| Defendants | United States Forest Service, United States Fish and Wildlife Service |
| DSA | Demographic Study Area |
| ESA | Endangered Species Act |
| F | Foraging Habitat |
| Forest | Shasta-Trinity National Forest |
| Forest Service | United States Forest Service |
| N | Nesting Habitat |
| NEPA | National Environmental Policy Act |
| NR | Nesting/Roosting Habitat |
| NRF | Nesting/Roosting/Foraging Habitat |
| NSO or Owl | Northern Spotted Owl |
| PBF | Physical and Biological Features (of Critical Habitat) |
| Plaintiffs or KFA | Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, We Advocate Thorough Environmental Review, Mount Shasta Bioregional Ecology Center |
| Project or SFS Project | South Fork Sacramento Public Safety and Forest Restoration Project |
| R | Roosting Habitat |
| Service | United States Fish and Wildlife Service |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 1

**INTRODUCTION**

1.      This is a civil action for declaratory and equitable relief, which stems from final administrative actions of the United States Fish and Wildlife Service ("Service") and the United States Forest Service ("Forest Service") (collectively, "Defendants") related to the South Fork Sacramento Public Safety and Forest Restoration Project ("SFS Project" or "Project") on the Shasta-Trinity National Forest ("Forest").

2.      Plaintiffs Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, and Mount Shasta Bioregional Ecology Center ("KFA" or "Plaintiffs") bring this challenge under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

3.      Plaintiffs allege that Defendants violated their substantive and procedural duties under Section 7 of the ESA, namely, to "insure" that the Project is "not likely to jeopardize the continued existence" of the Northern spotted owl ("NSO" or "owl"). 16 U.S.C. §1536(a)(2).

4.      The NSO is listed as a "threatened" species under the ESA, meaning that it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §1532(22). In fact, the Service has determined that the NSO meets the criteria of an "endangered" species—a "species which is in danger of extinction throughout all or a significant portion of its range, 16 U.S.C. §1532(6)—but that its listing as such is currently precluded by higher priorities.

5.      NSO populations have been ravaged by range-wide threats, including habitat loss from logging and wildfires, and the invasion of the barred owl, a species invasive to the western United States that outcompetes the NSO for habitat and food resources. The Service does not have any current, scientifically validated estimates of the NSO population, but hypothesizes that fewer than 3,000 individual NSO exist in a range that extends from Northern California to British Columbia, and that the species is declining at a rate of -5.3% annually.

6.      Despite these alarming numbers and trends—and continuing macro-level threats from habitat loss and competition with barred owls—the Service continues to serially greenlight forest management actions of the Forest Service, other federal agencies, and private actors that

COMPLAINT - 2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

cause "take" of NSO. "Take" is a term of art under the ESA which means to kill, harass, or harm to the degree that it significantly impairs normal breeding, feeding, or sheltering behavioral patterns. 16 U.S.C. § 1532(19); 50 C.F.R. § 17.3.

7.      Forest management activities, including tree felling, log hauling and transport, and roadwork (falling under the umbrella term, "logging") pose numerous threats to the NSO. The NSO depends on older forest habitats that contain a multi-layered, multi-species, closed canopy with large overstory trees. These forest habitats provide structures for nesting, cover from predators, and sufficient open space to fly and hunt for prey. Logging activities that remove large trees, open the canopy, and otherwise reduce habitat complexity can pose dramatic adverse impacts to the NSO.

8.      Under ESA Section 7, before undertaking forest management activities that "may affect" NSO, the Forest Service must consult with the Service over a project's impacts, a process that concludes with the Service's issuance of a Biological Opinion ("BiOp"). The Service in a series of recent BiOps has found that forest management projects that cause "take" of owls will not jeopardize the continued existence of the species. To reach this conclusion, the Service has impermissibly evaluated the impacts of each individual project in a vacuum, rather than accounting for the precarious status of the species and the existential threats it faces.

9.      The most recent example of this troubling management regime is the SFS Project. The Project is an "omnibus" project in that it seeks to achieve a number of goals, including public safety, recreational improvements, and fire mitigation. Plaintiffs do not challenge many of the Project activities. Instead, Plaintiffs challenge the portion of the Project involving logging activities within NSO territories that provide habitat for reproductively successful owl pairs and dispersing individuals.

10.     The Service determined in the SFS Project BiOp that such activities would take up to 12 owls from two of the longest occupied territories in a 2.5-million-acre area—including two reproductively successful owl pairs and multiple years of offspring.

11.     Despite these adverse effects, the Service concluded that the Project is "not likely to jeopardize the continued existence" of the NSO. Plaintiffs challenge the Service's BiOp and

COMPLAINT - 3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

"no jeopardy" conclusion as arbitrary, capricious, and contrary to the ESA.

12.     In particular, the BiOp categorically fails to reconcile how the Project's "take" of 12 owls would not appreciably dimmish the likelihood of the owl's survival and recovery—in light of the perilous status of the species and when combined with other significant stressors including competition with barred owls, wildfires, and other logging projects.

13.     The Service's issuance of a "no-jeopardy" BiOp, and the Forest Service's reliance thereon, violates the ESA.

14.     Plaintiffs respectfully request that this Court vacate the BiOp, and remand to the agencies for additional ESA Section 7 consultation.

15.     If necessary, Plaintiffs intend to seek narrowly tailored injunctive relief during the pendency of this litigation to protect NSOs.

16.     Should they prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, the ESA, 16 U.S.C. § 1540(g)(4), and/or any other applicable authorities.

## JURISDICTION

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1531 (federal question); 5 U.S.C. §§ 706 *et seq.*, (Administrative Procedure Act); 16 U.S.C. § 1540(g) (Endangered Species Act); and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act).

## VENUE

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the district serves "the county in which the action arises." A civil action arises in the county in which "a substantial part of the events or omissions which give rise to the claim occurred[.]" 28 U.S.C. § 1391(e)(1). The SFS Project area, the Shasta-Trinity Forest Supervisor's office, and the Service's Yreka field office are located in Siskiyou County, which is served by the Eastern District of California.

19.     **Intradistrict Assignment**. Pursuant to L.R. 120(d), assignment of this matter to the Sacramento Division is proper because Siskiyou County is served by the Sacramento Division.

COMPLAINT - 4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

**PARTIES**

20.     Plaintiff KLAMATH FOREST ALLIANCE is a 501(c)(3) non-profit conservation organization incorporated in the State of California and based in Arcata, California. KFA works in the public interest with the mission to promote sustainable ecosystems and sustainable communities. KFA was founded in 1989 by residents of the Klamath and Salmon River watersheds and represents over 500 members and supporters. KFA participates in forest planning through agency engagement, substantive comments, and collaboration with the goal of protecting and restoring the biodiversity, fisheries, wildlife, mature forests, and public lands of the Klamath-Siskiyou Mountain region, including the Shasta-Trinity National Forest. KFA's members and supporters use and enjoy the Project area and spend time observing and monitoring northern spotted owls and their young as well as recreating in the mature and old forests where the owls live. They would be irreparably harmed if the Project moves forward without a lawful BiOp and if NSOs are harmed by the Project.

21.     Plaintiff CONSERVATION CONGRESS is a 501(c)(3) non-profit organization incorporated in the State of California, dedicated to maintaining, protecting, and restoring the native ecosystems of northern California. Conservation Congress has a longstanding organizational interest in the proper and lawful management of National Forests located in northern California, including the Shasta-Trinity National Forest. Conservation Congress also has an organizational interest in the protection of the NSO. Conservation Congress' members, staff, and board members participate in a wide range of aesthetic, scientific, business, and recreational activities, such as hiking, fishing, hunting, photography, wildlife viewing, appreciation of scenery, and bird watching, including attempts to view and appreciate the NSO in the Shasta-Trinity National Forest, including the specific federal lands involved in the Project, and have concrete plans to continue these activities. The organization's membership includes professional photography businesses and freelance photographers who earn income by photographing in northern California's National Forests. Conservation Congress' members, staff, and board members pursue, and have concrete plans to continue pursuing, these aesthetic, scientific business and recreational activities, including on the lands involved in the Project. These interests of

COMPLAINT - 5

1   Conservation Congress, its members, officers, and staff are substantial and are adversely affected

2   by Defendants' failure to comply with the ESA. The requested relief would redress the injuries of

3   Conservation Congress and its members, staff, and board members.

4   22.   Plaintiff ENVIRONMENTAL PROTECTION INFORMATION CENTER is a

5   nonprofit public benefit corporation organized under the laws of California and headquartered in

6   Arcata, California. Since 1977, EPIC has defended the wildlife and wild places of the Klamath

7   Mountains and North Coast Range. EPIC's mission is science-based protection and restoration of

8   Northwest California's forests and seeks to ensure that a connected landscape exists for species

9   survival and climate adaptation. EPIC's advocacy utilizes community organizing, public

10   education, collaboration, and, when necessary, litigation. EPIC submits substantive comments on

11   projects that would negatively impact public and private forestlands. Most of EPIC's 2,000

12   members and 13,000 supporters live in northern California. EPIC's members and staff use, enjoy,

13   and recreate on public lands, including those within the Project area on the Shasta-Trinity

14   National Forest. EPIC's members enjoy monitoring northern spotted owls and their young, as

15   well as recreating in the mature and old forests where the owls live. They would be irreparably

16   injured by the Project and the corresponding harm to NSOs.

17   23.   Plaintiff MOUNT SHASTA BIOREGIONAL ECOLOGY CENTER is a 501(c)(3)

18   non-profit organization incorporated in the State of California. Since 1988, the Mount Shasta

19   Bioregional Ecology Center ("MSBEC") has played a pivotal role in preserving the integrity of

20   Mount Shasta and its surroundings. MSBEC's bioregional perspective encompasses not only

21   natural interconnected systems, but also their cultural layers that constitute the human relationship

22   to the land. MSBEC works through public education, science-based public policy and advocacy,

23   legal challenges, restoration, watershed monitoring, forest stewardship, building partnerships and

24   alliances, and engaging the local community and tribes to connect with and protect our bioregion.

25   24.   Plaintiffs, and their members, supporters, and staff regularly visit and enjoy the

26   Forest, including the Project area, and intend to do so again in the near future. The members,

27   supporters, and staff appreciate the aesthetics of the Forest and use the area to engage in

28   recreational, scientific, and spiritual activities, such as hiking, camping, fishing, photography,

COMPLAINT - 6

watershed research, and observing wildlife, including and specifically focusing on northern spotted owls.

25.     Plaintiffs have organizational interests in the proper and lawful management of the Forest. Plaintiffs, and their members, supporters, and staff have participated extensively in relevant administrative actions and have actively participated in the Project's administrative process.

26.     Plaintiffs, and their members, supporters, and staff would sustain injury to aesthetic, educational, recreational, spiritual, and scientific interests if the Project proceeds as authorized and if NSOs are harmed by the project. Plaintiffs, and their members, supporters, and staff have concrete plans to return to the area where the Project is proposed. Unless this Court grants the requested relief, Plaintiffs, and their members, and staff will be adversely and irreparably harmed by the Project.

27.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("Service") is an agency within the U.S. Department of the Interior. The Service's Yreka Fish and Wildlife Office issued the challenged BiOp in this case.

28.     Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the U.S. Department of Agriculture. The Forest Service manages the Shasta-Trinity National Forest.

## **LEGAL BACKGROUND**

### **Endangered Species Act**

29.     Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species[.]" 16 U.S.C. § 1531(b).

30.     An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range[.]" 16 U.S.C. § 1532(6). A "threatened species" is any species which is likely to become endangered within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

COMPLAINT - 7

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-227-2212

31.     The Secretaries of Commerce and the Interior are responsible for administering and enforcing the ESA. 16 U.S.C. § 1532(15). The Secretaries of Commerce and the Interior delegated this responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service (collectively, the "Services"), respectively. 50 C.F.R. § 402.02(b)[1]. The National Marine Fisheries Service administers the ESA as to marine species and the U.S. Fish and Wildlife Service administers the ESA as to terrestrial and freshwater species.

32.     Section 9 of the ESA prohibits any "person" from "taking" any member of an endangered species or a threatened species for which protective regulations have been promulgated. 16 U.S.C. §§ 1538(a)(1), 1533(d); 50 C.F.R. § 17.31 (extending take prohibition to threatened species).

33.     The term "person" is defined broadly to include, *inter alia*, any "officer, employee, agent, department, or instrumentality of the Federal Government.

34.     The term "take" is defined broadly: "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect[.]" 16 U.S.C. § 1532(19). "Harm" means "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

35.     Section 4 of the ESA requires the Service to "designate any habitat" of a listed species that is considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). "Critical habitat" is defined as the "specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (1) essential to the conservation of the species and (II) which may require special management considerations or protection[.]" 16 U.S.C. § 1532(A)(i).

36.     Section 4 of the ESA also directs the Service to develop and implement "recovery plans . . . for the conservation and survival" of listed species and incorporate "a description of

---

[1] References to the ESA regulations are to the 2019 regulations, *see* 84 Fed. Reg. 44,976 (Aug. 27, 2019), as the BiOp was issued on November 20, 2023, prior to the promulgation of revised ESA regulations on April 5, 2024. 89 Fed. Reg. 24,268 (Apr. 5, 2024).

COMPLAINT - 8

such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species[.]" 16 U.S.C. §§ 1533(f)(1), 1533(f)(1)(B)(i).

37.     Section 7 of the ESA imposes substantive and procedural obligations on all federal agencies. Substantively, Section 7 provides that federal agencies must "insure [sic] that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

38.     The Services issued regulations implementing ESA Section 7 in 1986. 51 Fed. Reg. 19,957 (June 3, 1986) (codified at 50 C.F.R. § 402.02–.17). The Services issued revised regulations in 2019 and 2024. 84 Fed. Reg. 44,976 (Aug. 27, 2019); 89 Fed. Reg. 24,268 (Apr. 5, 2024).

39.     The Services define "jeopardize the continued existence of" as engaging "in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or distribution of that species." 50 C.F.R. § 402.02 (2019).

40.     "Recovery" means "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in [ESA Section 4(a)(1), 16 U.S.C. § 1533(a)(1)]." 50 C.F.R. § 402.02.

41.     Procedurally, Section 7 requires a federal agency (the "action agency") to engage in consultation with the applicable Service (the "consulting agency" before undertaking a discretionary action that may affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2).

42.     Section 7 consultation is either informal or formal. Informal consultation is a process designed to help the action agency determine whether to engage in formal consultation. 50 C.F.R. § 402.13. If the action agency determines that the proposed action may affect, but is "not likely to adversely affect" a listed species or critical habitat, and the applicable Service concurs in writing, formal consultation is not required. 50 C.F.R. § 402.14(b)(1).

43.     If the action agency decides that the action may affect, and is "likely to adversely affect" a listed species or critical habitat, the action agency must engage in formal consultation

COMPLAINT - 9

with the applicable Service. 50 C.F.R. § 402.14. Formal consultation also is required if the consulting agency does not concur in writing with the action agencies "not likely to adversely affect" determination. 50 C.F.R. § 402.14(b).

44.     During formal consultation, the Service must "add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4); *see also* 16 U.S.C. § 1536(a)(2). The BiOp must be based on the best available scientific and commercial data. 16 U.S.C. § 1536(a)(2).

45.     The BiOp must include: a summary of the information on which the BiOp is based; a detailed discussion of the "environmental baseline" of the listed species and critical habitat; a detailed discussion of the "effects of the action" on listed species and critical habitat; and the Service's "jeopardy" opinion. 50 C.F.R. § 402.14(h)(1).

46.     "Environmental baseline" "refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline." 50 C.F.R. § 402.02.

47.     "Effects of the action" are "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the

COMPLAINT - 10

1    action." 50 C.F.R. § 402.02.

2         48.    "Cumulative effects" are "those effects of future State or private activities, not

3    involving Federal activities, that are reasonably certain to occur within the action area of the

4    Federal action subject to consultation." 50 C.F.R. § 402.02.

5         49.    If the Service determines that the action is "[l]ikely to jeopardize the continued

6    existence of a listed species or result in the destruction or adverse modification of critical

7    habitat," the BiOp must include "reasonable and prudent alternatives." 50 C.F.R. § 402.14(h)(1),

8    (2).

9         50.    "Reasonable and prudent alternatives" refer to "alternative actions identified

10   during formal consultation that can be implemented in a manner consistent with the intended

11   purpose of the action, that can be implemented consistent with the scope of the Federal agency's

12   legal authority and jurisdiction, that is economically and technologically feasible, and that the

13   [Service] believes would avoid the likelihood of jeopardizing the continued existence of listed

14   species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R.

15   § 402.02.

16        51.    The Service must issue an "incidental take" statement to the action agency if, after

17   formal consultation, the Service concludes that the proposed action will result in take, but is not

18   likely to jeopardize a listed species or adversely modify critical habitat. 16 U.S.C. § 1536(b)(4).

19        52.    "Incidental take" refers to "takings that result from, but are not the purpose of,

20   carrying out an otherwise lawful activity conducted by" the action agency. 50 C.F.R. § 402.02.

21        53.    The incidental take statement must specify: the impact, i.e., the amount or extent,

22   of the incidental taking on the species; "reasonable and prudent measures" necessary or

23   appropriate to minimize the impact; and terms and conditions that must be complied with by the

24   action agency to implement the specified measures. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R.

25   § 402.14(i).

26        54.    "Reasonable and prudent measures" refer to "those actions the [Service] considers

27   necessary or appropriate to minimize the impact of the incidental take on the species." 50 C.F.R.

28   § 402.02.

COMPLAINT - 11

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-227-2212

55.    After the initiation of consultation, the action agency shall not make an irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives. 16 U.S.C. 1536(d).

56.    Section 11 of the ESA authorizes "citizen suits," in which "any person may commence a civil suit on his own behalf" against a governmental agency "who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof[.]" 16 U.S.C. § 1540(g)(1)(A).

57.    Plaintiffs' challenge to the Forest Service's substantive compliance with ESA Section 7 in relying on a legally flawed BiOp is reviewable pursuant to the ESA.

## Administrative Procedure Act

58.    The APA, 5 U.S.C. §§ 701–06 confers a right of judicial review on any person adversely affected by agency action. The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. The APA also authorizes a reviewing court to compel agency action that is unlawfully withheld or unreasonably delayed.

59.    Pursuant to APA Section 706(2)(A) and (D) a court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."

60.    Plaintiffs' challenge to the Service's procedural compliance with ESA Section 7 in issuing the BiOp and its "no jeopardy" conclusion is reviewable pursuant to the APA.

## FACTUAL BACKGROUND

### The Northern Spotted Owl (*Strix occidentalis caurina*)

61.    The NSO is a dark brown, mid-sized bird with a barred tail, white spots on its head and breast, and dark brown eyes surrounded by prominent facial discs (Fig. 1). Juveniles are identified by the presence of fluffy, cream-colored down feathers (Fig. 2).

///

///

COMPLAINT - 12

**Figure 1**: Adult NSO (U.S. Fish and Wildlife Service)



**Figure 2**: Juvenile NSO (U.S. Fish and Wildlife Service)



COMPLAINT - 13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

62.     The NSO has an average lifespan of approximately 10–15 years, and a reproductive life span of six to nine years. NSOs are sexually mature at one year of age, but rarely breed until they are two to five years of age. Breeding females lay one to four eggs per clutch, averaging two, but most NSO pairs do not nest every year, nor are nesting pairs successful every year. The small clutch size, temporal variability in nesting success, and delayed onset of breeding all contribute to the relatively low fecundity of the species.

63.     NSOs are generally monogamous and form long-term pair bonds. Courtship behavior usually begins in February or March, and females typically lay eggs in late March or April. After they leave the nest in late May or June, juvenile northern spotted owls depend on their parents until they are able to fly and hunt on their own. Parental care continues after fledging into September.

64.     NSOs are prey specialists. NSOs may forage opportunistically during the day, but are primarily nocturnal and their diets are dominated by four to six species of nocturnal mammals. In Northern California, flying squirrels and dusky-footed wood rats comprise a major part of the NSO's diet.

65.     NSOs are territorial raptors. NSOs range widely in search of prey but are anchored during the breeding season to a nest site. NSOs exhibit high fidelity to nest sites. For survey and management purposes, the Service defines an "activity center" as the location or point representing the best of detections around a central location such as a nest site.

66.     The 100 acres around a nest site is commonly referred to as the "nest stand." The ½-mile radius circle (500 acres) surrounding the nest site ordinarily sees concentrated use and is called the "core" area.

67.     The area traversed by an individual or pair in their normal activities of breeding, feeding, and sheltering is called the "home range" or territory, and it generally extends 1.3 miles in all directions around the nest site or activity center (approximately 3,398 acres).

68.     Because habitat in the interior portion of the NSO range in California is often more heterogenous than in coastal areas, core use areas and home ranges for NSOs are often more accurately depicted by non-circular polygons that often follow drainages where higher quality

COMPLAINT - 14

habitat is present. While actual core use areas and home ranges likely conform to the distribution of high-quality habitat and are therefore non-circular, the circular core area (1/2-mile radius circle) home range 1.3-mile radius circle) represent reasonable approximations of the area which territorial NSOs defend and obtain most resources.

69.     NSOs are habitat specialists. NSOs generally rely on older forests (also referred to as mid- late-successional or mid- late-seral forests) because such forests contain the structures and characteristics required for breeding, feeding, and sheltering.

70.     NSO habitat is categorized as either nesting/roosting ("NR"), foraging ("F"), or dispersal ("D") habitat, depending on the types of life activities it can support. NSOs need sufficient quantities of each habitat type to survive and reproduce.

71.     Suitable NSO habitat generally has moderate to high canopy closure (60% to 80%); a multi-layered, multi-species canopy dominated by large (>30 inches in diameter at breast height) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, dwarf-mistletoe infections, and other evidence of decadence); numerous large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for owls to fly. NSOs also can be found in younger forest stands that have similar structural characteristics to older forests or that have retained structural elements from the previous forest.

72.     In Northern California, where woodrats are a major component of their diet, NSOs are more likely to use a variety of stands, including younger stands, brushy openings in older stands, and edges between forest types in response to higher prey density in some of these areas.

73.     Nesting/roosting habitat provides structural features for nesting, shelter, protection from adverse weather conditions, and cover to reduce predation risks. In Northern California, nesting/roosting habitat typically ranges from a basal area of 150–240 ft$^2$/acre and 70–100% canopy closure, although there may be gaps and heterogeneity.

74.     Foraging habitat is essential to provide a food supply for survival and reproduction. In the Northern California, foraging habitat is defined as mixed-conifer stands ranging from 125–200+ ft$^2$/acre and an average stand diameter of trees >16 inches diameter at

COMPLAINT - 15

1    breast height. Canopy cover ranges from 20–100%.

2      75.    Dispersal habitat helps maintain stable populations by filling territorial vacancies,

3 providing an important linkage function among blocks of higher value NRF habitats, and

4 facilitating gene flow. For these reasons it is essential to NSO conservation. Dispersal habitat is

5 defined as stands with at least 40% canopy cover and trees >11 inches diameter at breast height,

6 the presence of and capability to support roost sites, and some understory composition that

7 contributes to prey base and minimal foraging opportunities.

8      76.    The habitat composition within cores and home ranges has been found to be

9 directly correlated with demographic response such as occupancy, reproductive success, survival,

10 and fitness. For example, the survival and fitness of NSOs is positively correlated with larger

11 patch sizes or proportion of older forests.

12      77.    Population growth can occur only if there is adequate habitat in an appropriate

13 configuration to allow for the dispersal of owls across the landscape.

14      78.    Survival rates of NSO decrease dramatically when the amount of non-suitable-

15 habitat exceeds approximately 50% of the home range.

16      79.    The historical range of the NSO extended from southwest British Columbia down

17 through the Cascade Mountains, coastal ranges, and intervening forested lands in Washington,

18 Oregon, and California, as far south as Marin County. The current range is smaller, as the NSO is

19 functionally extirpated or uncommon in certain areas, including southwestern Washington and

20 British Columbia due to logging activities eliminating, reducing, and fragmenting suitable habitat.

21 The major reduction in historical range is largely the result of timber harvest activities that

22 eliminated, reduced, or fragmented NSO habitat.

23      80.    In June of 1990, the Service listed the NSO as "threatened" under the ESA due to

24 concerns over widespread habitat loss, habitat modification, and lack of protective regulatory

25 mechanisms. *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg.

26 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)). Critical habitat for the NSO was first

27 designated in 1992 and was last revised in 2021. *Endangered and Threatened Wildlife and*

28 *Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl*, 86 Fed. Reg.

COMPLAINT - 16

1   62,606 (December 10, 2021) (codified at 50 C.F.R. § 17.05).

2        81.    Current threats to the NSO include the extensive past and present habitat loss and

3   degradation from timber harvests, past and ongoing effects from wildfires, effects on vegetation

4   from fire exclusion, and growing threats from climate change on Pacific Northwest forests.

5        82.    Another pressing threat to the NSO is competition with barred owls (*Strix varia*).

6   Barred owls, while native to eastern North America, are a recent arrival and invasive to the

7   western United States. These owls are slightly larger and more aggressive than the NSO and

8   compete for the same habitat, prey, and resources. Additionally, barred owls consume a wider

9   variety of food than NSOs and are considered "generalist predators"; this ultimately results in

10   barred owls occupying habitat in much higher densities than the NSO. The presence and

11   distribution of barred owls impacts both habitat quality and use by NSOs.

12        83.    NSOs can be displaced by habitat losses from wildfires and logging, and may have

13   increased difficulty in finding new territories to colonize or in expanding their home ranges to

14   compensate for habitat reductions when barred owls are present on the landscape.

15        84.    On June 5, 2024, the Service announced the notice of availability of a Final

16   Environmental Impact Statement and proposed Barred Owl Management Strategy, aimed at

17   addressing the threat of the non-native barred owl on NSOs and California spotted owls. *Final*

18   *Environmental Impact Statement for the Barred Owl Management Strategy; Washington, Oregon,*

19   *and California*, 89 Fed. Reg. 55,647 (July 5, 2024). The strategy proposes culling the barred owl

20   population within the range of the NSO to support NSO conservation. At this time, it is unknown

21   whether or when the strategy will be adopted or implemented.

22        85.    Even if the strategy is implemented, recovery of NSO will require short- and long-

23   term availability of suitable NSO habitat on the landscape. Protecting NSO high-quality habitat

24   will help mitigate negative competitive interactions where the species' home ranges overlap.

25        86.    On account of ongoing and increasing threats including habitat loss from logging

26   and wildfires and the invasion of the barred owl, the Service determined that "uplisting" the NSO

27   from threatened to "endangered" was warranted, although precluded at this time by higher

28   priority listing decisions. *Endangered and Threatened Wildlife and Plants; 12-Month Finding for*

COMPLAINT - 17

*the Northern Spotted Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020).

87.     The Service determined that the current rate of decline raises concerns about the long-term persistence of the NSO throughout the Pacific Northwest: the stressors acting on the NSO and its habitat, particularly rangewide competition from the nonnative barred owl and high-severity wildfire are of such imminent, intensity, and magnitude to indicate that the NSO is in danger of extinction throughout all of its range.

88.     The Service estimates that there are fewer than 3,000 individual NSOs across the species' entire range. The Service acknowledges that this may be an overestimation.

89.     Since the mid-1990s, rangewide data from 11 long-term demographic study areas ("DSAs") have been used to evaluate trends in NSO populations. In the most recent meta-analysis, 26 years of survey and capture-recapture data from the demographic study areas (including data through 2018) was used to analyze demographic traits, rates of population change, and occupancy parameters for NSO territories. The most recent annual rate of decline of -5.3% indicates that the NSO's extinction rate has significantly increased since the 1990 listing.

90.     Populations in the DSAs have declined from 32% to over 80% since the mid-1990s. These declines correspond to reduced apparent survival, declining recruitment, increased territorial extinction, decreased territorial colonization, reduced fecundity, and reduced occupancy.

91.     Several recent scientific and peer-reviewed papers have warned that if these trends continue, the NSO will become extirpated throughout large portions of its range in the next decade. In fact, the species may already be in an "extinction vortex," in which a species' decline to only a few individuals can lead to demographic stochasticity, inbreeding, and disrupted behaviors, resulting in a rapid progression to extinction in just a few years.

92.     The Service has determined that the only way to arrest the precipitous decline of the NSO and to have a high probability of preventing extinction is to both manage the barred owl threat and conserve adequate amounts of high-quality habitat distributed across the range in a pattern that provides acceptable levels of connectivity as well as protection from stochastic events.

COMPLAINT - 18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

93.     In support of the 2021 NSO critical habitat rule, the Service prepared and issued a Species Status Report in August, 2019. The principal finding was that the current rate of decline raises concerns about the long-term persistence of the NSO throughout the Pacific Northwest.

94.     For monitoring, management, and regulatory purposes, the range of the NSO is divided into twelve physiographic provinces. These provinces are based largely on the regional distribution of major forest types and state boundaries. California includes three provinces: California Coast Range, California Cascades, and California Klamath.

95.     The twelve provinces meet the criteria for and are used by the Service as "recovery units." "Recovery units" are management subsets of the listed species that are created to establish recovery goals or carrying out management actions.

96.     According to the Service, when a proposed Federal action is likely to impair or preclude the capacity of a recovery unit to provide both the survival and recovery function it provides, that action may represent jeopardy to the species.

97.     As required by ESA Section 4, the Service published a Revised Recovery Plan for the NSO in 2011. 16 U.S.C. §1533(f). The Revised Recovery Plan sets recovery goals, objectives, criteria, and actions.

98.     The Recovery Goal is to improve the status of the species so it can be removed from protection under the ESA.

99.     The Revised Recovery Plan describes three Recovery Objectives, which are broad statements that describe the conditions under which the Service would consider the NSO to be recovered: (1) NSO populations are sufficiently large and distributed such that the species no longer requires listing under the ESA; (2) Adequate habitat is available for NSO and will continue to exist to allow the species to persist without the protection of the ESA; and (3) The effects of threats have been reduced or eliminated such that NSO populations are stable or increasing and NSO are unlikely to become threatened again in the foreseeable future.

100.    The Revised Recovery Plan describes four Recovery Criteria, which are measurable, achievable goals the Service believes will result from the implementation of Recovery Actions: (1) Stable population trend; (2) Adequate population distribution; (3)

COMPLAINT - 19

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    Continued maintenance and recruitment of NSO habitat; and (4) Post-delisting monitoring.

2          101.    The Revised Recovery Plan describes 33 Recovery Actions, which are

3    recommendations to guide the activities needed to accomplish the recovery objectives and

4    achieve the Recovery Criteria.

5          102.    Two Recovery Actions are particularly relevant to logging activities in NSO

6    habitat on Federal land: 10 and 32. Recovery Action 10 provides: Conserve spotted owl sites and

7    high value NSO habitat to provide additional demographic support to the NSO population. The

8    basis for Recovery Action 10 is the Service's recommendation to conserve occupied NSO sites

9    throughout the species' range, especially those containing the habitat conditions to support

10   successful reproduction. Because NSO on established territories are likely to be more successful

11   if they remain in those locations, managing to retain NSO at existing sites should be the most

12   effective approach to bolstering the demographic contribution of a habitat conservation network

13   and the highest priority for land managers.

14         103.    Recovery Action 32 provides: Because NSO recovery requires well distributed,

15   older and more structurally complex conifer forests on Federal and non-federal lands across its

16   range, land managers should work with the Service to maintain and restore such habitat while

17   allowing for other threats, such as fire and insects, to be addressed by restoration management

18   actions. These high-quality NSO stands are characterized as having large diameter trees, high

19   amounts of canopy cover, and decadence components such as broken-topped live trees,

20   mistletoes, cavities, large snags, and fallen trees.

21         104.    In 2012, the Service promulgated a critical habitat rule. *Endangered and*

22   *Threatened Wildlife and Plants: Designation of Revised Critical Habitat for the Northern Spotted*

23   *Owl*, 77 Fed. Reg. 71,876 (Dec. 4, 2012). In 2021, the Service revised the Critical Habitat rule,

24   but the new rule did not affect any previously designated critical habitat in California.

25   *Endangered and Threatened Wildlife and Plants: Designation of Revised Critical Habitat for the*

26   *Northern Spotted Owl*, 86 Fed. Reg. 62,606 (Nov. 10, 2021).

27         105.    Critical habitat for NSO is intended to protect and restore high-quality NRF habitat

28   and good quality dispersal habitat to promote viable and persistent populations throughout the

COMPLAINT - 20

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    NSO's range.

2         106.    The physical and biological features ("PBFs") of NSO critical habitat include: PBF

3    1 – forest types that occur in concert with the other PBFs and that support NSO across its

4    geographic range; PBF 2 – habitat that provides for nesting and roosting; PBF 3 – habitat that

5    provides for foraging; and PBF 4 – habitat that provides for dispersal.

6                                    **The SFS Project**

7         107.    The SFS Project area is located on National Forest System lands above Lake

8    Siskiyou, approximately three miles west of Mount Shasta City, California. Elevations range from

9    about 3,200 feet below Lake Siskiyou to 9,025 feet near Mount Eddy.

10        108.    The Project will "treat" through various vegetation management activities

11   approximately 16,285 acres. Activities include (but are not limited to) 12,000 acres of

12   commercial timber harvest and 830 acres of understory thinning, prescribed burning, and

13   roadwork.

14        109.    Timber harvest activities are expected to be completed within approximately 10

15   years. Fuel treatment activities are expected to be completed within one to three years after

16   completion of timber harvest activities, with additional burning every five to 10 years.

17        110.    The stated needs of the Project are to improve public safety in the event of a

18   wildfire, improve fire resilience of forests, and improve recreational opportunities.

19        111.    The Forest Service claimed that some of the treatment activities would reduce the

20   likelihood of NSO habitat loss due to stand-replacing wildfire.

21        112.    In ongoing correspondence with the Forest Service during the development of the

22   Project, the Service warned that numerous elements of the Project are significant in terms of their

23   likely adverse effects to NSO.

24        113.    The Service encouraged more consideration of the NSO's continued demographic

25   decline, and the accumulated impacts to territories, suitable habitat, and critical habitat over the

26   past several years on the Forest, resulting from a combination of timber harvest and wildfire.

27        114.    The Service took the position that the Project could be more strategically designed

28   and modified in order to still create forest stand and fire resilience without risking the reasonable

COMPLAINT - 21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

certainty of "take" of or harm to NSO pairs, individuals, or their young.

115.   Overall, during both formal consultation and informal conferrals there were disagreements between the agencies about the scope and magnitude of impacts to NSOs.

116.   For example, the Service disputed the wisdom of logging in current NSO habitat for the speculative goal of protecting habitat from a future wildfire. The Service noted that observations from recent fires on the Forest and adjacent national forests indicate that wind-driven fires during extreme temperature and low relative humidity conditions are not preventable due to the extreme weather conditions.

117.   The Service underscored that the effects of projects designed to influence fire severity are uncertain at best. In contrast, the best available scientific and commercial information indicates that current suitable owl habitat, especially nesting/roosting habitat, is resistant to high severity fire and can serve as a buffer to negative impacts. Nesting/roosting habitat—without active management—has a lower probability of burning at moderate or high severity, as compared to other forest types.

118.   Per the NSO Recovery Plan, treatments where long-term benefits clearly do not outweigh short-term risks should be avoided. The Recovery Plan instead prioritizes protecting occupied sites and high value habitat.

119.   The Project's treatments in current suitable and occupied NSO habitat, with the speculative goal of influencing future fire behavior, are inconsistent with the Recovery Plan and the best available scientific and commercial information.

120.   On other projects, such as Bear Country (Consultation 08EYRE00-F-2022-0036749), the Forest Service has been able to pursue its fire mitigation goals, while strategically placing treatments so as to not adversely affect NSO reproductive behaviors or success in occupied core areas. This is accomplished in part by not removing high value habitats that are important for the successful reproduction of NSOs and long-term recovery.

**The SFS Project BiOp**

121.   On November 20, 2023, the Service issued its BiOp for the SFS Project.

122.   The BiOp describes the "action area" for purposes of consultation, comprised of

COMPLAINT - 22

1   "all areas to be affected directly or indirectly by the Federal action and not merely the immediate
2   area involved in the action." 50 C.F.R. § 402.02. For the SFS Project, the Service set the action
3   area as a 1.3-mile buffer around all proposed treatments.

4       123.    The action area sits within two physiographic provinces/recovery units: California
5   Cascades and California Klamath. (Numbers 12 and 10, respectively, of Figure 3.) NSO
6   populations in the California Cascades and California Klamath recovery units are considered
7   principal zones of NSO productivity that play a critical role in maintaining overall population
8   stability. These recovery units contain a "source" population of NSOs.

9   **Figure 3: Map of NSO Physiographic Provinces (U.S. Fish and Wildlife Service)**



25      124.    The California Cascades recovery unit encompasses approximately 2.5 million
26  acres at the eastern extent of the NSO's range in California. It lies south of the Oregon Eastern
27  and Western Cascades recovery units, and east of the California Klamath recovery unit.

COMPLAINT - 23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

125.     The California Cascades recovery unit is recognized as providing an important contribution to NSO conservation. While habitat in the recovery unit is fragmented, including by large landscape features (Mount Shasta and the Shasta Valley), it serves as an important linkage between NSO and California spotted owl ranges.

126.     Given the relatively lower quality habitat in the recovery unit, conserving available habitat is more important to the continued use of an area by NSOs for demographic support, gene flow, and connectivity. Local demographic stability to known and future NSO pairs and individuals is also an important objective of the recovery unit.

127.     The California Klamath recovery unit encompasses approximately six million acres and extends from the Oregon border with California, south to the Clear Lake Basin within the Inner Coast Range. It lies between the California Coast and California Cascades recovery units and is bordered to the north by the Oregon Klamath recovery unit.

128.     The California Klamath recovery unit is considered essential to NSO conservation because it helps maintain habitat linkages, provides demographic support among NSO populations, supports dispersal, maintains the potential for genetic interchange between populations, and tempers (to a certain extent) the adverse effects caused by competition with barred owls.

129.     Along with the Oregon Klamath recovery unit, the California Klamath recovery unit is considered to be a demographic stronghold for the rangewide population, with continued reproduction that plays a critical role in maintaining population stability. Both recovery units contain a "source" population of NSOs and therefore are targeted for habitat protection and restoration.

130.     Despite its importance for NSO conservation, there is concern for recruitment, genetic diversity and vigor, and overall long-term population stability of NSOs within the California Klamath recovery unit.

131.     The Service does not have current population estimates for either recovery unit. Based on various sources, the Service estimates that the adverse impacts from the Project may influence approximately 21 percent of the estimated population.

COMPLAINT - 24

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-227-2212

132.    The action area is within the 2012 East Cascades Designated Critical Habitat Unit 8 (totaling 368,381 acres), subunit ECS-3 (East Cascades South) (totaling 112,179 acres). All of the subunit is on lands managed by the Forest Service. The designated function of the ECS-3 subunit is to provide demographic support in an area of sparsely distributed high-quality habitat and Federal land, and to provide population connectively between subunits to the north and south. It has been designated as essential for population connectivity.

133.    Within the action area, there are currently 11,920 acres of critical habitat.

134.    The Service determined that the primary effects to NSOs and NSO habitat from the Project would occur from habitat modification. (Disturbance from noise and smoke were believed to be mitigated through seasonal restrictions.) Adverse effects are anticipated from habitat loss, reduction, and continuous areas of effects in currently occupied sites and important connectivity areas.

135.    The effects of the Project are expected to impair NSO breeding, feeding, and sheltering behaviors in two occupied core use areas and home ranges, and connectivity between the two sites.

136.    At the Project scale, approximately 1,986 acres of nesting/roosting habitat, 6,161 acres of foraging habitat, and 4,065 acres of dispersal habitat are proposed for treatment. This includes portions of the two occupied cores and home ranges, the connectivity corridors between them, and other connectivity areas in the action area.

137.    The Service noted that the overlapping and continuous treatments that reduce stand basal areas, canopy cover and closure, layering, snags, and downed wood would negatively impact NSOs attempting to use or cross those areas from increased vulnerability to predation or reduced prey availability of flying squirrels or woodrats.

138.    The Service uses specific terminology to categorize the estimated degree of change to habitats used by NSOs, and the potential of the change to alter habitat amounts and function. "Degrade" describes the effect when treatments have a negative impact on the quality of NSO habitat by removing or reducing habitat elements, but not to the degree that the pre-treatment habitat changes.

COMPLAINT - 25

139.    "Downgrade" describes the effect when treatments reduce nesting, roosting, or foraging habitat elements to the degree the habitat will not function in its pre-treatment capacity, but the habitat will continue to function at the next lower habitat level.

140.    "Remove" describes the effect when treatments remove and reduce habitat elements to the degree that the habitat no longer functions in its pre-treatment condition as nesting, roosting, or foraging.

141.    The Service assumes "adverse effects" can occur if an action reduces the quantity or quality of existing nesting, roosting, foraging, or dispersal habitat to an extent that it would be likely to impair breeding, feeding, or sheltering behaviors of an individual NSO.

142.    Within nesting/roosting habitat, the Project would remove 685 acres, downgrade 120 acres, and degrade 1,123 acres. The Service noted, however, that some of the nesting/roosting habitat characterized as "downgrade" may not actually provide sufficient habitat conditions for foraging or dispersal and should instead be characterized as "remove." As well, while some of the areas characterized as "degrade" would technically still qualify as nesting/roosting habitat, the continuous treatments in the occupied sites and higher value habitat would result in cumulative adverse impacts to NSOs and their prey.

143.    Within foraging habitat, the Project would remove 2,578 acres, and degrade 3,357 acres. The Service noted, however, that some of the foraging habitat characterized as a "degrade" may not actually provide foraging habitat conditions or sustain prey.

144.    Within dispersal habitat, the Project would remove 1,549 acres, and degrade 632 acres.

145.    Overall, at least 4,812 acres of owl habitat would be removed, 120 acres downgraded, and 5,112 acres degraded.

146.    The Service determined that the Project would adversely affect 5,900 acres—4,351 of nesting/roosting/foraging habitat, and 1,549 acres of dispersal habitat—from habitat loss and modification.

147.    The Project would treat stands that have been mapped as "fire refugia"—areas that have been historically resistant to wildfire. These stands have similar characteristics to

COMPLAINT - 26

1   nesting/roosting habitat because they contain higher tree and snag densities and downed wood.

2   NRF habitat would be removed from mapped fire refugia. The Service observed the apparent

3   inconsistency in removing this habitat where it is intended to provide refuge habitat for NSO (and

4   other species) in a time of rapid change.

5       148.    The Project would treat 7,535 acres of critical habitat. 2,540 acres of PBFs 2, 3,

6   and 4 would be removed. 89 acres of PBF 2 would be downgraded or removed, depending on the

7   magnitude of impacts from thinning and follow-up treatments. 770 acres of PBF 3 would be

8   degraded, downgraded, or removed, depending on the magnitude of impacts from thinning and

9   follow-up treatments. 2,755 acres of PBFs 2, 3, and 4 would be degraded.

10       149.    The BiOp describes five NSO activity centers within the action area; two of them

11   are considered to be occupied by territorial pairs: Soapstone and Scott (Fig. 4). While long-term

12   occupancy of one territory—Morgan—has not been demonstrated, the habitat within it remains

13   important for NSOs in the action area during natal dispersal or use, or for nonterritorial owls.

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

COMPLAINT - 27

**Figure 4**: Map of Project Treatments in NSO Home Ranges (U.S. Fish and Wildlife Service)



150.     Soapstone and Scott have a long-term history of occupancy. They comprise two of the longest-occupied NSO territories in the California Cascades recovery unit since the 1990 listing. The two territories contribute to the local population and populations in both the California Cascades and California Klamath recovery units.

151.     More specifically, these two territories have continuously contributed to the long-term persistence of NSO in the action area and to NSO populations in both recovery units and the range-wide scale over the last 35 years.

152.     Upon information and belief, at least one of the pairs of NSOs occupying the territories successfully reproduced and is raising owlets in 2024.

153.     At the activity center scale, the Service recommends maintaining a minimum of 250 acres of nesting/roosting and 150 acres of foraging habitat for a total of 400 acres of NRF in

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

the core; and 1,336 acres of NRF habitat in the home range (or about 40%).

154.     Currently, both the Scott and Soapstone territories, as well as historic Morgan, are considered above recommended thresholds at the home range scale: 2,651 acres (Scott), 2,176 acres (Soapstone), 1,785 acres (Morgan). Scott and Morgan are below the recommended thresholds for the core area scale: 386 acres (Scott), 353 acres (Morgan). Soapstone is above the threshold at 497 acres.

155.     The Project will reduce the amount of NRF habitat in all three activity centers. After treatment, barely sufficient NRF habitat will remain in the Scott territory home range: 1,431. Only 271 acres of NRF habitat will remain in the core, well below the recommended threshold of 400 acres.

156.     After treatment, 1,770 acres of NRF in the home range and 475 acres of NRF in the core will remain in the Soapstone territory, above recommended thresholds, but at a reduction from current values.

157.     After treatment, 1,533 acres of NRF habitat will remain in the Morgan territory (above threshold) and 353 acres of NRF habitat will remain in the core (below threshold).

158.     The Project's changes to the distribution, amount, and quality of NRF habitats will adversely impact NSO prey through direct injury or mortality and displacement cause by repeated, cumulative habitat disturbance. Effects to prey will negatively influence NSO fitness in the action area due to higher energy expenditures to locate prey.

159.     Barred owls have been detected within and in close proximity to the action area. While the Service expects competitive interactions between NSOs and barred owls to occur regardless of Project implementation, habitat loss can intensify competition between the two species. In areas where the two species compete directly for resources, maintaining larger amounts of older, higher-quality forest may help NSOs persist and reduce competitive interactions.

160.     By removing, reducing, or degrading NRF and high-quality habitat known to be used by NSOs in the action area, combined with the likely presence of barred owls in and near the action area, the Project is likely to exacerbate competitive interactions between the two species.

COMPLAINT - 29

The Service, however, stated that it is unknown how, or to what extent, barred owls will influence future NSO demographics in the action area and surrounding landscape.

161.    Project treatments are expected to create a connectivity barrier throughout portions of the action area and to the west into the California Klamath recovery unit and neighboring critical habitat subunits.

162.    The effects of the action are expected to impair NSO breeding, feeding, and sheltering behaviors in two occupied core areas and home ranges and connectivity areas between the two sites. Reproduction, numbers, and distribution of NSO in the action area will be reduced over the first ten years of implementation.

163.    The Service estimated that two pairs (four adults) and eight young or subadult NSOs would be "taken" by the effects of the Project.

164.    The Service determined that there would be negative impacts to the demographic contributions from two occupied NSO sites for ten years.

165.    The Service determined that the Project is not consistent with recovery goals and actions, particularly with respect to active management in occupied sites (Recovery Action 10) and conserving high quality habitat (Recovery Action 32).

166.    Within a 30-square-mile area centered on the action area, there are 29 recognized activity centers (2000–2022). Since 2015, only four have had confirmed nesting. Accordingly, the Project would impact half (2 out of 4) of the area's remaining activity centers with confirmed nesting.

167.    Despite the short- and long-term effects of the Project, the Service concluded that the Project is not likely to jeopardize the continued existence of the NSO or cause the adverse modification or destruction of NSO critical habitat.

168.    At the recovery unit scale, the Service concluded that the Project's "localized effects" are not expected to preclude the survival or recovery of the species. The Service averred that the Project is not expected to "measurably influence" the provincial baseline.

169.    At the rangewide scale, the Service likewise concluded that the Project's adverse effects are not expected to appreciably reduce the likelihood of both the survival and recovery of

COMPLAINT - 30

the species. The Service averred that the take of 12 individuals represents less than one percent of the current rangewide population estimate of 3,000 NSOs.

**Additive Threats to NSO in the Two Recovery Units**

170.     The Service's "no jeopardy" conclusion rests on the fact that the survival and recovery of the species will not be impacted at the recovery unit or rangewide scales because the Project will affect a relatively small number of owls. That conclusion necessarily assumes the stability and continued persistence of owls outside the action area.

171.     The Service has a pattern and practice of issuing "no jeopardy" BiOps and authorizing incidental take for forest management projects affecting the California Cascades and California Klamath recovery units. The SFS BiOp does not mention, let alone evaluate, these projects and their overlapping impacts on NSO in the two recovery units.

172.     On June 1, 2023, the Service issued a "no jeopardy" BiOp for the McFarland Project on the Shasta-Trinity National Forest (2022-0028191-S7). The Service authorized incidental take of six NSOs in the California Klamath recovery unit.

173.     On February 27, 2023, the Service issued a "no jeopardy" BiOp for the Region 5 Post Disturbance Hazardous Tree Management Project, which includes management activities on the Shasta-Trinity National Forest (Consultation 2022-0013868-S7-001, 2022-0013866-S7-001, 2022-0013869-S7-001, 2022-0013867-S7-001). The Service authorized incidental take of an unknown number of NSOs associated with eight probable activity centers in the California Cascades and California Klamath recovery units.

174.     On February 2, 2022, the Service issued a "no jeopardy" BiOp for the Plaskett-Keller Project on the Mendocino National Forest (Consultation AFWO-2022-000115). The Service authorized incidental take 12 NSOs in the California Klamath recovery unit.

175.     On September 5, 2020, the Service issued a "no jeopardy" BiOp for the Sierra Pacific Industries Habitat Conservation Plan on private timberlands in Northern California (Consultation 08EYRE00-2020-F-0151). The Service authorized incidental take of 115 NSOs in the California Cascades and California Klamath recovery units.

176.     On October 22, 2019, the Service issued a "no jeopardy" BiOp for the Crawford

COMPLAINT - 31

1   Project on the Klamath National Forest (Consultation 08EYRE00-2019-F-0214). The Service

2   authorized incidental take of four NSOs in the California Klamath recovery unit.

3        177.    On September 4, 2018, the Service issued a "no jeopardy" BiOp for the Seiad-

4   Horse, Oak Roadside Hazard, Horse-Creek – Robinson, Johnny O'Neil, and 2017 Emergency

5   Consultation Projects on the Klamath National Forest (Consultation 08EYRE00-2012-I-0007-

6   R004, 08EYRE00-2018-F-0230, 08EYRE00-2018-F-0231, 08EYRE00-2018-F-0229,

7   08EYRE00-2018-F-0228). The Service authorized incidental take of four NSOs in the California

8   Klamath recovery unit.

9        178.    On April 13, 2018, the Service issued a "no jeopardy" BiOp for the Pettijohn

10   Project on the Shasta-Trinity National Forest (Consultation 81330-2009-F-0027-R001). The

11   Service authorized incidental take of four NSOs in the California Klamath recovery unit.

12        179.    On February 19, 2016, the Service issued a "no jeopardy" BiOp for the Westside

13   Project on the Shasta-Trinity National Forest (Consultation 08EYRE00-2015-F-0023). The

14   Service authorized incidental take of over 100 NSOs in the California Klamath recovery unit.

15        180.    In addition to the incidental take of NSOs, these and other forest management

16   projects have adversely affected NSO habitat. Between 2012 and 2021, land management projects

17   on federal land downgraded or removed at least 174 acres and 1,114 acres of nesting and roosting

18   habitat in the California Cascades and California Klamath recovery units, respectively. Between

19   2012 and 2021, land management projects on federal land downgraded or removed at least 819

20   acres and 2,109 acres of foraging habitat in the California Cascades and California Klamath

21   recovery units, respectively.

22        181.    Upon information and belief, the Service has never issued a "jeopardy" and/or

23   "adverse modification" BiOp for a project impacting owls in the California Cascades recovery

24   unit.

25        182.    Upon information and belief, the Service has never issued a "jeopardy" and/or

26   "adverse modification" BiOp for a project impacting owls in the California Klamath recovery

27   unit.

28        183.    Upon information and belief, the Service has never issued a "jeopardy" and/or

COMPLAINT - 32

"adverse modification" BiOp for a project impacting owls anywhere in the range of the NSO.

184.    The impacts of the above-described projects (and others) are additive to the impacts from wildfires and competition with barred owls in the California Cascades and California Klamath recovery units.

185.    In the California Klamath recovery unit, between 2012–2021, 104,300 acres of nesting/roosting habitat and 31,643 acres of foraging was either downgraded or removed because of natural events including wildfires.

186.    In both recovery units, barred owls have confirmed nesting and occupancy, and are being detected at higher frequencies.

**Notice of Intent**

187.    On June 20, 2024, Plaintiffs provided written notice ("Notice Letter") of their intention to sue for violations of the ESA, pursuant to 16 U.S.C. § 1540(g)(2)(A)(i). A true and correct copy of the Notice Letter is appended as Exhibit 1.

188.    Along with the Notice Letter, Plaintiffs submitted to the agencies a report prepared by owl biologist Tonja Chi, M.S. based on detailed field research in the action area. Ms. Chi documented serious discrepancies in habitat typing (as nesting, roosting, foraging, or dispersal habitat) between on-the-ground conditions and what the Forest Service had reported in project documents.

189.    More than 60 days have passed since written notice was provided to the Secretary, Service, and Forest Service.

**FIRST CLAIM FOR RELIEF**

**(Against Defendant Service for Issuing an Unlawful BiOp –**

**Endangered Species Act/Administrative Procedure Act Violation)**

190.    Plaintiffs repeat and hereby incorporate by reference the allegations contained in the above paragraphs.

191.    The Service's issuance of a BiOp is a "final agency action" subject to judicial review under the APA.

192.    Pursuant to ESA Section 7, the Service must—based on the best available

COMPLAINT - 33

1   scientific and commercial data—formulate its biological opinion as to whether an action is likely

2   to jeopardize the continued existence of listed species or result in the destruction or adverse

3   modification of critical habitat. 16 U.S.C. § 1536(a)(2).

4        193.    "Jeopardize the continued existence of means to engage in an action that

5   reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both

6   the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or

7   distribution of that species." 50 C.F.R. § 402.02.

8        194.    In formulating its jeopardy conclusion, the Service must account for four factors

9   by adding (1) the effects of the action and (2) cumulative effects to (3) the environmental

10   baseline, in light of (4) the status of the species and critical habitat. 50 C.F.R. § 402.14(g)(4).

11       195.    In issuing the SFS BiOp and "no jeopardy" opinion the Service offered

12   explanations that run counter to the evidence before the agency, failed to articulate a rational

13   connection between the facts found and the choice made, and failed to consider important aspects

14   of the problem.

15       196.    The SFS BiOp fails to present a complete and accurate description of the effects of

16   the action, based on the best available scientific and commercial data. For example, the Service

17   failed to adequately account for the indirect effects of (1) the invasion of barred owls and the

18   consequences of increased competitive interactions between the two species; and (2) how climate

19   change may amplify the effects of the Project—and vice versa.

20       197.    The SFS BiOp fails to present a complete and accurate description of the

21   environmental baseline, based on the best available scientific and commercial data. For example,

22   the Service failed to account for the adverse effects of past and present projects with aggregate

23   impacts within the two recovery units. The Service defined the "action area" artificially narrowly,

24   with the consequence of excluding these projects from consideration.

25       198.    The SFS BiOp fails to present a complete and accurate description of the status of

26   the species, based on the best available scientific and commercial data. For example, the Service

27   does not have a scientifically validated current population estimate for NSOs at either the

28   recovery unit or rangewide scales. Nor does the BiOp identify a "tipping point" for the species—

COMPLAINT - 34

1    the point from which there is low or zero likelihood of recovery.

2          199.    Overall, the Service failed to rationally explain its conclusion that the Project

3    would not reduce appreciably the likelihood of both the survival and recovery of the species. For

4    example, while the Service noted the Project's inconsistency with certain Recovery Actions in the

5    Recovery Plan, the jeopardy analysis does not reconcile this inconsistency or address

6    inconsistency with Recovery Criteria and other fundamental aspects of the Recovery Plan.

7          200.    Nor does the jeopardy analysis distinguish between the distinct survival and

8    recovery needs of the species, in order to support the conclusion that the NSO's recovery would

9    not be appreciably diminished. The best available scientific and commercial data suggests that the

10   NSO may already be in an "extinction vortex," and the Service failed to rationally explain how

11   the species can absorb the impacts of the Project in light of the ongoing and pervasive local,

12   regional, and rangewide threats—and still continue on the path to recovery.

13         201.    Ultimately, the Service failed to adequately account for the perilous status of the

14   species—on account of rangewide stressors like habitat loss and competition with barred owls,

15   and more localized stressors like past and present projects that degrade habitat—and situate the

16   Project's take of owls from demographically critical NSO territories within that context. In other

17   words, the Service failed to rationally explain how a species in steep decline can sustain further

18   losses of reproductively successful pairs, and yet still maintain the possibility of recovery.

19         202.    The SFS BiOp and "no jeopardy" conclusion are arbitrary, capricious, and not in

20   accordance with the ESA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2).

21                          **SECOND CLAIM FOR RELIEF**

22        **(Against Defendant Forest Service for Reliance on an Unlawful BiOp –**

23        **Endangered Species Act/Administrative Procedure Act Violation)**

24         203.    Plaintiffs repeat and hereby incorporate by reference the allegations contained in

25   the above paragraphs.

26         204.    ESA Section 7 imposes on the Forest Service a substantive duty to "insure" that

27   agency action like the SFS Project is not likely to jeopardize the continued existence of listed

28   species like NSO or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2).

COMPLAINT - 35

205.     The Forest Service may not escape liability by simply relying on the Service's BiOp; the agency cannot meet its Section 7 obligations by relying on a BiOp that is unlawful and legally flawed.

206.     For all of the reasons described above in Claim 1, the Service's BiOp suffers from a series of legal flaws.

207.     The Forest Service relied on the BiOp in issuing its Decision Notice.

208.     By relying on an unlawful and legally flawed BiOp, the Forest Service has violated its duties under ESA Section 7. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1540(g)(1)(A).

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the following relief from this Court:

(a)     DECLARE the Service's Biological Opinion arbitrary, capricious, and not in accordance with the ESA;

(b)     DECLARE the Forest Service's reliance on the Biological Opinion arbitrary, capricious, and not in accordance with the ESA;

(c)     VACATE the Biological Opinion, and REMAND to the Service for additional consideration;

(d)     ISSUE preliminary and permanent injunctive relief prohibiting the Forest Service from implementing the SFS Project where such implementation may affect NSO, unless and until the agencies have completed lawful ESA Section 7 consultation;

(e)     AWARD Plaintiffs their costs, including expenses, expert witness fees, and reasonable attorney's fees under applicable law; and

(f)     GRANT Plaintiffs such further relief as this Court deems just and proper.

DATED this 28th day of August, 2024

///

///

///

///

COMPLAINT - 36

1   Respectfully submitted,

2       /s/ Oliver J. H. Stiefel
        Oliver J. H. Stiefel (OR Bar # 135436)
3       (503) 227-2212 | oliver@crag.org
        Meriel L. Darzen (OR Bar # 113645)
4       (503) 525-2725 | meriel@crag.org
        CRAG LAW CENTER
5       3141 E. Burnside St.
        Portland, Oregon 97214
6       Fax: (503) 296-5454

7       /s/ Thomas E. Wheeler
        Thomas E. Wheeler (CA Bar No. 304191)
8       (707) 446-9027 | tom@wildcalifornia.org
        ENVIRONMENTAL PROTECTION INFORMATION CENTER
9       145 G. Street, Suite A
        Arcata, CA 95521

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 37