Oliver J. H. Stiefel (OR Bar No. 135436)
(503) 227-2212 | oliver@crag.org
Meriel L. Darzen (OR Bar No. 113645)
(503) 525-2725 | meriel@crag.org
Kelsey Y. Dunn (OR Bar No. 244709)
(503) 234-0788 | kelsey@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, OR 97214
LEAD COUNSEL
*Pro Hac Vice*

Thomas E. Wheeler (CA Bar No. 304191)
(707) 446-9027 | tom@wildcalifornia.org
ENVIRONMENTAL PROTECTION INFORMATION CENTER
145 G. Street, Suite A
Arcata, CA 95521
LOCAL COUNSEL

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KLAMATH FOREST ALLIANCE**, a California non-profit corporation, **CONSERVATION CONGRESS**, a California non-profit corporation, **ENVIRONMENTAL PROTECTION INFORMATION CENTER**, a California non-profit corporation, and **MOUNT SHASTA BIOREGIONAL ECOLOGY CENTER**, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES FISH AND WILDLIFE SERVICE**, and **UNITED STATES FOREST SERVICE**, <br><br> Defendants. | No. 2:24-cv-02347-DC-CSK <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCITON** |

1

# TABLE OF CONTENTS

2   TABLE OF CONTENTS ............................................................................................ i

3   TABLE OF AUTHORITIES ..................................................................................... iii

4   GLOSSARY OF TERMS .......................................................................................... vi

5   PROJECT AREA MAPS ........................................................................................... vii

6   IMAGE OF NORTHERN SPOTTED OWL ............................................................ vii

7   NOTE ON ADMINISTRATIVE RECORDS AND BATES STAMP CITE FORM .................. viii

8   INTRODUCTION ..................................................................................................... 1

9   LEGAL FRAMEWORK AND STANDARD OF REVIEW ..................................... 2

10   I. Endangered Species Act ..................................................................................... 2

11   II. Administrative Procedure Act ........................................................................... 3

12   III.  Preliminary Injunction .................................................................................... 3

13   FACTUAL BACKGROUND ................................................................................... 4

14   I.    The Northern Spotted Owl ............................................................................... 4

15   II.   The South Fork Sacramento Project and Biological Opinion ........................ 6

16   III.   Additive Threats .............................................................................................. 7

17   IV.   Imminent Logging Operations ....................................................................... 9

18   ARGUMENT ............................................................................................................ 11

19   I.    Plaintiffs Are Likely to Succeed on the Merits. ............................................. 11

20   A. The Service Failed to Rationally Explain Why the SFS Project Would Not
        Appreciably Impair the Owls' Recovery Prospects. ..................................... 12

21
22   B.  The Service Failed to Rationally Explain Its "No Jeopardy" Determination. ................. 13

23   1.  The Service's "No Jeopardy" Determination for the Recovery Unit Scale is
        Arbitrary and Capricious. ............................................................................ 14

24   2.  The Service's "No Jeopardy" Determination for the Rangewide Scale is
        Arbitrary and Capricious. ............................................................................ 16

25
26   C.  The Forest Service's Reliance on a Legally Flawed BiOp is
        Arbitrary and Capricious. ............................................................................ 17

27   II.   An Injunction Is Necessary to Avoid Irreparable Harm. ............................... 18

28

PLS.' MEMO ISO PI - i

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1

A.  Implementation of the Project Through the Rainbow and Subsequent
    Longbow Contract Would Irreparably Harm Owls. ................................................... 19

2

3

B.  Implementation of the Project Through the Rainbow and Subsequent
    Longbow Contracts Would Irreparably Harm Plaintiffs................................................ 22

4

III.   The Balance of Hardships and Public Interest Favor an Injunction. ................................. 23

5

IV.   Scope of Injunction ........................................................................................ 24

6

V.   No Bond Should Be Required ............................................................................ 24

7

CONCLUSION ...................................................................................................... 25

8

CERTIFICATE OF SERVICE ................................................................................. II

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

4     *All. for the Wild Rockies v. Cottrell,*
        632 F.3d 1127 (9th Cir. 2011)............................................................. 3, 18, 19, 22
5
      *Amoco Prod. Co. v. Vill. of Gambell,*
6       480 U.S. 531 (1987)................................................................................ 18, 23

7     *Appalachian Voices v. U.S. Dep't of Interior,*
        25 F.4th 259 (4th Cir. 2022) .......................................................................... 14
8
      *CBD v. USFS,*
9       670 F. Supp. 3d 1121 (D. Mont. 2023) .......................................................... 22

10    *Cent. Or. Landwatch v. Connaughton,*
        905 F. Supp. 2d 1192 (D. Or. 2012) .............................................................. 25
11
      *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
12      789 F.3d 1075 (9th Cir. 2015)......................................................... 1, 18, 23, 24

13    *Ctr. for Biological Diversity v. Bernhardt,*
        982 F.3d 723 (9th Cir. 2020)........................................................................... 17
14
      *Ctr. for Biological Diversity v. Salazar,*
15      804 F. Supp. 2d 987 (D. Ariz. 2011).............................................................. 12

16    *Ctr. for Biological Diversity v. U.S. BLM,*
        698 F.3d 1101 (9th Cir. 2012)................................................................... 2, 17
17
      *E. Bay Sanctuary Covenant v. Trump,*
18      349 F. Supp. 3d 838 (N.D. Cal. 2018) ........................................................... 25

19    *FCC v. Rosboro Lumber,*
        50 F.3d 781 (9th Cir. 1995)............................................................................ 19
20
      *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
21      98 F.4th 1180 (9th Cir. 2024) ................................................................ 1, 3, 24

22    *Forestkeeper v. USFS,*
        No. 1:21-cv-01041-DAD-BAM, 2021 U.S. Dist. LEXIS 192443 (E.D. Cal. Oct. 5, 2021) ..... 25
23
      *Friends of the Earth, Inc. v. Brinegar,*
24      518 F.2d 322 (9th Cir. 1975)........................................................................... 25

25    *Gifford Pinchot [Task Force v. U.S. FWS,*
        378 F.3d 1059 (9th Cir. 2004).......................................................................... 12
26
      *Karuk Tribe of Cal. v. U.S. Forest Serv.,*
27      681 F.3d 1006 (9th Cir. 2012).......................................................................... 3

28

PLS.' MEMO ISO PI - iii

*League of Wilderness Defs. v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014).........................................................................11, 12, 23

*Marbled Murrelet v. Babbitt*,
   83 F.3d 1060 (9th Cir. 1996)................................................................................19, 20

*Mtr. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("State Farm")*,
   463 U.S. 29 (1983)................................................................................................3, 15

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*,
   23 F.3d 1508 (9th Cir. 1994))................................................................................3, 4

*Nat'l Wildlife Fed'n v. NMFS*,
   524 F.3d 917 (9th Cir. 2008).......................................1, 12, 13, 14, 16, 17

*Nat'l Wildlife Fed'n v. NMFS*,
   886 F.3d 803 (9th Cir. 2018)....................................................18, 19, 22, 23

*Native Ecosystems Council v. Marten*,
   334 F. Supp. 3d 1124 (D. Mont. 2018) ......................................................................3

*Ohio v. EPA*,
   603 U.S. 279 (2024)..............................................................................................11

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. BOR*,
   426 F.3d 1082 (9th Cir. 2005)..................................................................................16

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
   766 F.2d 1319 (9th Cir. 1985)............................................................................24, 25

*Republic of the Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988).................................................................................11

*S. Yuba River Citizens League v. NMFS*,
   723 F. Supp. 2d 1247 (E.D. Cal 2010)...................................................................15

*Save Our Cabinets*,
   255 F. Supp. 3d 1035 (D. Mont. 2017) .................................................................18

*Turtle Island Restoration Network v. U.S. DOC ("Turtle Island")*,
   878 F.3d 725 (9th Cir. 2017)....................................................1, 14, 16, 17

*TVA v. Hill*,
   437 U.S. 153 (1978)..............................................................................................23

*Wild Fish Conserv. v. Salazar*,
   628 F.3d 513 (9th Cir. 2010)..................................1, 11, 12, 13, 14, 17, 18

*Wildlands v. Warnack*,
   570 F. Supp. 3d 983 (D. Or. 2021) ........................................................................25

*Winter v. Natural Res. Defense Council*,
   555 U.S. 7 (2008)..............................................................................................3, 18, 22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

**STATUTES**

5 U.S.C. § 706(2) ................................................................................................ 1, 3

16 U.S.C. § 1531 ................................................................................................ 1, 18

16 U.S.C. § 1532(6) ................................................................................................ 4

16 U.S.C. § 1532(20) ............................................................................................... 4

16 U.S.C. § 1533(f) ................................................................................................. 5

16 U.S.C. § 1536(a)(2) ........................................................................................ 2, 17

16 U.S.C. § 1536(b)(4) ......................................................................................... 2, 7

16 U.S.C. § 1536(d) ............................................................................................... 24

16 U.S.C. § 1536(o)(2) ......................................................................................... 2, 7

**REGULATIONS**

50 C.F.R. § 17.3 .................................................................................................... 2

50 C.F.R. § 402.02 ............................................................................................. 2, 12

50 C.F.R. § 402.14(g)(4) ......................................................................................... 2

**RULES**

Federal Rule of Civil Procedure 65(c) ..................................................................... 24

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-227-2212

1

## GLOSSARY OF TERMS

| APA | Administrative Procedure Act |
|---|---|
| BiOp | Biological Opinion |
| D | Dispersal Habitat |
| Defendants | United States Forest Service, United States Fish and Wildlife Service |
| DSA | Demographic Study Area |
| ESA | Endangered Species Act |
| F | Foraging Habitat |
| Forest | Shasta-Trinity National Forest |
| Forest Service | United States Forest Service |
| N | Nesting Habitat |
| NEPA | National Environmental Policy Act |
| NR | Nesting/Roosting Habitat |
| NRF | Nesting/Roosting/Foraging Habitat |
| NSO or Owl | Northern Spotted Owl |
| PBF | Physical and Biological Features (of Critical Habitat) |
| Plaintiffs or KFA | Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, Mount Shasta Bioregional Ecology Center |
| Project or SFS Project | South Fork Sacramento Public Safety and Forest Restoration Project |
| R | Roosting Habitat |
| Service | United States Fish and Wildlife Service |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

# PROJECT AREA MAPS

 

Pre-Project NSO habitat in the Project area with current and historic activity centers, and NSO and barred owl detections. FWS-305.

NSO habitat in Project area, overlayed with Project vegetation management activities. FWS-331.

## IMAGE OF NORTHERN SPOTTED OWL (FWS-25336)



PLS.' MEMO ISO PI - vii

**NOTE ON ADMINISTRATIVE RECORDS AND BATES STAMP CITE FORM**

The Service and Forest Service have each lodged administrative records in this case. ECF20. Plaintiffs cite to the administrative records in accordance with each administrative record document's bates stamp number, *e.g.*, "FWS-xxx," "FWS-EX-xxx," and "FS-xxx," but elide from the citation any zeros that precede the counting numbers. *E.g.*, FWS-00001 is cited as FWS-1.

PLS.' MEMO ISO PI - viii

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

**INTRODUCTION**

Plaintiffs respectfully request this Court enjoin imminent logging operations authorized under the South Fork Sacramento Safety and Forest Restoration Project ("SFS Project" or "Project") within northern spotted owl ("NSO" or "owl") nesting, roosting, and foraging ("NRF") habitat. Such an injunction is necessary to preserve the status quo during the pendency of litigation and is tailored to the specific irreparable harm of degrading and removing NRF habitat.

A preliminary injunction is warranted because Plaintiffs are likely to succeed on the merits, will suffer irreparable harm in the absence of an injunction, and the balance of equities tips in their favor. On the merits, Plaintiffs respectfully refer this Court to the already filed summary judgment briefing. *See* ECF Nos. 29, 36. In summary, three controlling Ninth Circuit cases support Plaintiffs' claim that the United States Fish and Wildlife Service's ("Service") Biological Opinion ("BiOp") for the Project is arbitrary, capricious, and contrary to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq. See* 5 U.S.C. § 706(2). The Service impermissibly conducted the bulk of its jeopardy analysis in a vacuum, failing to account for the owl's precipitous decline and failing to analyze whether the owl population at the regional and rangewide scales could absorb the additional negative impact of the Project, which would cause "take" of 12 owls from long-occupied, reproductively successful owl territories. *See Nat'l Wildlife Fed'n v. NMFS* ("*NWF v. NMFS*"), 524 F.3d 917, 929–30 (9th Cir. 2008), *Turtle Island Restoration Network v. U.S. DOC* ("*Turtle Island*"), 878 F.3d 725, 737–38 (9th Cir. 2017), *Wild Fish Conserv. v. Salazar* ("*Wild Fish*"), 628 F.3d 513, 528–29 (9th Cir. 2010).[1]

The remaining injunction factors weigh in Plaintiffs' favor. Logging nesting, roosting, and foraging habitat for an ESA-listed species constitutes an irreparable injury. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.* ("*Cottonwood*"), 789 F.3d 1075, 1091 (9th Cir. 2015), *cert den.* 580 U.S. 916 (2016). And Congress has already decided that in ESA cases, the balance of hardships and the public interest tips in favor of protected species. *See id.*; *see also Flathead-Lolo-Bitterroot Citizen Task Force v. Montana* ("*Flathead-Lolo-Bitterroot*"), 98 F.4th 1180, 1190 (9th Cir. 2024).

---

[1] Cases have been cleaned up, with internal citations omitted, unless otherwise noted.

PLS.' MEMO ISO PI - 1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1        **LEGAL FRAMEWORK AND STANDARD OF REVIEW**

2    **I.    Endangered Species Act**

3        Detailed legal background can be found at pages 2–3 of Plaintiffs' Memorandum in

4    Support of Motion for Summary Judgment ("Pls. SJ Memo"), ECF No. 29. In summary, Section 7

5    of the ESA imposes both substantive and procedural duties. Substantively, federal agencies like the

6    Forest Service must "insure that any action authorized, funded, or carried out . . . is not likely to

7    jeopardize the continued existence of any endangered species or threatened species[.]" 16 U.S.C.

8    § 1536(a)(2). "Jeopardize the continued existence of" means to "engage in an action that

9    reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both

10   the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or

11   distribution of that species." 50 C.F.R. § 402.02 (2019).

12       Procedurally, the Forest Service must consult with the Service before taking any

13   discretionary action that may affect a listed species like the owl. 16 U.S.C. § 1536(a)(2). The

14   Service must formulate its biological opinion—based on the "best available scientific and

15   commercial data"—as to whether an action (like the Project) is likely to jeopardize the continued

16   existence of the listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(4). The Service must

17   address the jeopardy question by "add[ing] the effects of the action and cumulative effects to the

18   environmental baseline, [] in light of the status of the species and critical habitat[.]" 50 C.F.R.

19   § 402.14(g)(4).

20       The Service must issue an incidental take statement to the Forest Service if the action will

21   result in "take" of a listed species but is not likely to cause jeopardy. 16 U.S.C. § 1536(b)(4).[2]

22   While compliance with an incidental take statement shields the Forest Service from liability under

23   ESA Section 9, *see* 16 U.S.C. § 1536(o)(2), the Forest Service cannot meet its substantive

24   obligations under Section 7 by relying on a BiOp that is legally flawed. *Ctr. for Biological*

25   *Diversity v. U.S. BLM* ("*CBD v. BLM*"), 698 F.3d 1101, 1127–28 (9th Cir. 2012).

26

27       [2] As relevant here, "take" means to harm a listed species by causing "significant habitat
     modification or degradation where it actually kills or injures wildlife by significantly impairing
28   essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

     PLS.' MEMO ISO PI - 2                                    *Crag Law Center*
                                                              *3141 E Burnside St.*
                                                              *Portland, OR 97214*
                                                              *Tel. 503-227-2212*

## II.     Administrative Procedure Act

Plaintiffs' claims are reviewed pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). *See* Pls. SJ Memo at 15–16; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012). Agency actions must be "set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Agency action is arbitrary or capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Mtr. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983).

## III.     Preliminary Injunction

A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent the injunction; (3) the balance of equities tips in its favor; and (4) the injunction would serve the public interest. *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008). "The purpose of a preliminary injunction is to preserve the status quo and prevent the irreparable loss of rights before a final judgment on the merits." *Native Ecosystems Council v. Marten*, 334 F. Supp. 3d 1124, 1130 (D. Mont. 2018).

Courts in the Ninth Circuit employ a "sliding scale" approach in which, for example, "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Under this approach, a preliminary injunction may issue where a plaintiff's likelihood of success is such that "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.*

In ESA cases, "Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Flathead-Lolo-Bitterroot*, 98 F.4th at 1190 (citing *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994)). "So when applying the 'serious questions' test to ESA claims, the last two factors— balance of hardships and the public interest—always tip heavily in favor of protected species." *Id.*

PLS.' MEMO ISO PI - 3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1   (citing *Burlington N. R.R., Inc.*, 23 F.3d at 1511) (cleaned up). Thus, "[i]n practice . . . only the

2   first two factors—serious questions on the merits and likelihood of irreparable injury—are at issue

3   when analyzing ESA claims under the 'serious questions' test." *Id.*

4                                  **FACTUAL BACKGROUND**

5          Detailed factual background can be found at pages 3–14 of Plaintiffs' SJ Memo and pages

6   2–5 of Plaintiffs' Response to Defendants' Cross-Motion for Summary Judgment and Reply in

7   Support of Motion for Summary Judgment ("Pls. Resp."), ECF No. 36. A summary of the salient

8   facts is provided herein.

9   **I.      The Northern Spotted Owl**

10         The NSO once was abundant in old-growth forests extending from southwest British

11  Columbia as far south as Marin County, California, but today, the NSO is functionally extirpated

12  in large parts of its historical range due to timber harvest activities eliminating, reducing, and

13  fragmenting suitable habitat. FWS-421. Where NSOs persist, populations have declined

14  precipitously. FWS-524; FWS-6343. The best available scientific and commercial information

15  shows that NSO populations declined at an average annual rate of -5.3% from 1995 through 2016,

16  indicating that the NSO's likelihood of extinction has significantly increased. *See* FWS-6331–51;

17  FWS-419.

18         In 2020, on account of ongoing and increasing threats including habitat loss from past and

19  present logging and wildfires, climate change, and the invasion of the barred owl, the Service

20  determined that "uplisting" the NSO from "threatened" to "endangered" was warranted but

21  precluded by higher priority listing decisions. FWS-25599–601.[3] According to the Service, these

22  threats (or "stressors") are now of such imminence, intensity, and magnitude to indicate that the

23  NSO is in danger of extinction throughout its range. FWS-25600; FWS-EX-456 (2022 study

24  confirming that the NSO exhibits the signs of an "extinction vortex," in which a species' decline

25

26  _____

27         [3] An "endangered species is "any species which is in danger of extinction throughout all
    or a significant portion of its range[.]" 16 U.S.C. § 1532(6). A "threatened species" is "any
28  species which is likely to become an endangered species within the foreseeable future throughout
    all or a significant portion of its range." *Id.* § 1532(20).

    PLS.' MEMO ISO PI - 4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    to only a few individuals can result in a rapid progression to extinction in just a few years).

2            The only way to address "precipitous[]" NSO population declines is to "both manage the

3    barred owl threat and conserve adequate amounts of high quality habitat distributed across the

4    range in a pattern that provides acceptable levels of connectivity as well as protection from

5    stochastic events." FWS-361; FWS-525 (need to ameliorate negative effects of barred owls while

6    also maintaining NSO habitat).[4] Conservation of suitable habitat—particularly habitat currently

7    occupied by owls—is therefore considered of paramount importance until population trends

8    improve. FWS-11045.[5] According to the NSO Recovery Plan,[6] retaining NSO at existing sites is

9    likely the most effective approach and should be the highest priority for land managers, because

10    NSO on established territories are likely to be more successful if they remain in those locations.

11    FWS-11046.

12            NSOs need sufficient quantities of nesting/roosting ("NR"), foraging ("F"), and dispersal

13    ("D") habitat to survive and reproduce. FWS-23239–40; FWS-25354–56; FWS-353 (minimum of

14    400 NRF acres in nest cores and 1,336 NRF acres in owl territories). When available NRF is

15    below the recommended thresholds, "fitness may be compromised when additional habitat losses

16    or widescale degradation occurs." FWS-310. Nesting/roosting habitat provides structural features

17    for nesting and shelter, protection from adverse weather conditions, and cover to reduce predation

18

19            [4] Barred owls, native to eastern North America, are slightly larger and more aggressive
20    than NSOs and compete for the same habitat, prey, and resources. FWS-318; FWS-5400.
      "[B]arred owl occupancy causes NSO to leave their territories and negatively affects colonization
21    of new territories." FWS-364. The Forest Service does not have any programmatic plan to
      manage barred owls.
22            [5] Suitable NSO habitat generally has moderate to high canopy closure (60% to 80%); a
      multi-layered, multi-species canopy with large overstory trees; a high incidence of large trees
23    with various deformities; large snags; a large accumulation of fallen trees and other wood debris
      on the ground; and sufficient space below the canopy for NSOs to fly. FWS-425.
24            [6] As required by ESA Section 4, the Service published a Revised Recovery Plan for the
      NSO in 2011 ("Recovery Plan"). 16 U.S.C. § 1533(f); FWS-10965–11241. It sets recovery
25    "Goals," "Objectives," "Criteria," and "Actions," and establishes "Recovery Units," each of
      which "provides an essential survival and recovery function for the species." FWS-11004. The
26    SFS Project affects the California Cascades and California Klamath Recovery Units. *See* FWS-
      500-03 (recognizing California Cascades Recovery Unit as an important contributor to NSO
27    conservation); FWS-511(recognizing California Klamath Recovery Unit as "essential to NSO
      conservation" and a "demographic stronghold" for the species).
28
      PLS.' MEMO ISO PI - 5

1  risks. FWS-23239. Foraging habitat is essential to provide a food supply for survival and

2  reproduction. *Id.* Dispersal habitat helps maintain stable populations by filling territorial vacancies,

3  providing an important linkage function among blocks of higher value NRF habitats, and facilitating

4  gene flow. FWS-23239–40.

5  **II.    The South Fork Sacramento Project and Biological Opinion**

6          The Project, located on National Forest System lands above Lake Siskiyou, approximately

7  three miles west of Mount Shasta City, California, authorizes logging and other vegetation

8  management activities on approximately 16,285 acres on the Shasta-Trinity National Forest.

9  FWS-274. These activities include various logging operations that involve cutting trees within

10  owl habitat. FWS-276–78, 326–27; FWS-19–24.

11          There are five NSO territories within the action area, at least two of which are currently

12  occupied and have a long history of occupancy: "Soapstone" and "current Scott" (also simply

13  called "Scott"). FWS-301, 324.[7] They comprise two of the longest-occupied NSO territories in

14  the California Cascades Recovery Unit since the 1990 listing. FWS-388. Over the last 35 years,

15  these territories have continuously contributed to the long-term persistence of NSO at the action

16  area, Recovery Unit, and range-wide scales. FWS-396.

17          The SFS Project would significantly impact the Soapstone and current Scott territories, as

18  well as other NSO habitat. *See* FWS-396 (Project may affect 100 percent of the NRF and

19  dispersal habitat in the Scott and Soapstone core use areas and territories). Management activities

20  would be conducted within 8,147 acres of nesting, roosting, and foraging habitat, and 4,065 acres

21  of dispersal habitat. FWS-328. Of these acres, 5,900 would be "adversely affected," in that the

22  quantity or quality of existing habitat would be reduced to the extent that it would likely to impair

23  breeding, feeding, or sheltering behaviors of an individual NSO. FWS-326, 309.

24          Pursuant to ESA Section 7, the Forest Service formally consulted with the Service over

25  the Project's impacts on owls. FWS-257. During both formal consultation and informal

26  _____

27          [7] The area traversed by an individual or pair in their normal activities of breeding, feeding, and sheltering is called the "home range" or "territory." FWS-423. It generally extends 1.3 miles in all directions around the nest site or activity center (approximately 3,398 acres), although owls

28  will likely use the best available habitat, which is often in a non-circular arrangement. FWS-353.

PLS.' MEMO ISO PI - 6

1   conferrals, there were disagreements between the agencies about the scope and magnitude of

2   impacts to NSOs, FWS-270–73, and the Service recommended "a careful re-design of treatments

3   to avoid reducing the quality and function of high value and high quality habitats in known NSO

4   sites and the project area[.]" FWS-531; *see* Pls. SJ Memo at 11–12, Pls. Resp. at 2–3 (detailed

5   description of disputes related to treatments in NSO habitat).

6          Ultimately, however, the Service issued a BiOp and Incidental Take Statement, FWS-

7   257–519; 16 U.S.C. §§ 1536(b)(4), (o)(2). Because the Project was not re-designed in a way to

8   avoid heavy treatments in important NSO habitat, the Service determined that Project activities

9   are likely to adversely affect and are reasonably certain to impede NSO feeding and foraging

10  patterns, sheltering behaviors, and adult-provisioning of young associated with the two core nest

11  areas and territories. FWS-396. According to the Service, reproduction, numbers, and distribution

12  of NSO in the action area would be reduced over the first ten years of implementation. FWS-354.

13  The Service estimated that two pairs (four adults) and eight young or subadult NSOs would be

14  "taken" by the effects of the Project, FWS-387, impairing the demographic contributions from the

15  two occupied NSO sites. FWS-391.

16         Out of an otherwise lengthy 264-page BiOp, the jeopardy analysis is a scant four-and-a-

17  half pages, three of which simply contain a summary of the BiOp; the actual jeopardy analysis is

18  one-and-a-half pages. FWS-384–89. At the Recovery Unit scale, the Service averred that the

19  Project is not expected to "measurably influence" the provincial baseline, although it estimated

20  that the Project would impact 21% of the population. FWS-388. At the rangewide scale, the

21  Service averred that the take of 12 individuals represents less than one percent of the estimated

22  2021 rangewide population of 3,000 NSOs. FWS-389. Accordingly, despite the acknowledged

23  short- and long-term effects of the Project, including "take" from two demographically critical

24  territories, the Service concluded that the SFS Project is not likely to jeopardize the continued

25  existence of the species. FWS-392–93.

26  **III.    Additive Threats**

27         The Project is not an isolated source of impacts to the NSO. In fact, the dramatic decline

28  of the NSO is a result of ongoing and interrelated stressors, including habitat loss from logging

PLS.' MEMO ISO PI - 7

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1   and wildfires, and the invasion of the barred owl. FWS-14457 (long-term persistence of NSO

2   populations may be compromised with the combination of high-intensity fires, habitat removal

3   from logging, and increased competition with barred owls); FWS-25600; FWS-25378 ("[NSO]

4   habitat is lost and fragmented through disturbance factors such as timber harvest . . . wildfire, and

5   . . . outbreaks."). These stressors combine to exert multidimensional effects. For example, "[t]he

6   loss of habitat has the potential to intensify competition with barred owls by reducing the total

7   amount of resources available to [NSO] and by increasing the likelihood and frequency of

8   competitive interactions." FWS-23233; FWS-355 ("Habitat loss can intensify competition

9   between the two species.").

10       Competition with barred owls may now "be the primary cause of [NSO] declines across their

11   range." FWS-25338; FWS-318; FWS-6332; FWS-23233. As "generalist predators," barred owls

12   consume a wider variety of food and thus are able to occupy habitat in much higher densities than

13   NSOs. *Id.* NSOs are known to shift their locations in response to barred owl competition and

14   occupation. FWS-300. In both the California Cascades and California Klamath Recovery Units,

15   barred owls have confirmed nesting and occupancy, and are being detected at higher frequencies,

16   FWS-503, FWS-509–10, FWS-516–17, amplifying the risks of the synergistic impacts from

17   habitat loss and competition with barred owls. *Cf.* FWS-10528 ("competition with an increasing

18   number of barred owls, combined with continued loss of potentially suitable forest cover is

19   contributing to population declines of [NSO.]").

20       Habitat loss from logging and wildfires is another primary stressor. FWS-25600. Large scale

21   wildfire is now considered the primary source of habitat loss on Federal lands. FWS-434; *see* FWS-

22   458–60 (between 2012 and 2021, while NRF habitat on the California Cascades Recovery Unit

23   was spared, 135,943 acres of NRF habitat on the California Klamath Recovery Unit was

24   downgraded or removed). Meanwhile, logging activities continue apace. Logging activities remove

25   or damage NSO habitat by removing or modifying forest structure; the resulting loss of structural

26   complexity and heterogeneity is linked to declining NSO fitness, including less successful

27   reproduction, lower survival, site abandonment, and altered foraging behaviors. FS-1957; FWS-

28   14026; *see also* FWS-327.

PLS.' MEMO ISO PI - 8

1    In particular, the Service has a pattern and practice of issuing "no jeopardy" BiOps and

2    authorizing incidental take and habitat removal for logging projects affecting owls in the

3    California Cascades and California Klamath Recovery Units. *See* Pls.' SJ Memo at Table 1 (take

4    of over 200 owls); *see also* FWS-458–60 (between 2012 and 2021, forest management projects on

5    federal land downgraded or removed at least 993 acres and 3,223 acres of NRF habitat on the

6    California Cascades and California Klamath Recovery Units, respectively).[8]

7    The principal flaw of the SFS BiOp is that does not evaluate the Project in light of the

8    other ongoing stressors, and address how the owl population can absorb the impact of the

9    Project's removal of high-quality habitat and take of 12 owls in light of the barred owl incursion,

10   habitat loss, and take from concurrent projects.

11   **IV.    Imminent Logging Operations**

12   The Service issued the SFS BiOp on November 23, 2023, FWS-257, and the Forest

13   Service signed the final decision on December 21, 2023. FS-128, 138. After providing the

14   requisite notice of intent to sue, ECF No. 1-1, Plaintiffs filed this lawsuit on August 28, 2024.

15   ECF No. 1. Defendants filed their Answer on November 4, 2024. ECF No. 18. While cross-

16   motions for summary judgment are fully briefed, this Court has not yet had the opportunity to

17   issue a ruling on the merits. ECF No. 39 ¶¶ 4–6.

18   As part of the Parties' negotiations over a stipulated briefing schedule in November of

19   2024, Defendants agreed to provide Plaintiffs at least 30 days' notice before commencement of

20   ground-disturbing activities implementing the SFS Project. ECF No. 39 ¶ 3. The first timber sale

21   under the Project, the Rainbow Thin MP ("Rainbow Thin") contract, was awarded in January

22   2024, but to date, no operations have taken place. *See* Declaration of Kelsey Dunn ("Dunn Decl.)

23   Ex. 2 (Report of Timber Sale showing 278 acres awarded to Scott Timber Co.). The Parties

24   completed briefing on summary judgment on May 23, 2025, *see* ECF No. 39 ¶ 6, before

25   commencement of any ground-disturbing operations in owl nesting, roosting, or foraging habitat

26

27   _____
     [8] In fact, the Service has never issued a jeopardy opinion for BiOp for a project impacting
28   owls anywhere across the species' range, let alone in the California Cascades or California
     Klamath Recovery Units, since the 1990 listing. ECF No. 1, 18 ¶¶ 181–83.

PLS.' MEMO ISO PI - 9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    pursuant to any timber sale contract.

2            On August 8, counsel for Defendants advised that the purchaser of the Rainbow Thin

3    contract is tentatively planning to begin operations in or after mid-September, and may start work

4    at any point after September 15, 2025. ECF No. 39 ¶ 8. On August 11, counsel for Defendants

5    followed up and advised that operations on the Rainbow Thin contract will not start prior to

6    September 22, 2025. *Id.* ¶ 9.

7            The Rainbow Thin Sale contract area is located southwest of Lake Siskiyou, and overlaps

8    nesting, roosting, and foraging habitat in and around the eastern portion of the current Scott

9    territory, with logging units between Scott Camp Creek and Castle Lake Creek and south of

10   Castle Lake Creek. *Compare* Dunn Decl. Ex. 1 (Sale Map) *with* FWS-520. Another logging unit

11   overlaps the southeastern portion of the Morgan territory along the South Fork Sacramento River.

12   *Id.* A comparison of the available maps and information indicates that one of the treatments

13   planned under the Rainbow Thin contract, for the logging units (units 21, 27, 29), is "Fuel

14   Management Zone" ("FMZ"). *Compare* Dunn Decl. Ex. 1 (Sale Map) with FS-6005 (Map 4 Scott

15   NSO core deferred areas). According to the Service, FMZ treatments would remove habitat by

16   significantly reducing basal area and canopy cover. FWS-328–31.[9] "The effects of the FMZ

17   treatment . . . are considered adverse and long-term, primarily due to their continuity, scale,

18   placement in occupied NSO cores and home ranges, or places in areas that provide connectivity

19   between higher value habitats. The effects are considered a permanent removal of habitat. . .").

20   FWS-331.

21           The Forest Service advertised the second sale implementing the Project, the Longbow

22   Thin MP Integrated Resource Timber Contract ("Longbow Thin"), on July 30, 2025. ECF No. 39

23   ¶ 7. The Longbow Thin contract is set to be awarded on September 15, 2022. *Id*. The Longbow

24   Thin contract involves treatment of over 225 acres (units 22, 23, 24, 25, 33) south of the South

25   Fork Sacramento River. Dunn Decl. Exs. 3 (Sale Map) & 4 (Prospectus). It overlaps with and

26

27           [9] "Remove" is a term of art, describing the effect when treatments "remove and reduce
     habitat elements to the degree the habitat no longer functions in its pre-treatment condition as
28   nesting, roosting, or foraging." FWS-311–12.

     PLS.' MEMO ISO PI - 10                                    *Crag Law Center*
                                                               *3141 E Burnside St.*
                                                               *Portland, OR 97214*
                                                               *Tel. 503-227-2212*

1  would remove NSO nesting, roosting, and foraging habitat in and around the northern portion of

2  the current Scott territory and the southern end of the Morgan territory. *Compare* Dunn Decl. Ex.

3  3 (Sale Map) *with* FWS-520. FMZ treatments will likewise occur in this area. *Compare* Dunn

4  Decl. Ex. 3 (Sale Map) with FS-6005 (Map 4 Scott NSO core deferred areas).

5                                        **ARGUMENT**

6  **I.      Plaintiffs Are Likely to Succeed on the Merits.**

7          A likelihood of success on any one of Plaintiffs' claims is sufficient to obtain an

8  injunction. *See League of Wilderness Defs. v. Connaughton* ("*LOWD*"), 752 F.3d 755, 760 (9th

9  Cir. 2014). In the alternative, Plaintiffs raise at least "serious questions" on the merits—all that is

10 necessary for an injunction to issue here because the balance of harms tips sharply in Plaintiffs'

11 favor. *See infra* pp. 23–24. "Serious questions" are those that are "substantial, difficult and

12 doubtful enough" to require more thorough review. *Republic of the Philippines v. Marcos*, 862

13 F.2d 1355, 1362 (9th Cir. 1988).

14         The gravamen of Plaintiffs' case is that the Service's "no jeopardy" conclusion is arbitrary

15 and capricious because the Service failed to "articulate a satisfactory explanation for its action

16 including a rational connection between the facts found and the choice made." *State Farm*, 463

17 U.S. at 43. The facts show that (1) the owl population is in an "extinction vortex" because of

18 local, regional, and rangewide stressors; (2) the population has little ability to withstand

19 additional impacts; (3) protecting high-quality habitat and occupied sites is critical to the owl's

20 continued survival and recovery; and (4) the Project would remove high-quality habitat and cause

21 "take" of owls from two demographically critical territories that comprise a "source population."

22 The Service however, failed to provide an explanation for its "no jeopardy" conclusion—let alone

23 a rational one—that reconciles these critical facts.

24         To secure an injunction, Plaintiffs need not prove that this Project would indeed cause

25 jeopardy. Rather, Plaintiffs only must show that there is a likelihood, or at least a substantial

26 question, that the Service's decision was not "rationally explained" under the APA. *See Ohio v.*

27 *EPA*, 603 U.S. 279, 292 (2024); *Wild Fish*, 628 F.3d at 527 ("It is not our role to decide whether

28 the findings in the 2008 BiOp require a jeopardy conclusion. Instead . . . we must determine

PLS.' MEMO ISO PI - 11

1    whether the agency articulated a rational connection between the facts found and the conclusions

2    made."). Plaintiffs satisfy the applicable standards on four key issues briefed in full on summary

3    judgment and summarized here—although this Court need only find a likelihood of success or

4    substantial questions on one of them. *LOWD*, 752 F.3d at 760.

5        A.    **The Service Failed to Rationally Explain Why the SFS Project Would Not
              Appreciably Impair the Owls' Recovery Prospects.**

6

7        As the Ninth Circuit has made clear, "the jeopardy regulation requires [the Service] to

8    consider both recovery and survival impacts." *NWF v. NMFS*, 524 F.3d at 931; *see also Ctr. for*

9    *Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 998 (D. Ariz. 2011) ("The ESA, its

10   implementing regulations, [the Service's] Consultation Handbook [FWS-26035–349], and the

11   Ninth Circuit's decision in *Gifford Pinchot* [*Task Force v. U.S. FWS*, 378 F.3d 1059, 1074 (9th

12   Cir. 2004) *amended*, 387 F.3d 968 (9th Cir. 2004)] all require that listed species be protected

13   from any appreciable reduction in their likelihood of recovery.") (Tashima, Circuit Judge, sitting

14   by designation).[10] Here, among a series of errors the Service committed in the BiOp, *see* Pls.

15   Memo at 25–29; Pls. Resp. at 19–24, one stands out: the Service failed to address how adversely

16   impacting this "source population" of owls will not impair the owl's recovery prospects at the

17   recovery unit scale, given the owl's plummeting population.[11]

18       The Ninth Circuit set aside a BiOp when the court addressed a very similar situation. In

19   *Wild Fish*, as here, the local population of the listed species (bull trout) was important. *Compare*

20   628 F.3d at 529 ("the Icicle Creek local population is important to the core area") *with* FWS-388

21   (Scott and Soapstone territories comprise a "source population"). And, in turn, the core area was

22   important to the broader population, 628 F.3d at 529 ("The Wenatchee River core area is

23   particularly important to the recovery unit"), just as here, the two Recovery Units "are considered

24   principal zones of NSO productivity that play a critical role in maintaining overall population

25   stability." FWS-524; FWS-396 ("These two territories have continuously contributed to the long-

26

27       [10] "Recovery" means improvement in the status of listed species to the point at which
     listing is no longer appropriate. 50 C.F.R. § 402.02.

28       [11] Demographic "source populations" are important to population stability. FWS-14774.

     PLS.' MEMO ISO PI - 12                            *Crag Law Center*
                                                        *3141 E Burnside St.*
                                                        *Portland, OR 97214*
                                                        *Tel. 503-227-2212*

1    term persistence of [NSO] in the action area, and to [NSO] populations in both the California

2    Cascades and California Klamath recovery units and range-wide scale over the last 35 years. The

3    Project would reduce the area's contribution to the NSO population in the two recovery units.").

4         In *Wild Fish*, it was "far from obvious that the extirpation of the [local population] would

5    be harmless." 628 F.3d at 529. Similarly here, the BiOp fails to explain how negatively impacting

6    the Scott and Soapstone territories—in which the owls comprise 21% of the Recovery Unit

7    population—would not appreciably impair the owl's recovery. FWS-388 (Recovery Unit "no

8    jeopardy" analysis); *see also infra* pp. 14–16. The Recovery Plan—and the more recent, best

9    available science—stress the importance of protecting occupied sites if the species is to have any

10   chance of recovering. FWS-23001 (primary NSO recovery goal is the protection of stands that are

11   either occupied or contain high value habitat); FWS-25419. "Activity centers containing current or

12   past reproductive owls rank highest for conservation and recovery of their current condition."

13   FWS-529. But the Project authorizes heavy logging in activity centers containing reproductive

14   owls, and indeed, is inconsistent with the Recovery Plan. FWS-384.

15        It was incumbent on the Service to provide a rational explanation as to how the Project

16   would not appreciably impair recovery, where it would take 12 owls from occupied sites

17   comprising a source population, and where such occupied sites are critical for recovery. This duty

18   is even more pressing than in *Wild Fish* because here, the evidence shows that the owl population

19   is likely in an "extinction vortex" from which recovery may not be possible without dramatic

20   interventions. FWS-EX-456, 459. No such facts were present in *Wild Fish*. *See* 628 F.3d at 513,

21   529 (affected population was one of seven populations in the core area, which in turn, contained

22   about 90 core areas and 500 populations within the recovery unit; while populations were

23   generally declining across the recovery unit, there was no evidence of a collapse). Without any

24   such analysis, the Service has failed to "provide[] some reasonable assurance that the [Project]

25   will not appreciably reduce the odds of success for future recovery planning, by tipping a listed

26   species too far into danger." *NWF v. NMFS*, 524 F.3d at 936.

27        **B.    The Service Failed to Rationally Explain Its "No Jeopardy" Determination.**

28        The Service failed to rationally explain how the owl—a species in steep population

PLS.' MEMO ISO PI - 13

1   decline—can sustain further "take" of reproductively successful owls and still avoid jeopardy.

2   According to the law of this Circuit, the Service may not "conduct the bulk of its jeopardy analysis

3   in a vacuum," but rather, must "consider the [action] in [its] actual context." *NWF v. NMFS*, 524

4   F.3d at 929–30. In other words, "[t]he relevant inquiry is . . . whether the action effects, **when**

5   **added to the underlying baseline conditions**, are such that they would cause jeopardy." *Turtle*

6   *Island*, 878 F.3d at 737–38 (emphasis added). Thus, the Service must account for "aggregate"

7   effects. *NWF v. NMFS*, 524 F.3d at 926; FWS-26148.

8        Here, however, the Service failed to account for the owl's perilous status and ongoing,

9   existential stressors, and rationally explain how the Project's additive take of owls from

10  demographically critical NSO territories would not cause jeopardy. *Cf. Appalachian Voices v. U.S.*

11  *Dep't of Interior,* 25 F.4th 259, 279 (4th Cir. 2022) ("If a species is already speeding toward the

12  extinction cliff, the agency may not press on the gas."). The Service's "no jeopardy" conclusion for

13  both the recovery unit and rangewide scales cannot be sustained on the record.

14              **1.      The Service's "No Jeopardy" Determination for the Recovery Unit**
                         **Scale is Arbitrary and Capricious.**
15

16       The BiOp first addresses jeopardy at the Recovery Unit scale, which it was required to do.

17  FWS-497 ("When a proposed Federal action appreciably impairs or precludes the capacity of a

18  recovery unit from providing for both the survival and recovery, the action may also represent

19  jeopardy to the species."); *Wild Fish*, 628 F.3d at 528–29 (explaining that even small impacts at

20  the local scale can still register significant species-level effects). The Service found that "the

21  adverse impacts from the action may influence approximately 21% of the estimated population,"

22  but concluded, without further analysis or explanation, that such impacts would not "measurably

23  influence the provincial baseline or constitute an appreciable reduction in the 'recovery support'

24  function of each recovery unit, as defined in the Recovery Plan." FWS-388.[12] Among other

25  reasons, *see* Pls. SJ Memo at 20–23; Pls. Resp. at 8–14, this conclusion is arbitrary and capricious

26  because the Service failed to consider an important aspect of the problem: the health and stability

27  _____

28   [12] The Recovery Plan explains that each Recovery Unit "provides an essential survival and
     recovery function for the species." FWS-11004.

PLS.' MEMO ISO PI - 14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    of other owl territories in the Recovery Units to compensate for the loss of one-fifth of the

2    population. *State Farm*, 463 U.S. at 43.

3        Importantly, the conclusion that impacting 21% of the population will not cause an

4    appreciable reduction in the likelihood of NSO survival and recovery necessarily assumes the

5    stability and continued persistence of the remaining 79%—an untenable assumption given the

6    other significant stressors on owls in the two Recovery Units. Indeed, NSO occupancy across the

7    species' range is declining substantially, coincident with increased barred owl occupancy. FWS-

8    6348. Barred owls are increasingly showing up in the two recovery units, FWS-509–10, FWS-516–

9    17, and "habitat loss can intensify competition between the two species." FWS-355; *see also* FWS-

10   510 (NSOs that are "displaced because of fire or habitat reductions have increased difficulty in

11   finding new territories to colonize or in expanding their home ranges to compensate for habitat

12   reductions when barred owls are present on the landscape"). The Service continues to authorize

13   take resulting from habitat degradation and removal within the recovery units, *see supra* p. 9; the

14   "compounding effects of barred owls and extensive vegetation management in areas occupied by

15   NSO exerts even more pressure on NSO survival and recovery." FWS-301.

16       Given these significant and multidimensional effects, the owl population is plummeting,

17   not stable; the Service failed to rationally explain how other areas can compensate for the impacts

18   to reproductive pairs here. *Cf. S. Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d 1247, 1267

19   (E.D. Cal 2010) (explaining that in "order to determine that the stressors will not cause a decline in

20   reproduction, population, distribution, or diversity, the BiOp must discuss (through some method)

21   the magnitude of the stressors' impact, the populations' ability to tolerate this impact, and the

22   reason why any decline will not reduce the overall likelihood of survival or recovery," and holding

23   that without a predicate finding that the populations were stable, the "no jeopardy" conclusion was

24   arbitrary).

25       In sum, a Project that impacts 21% of the Recovery Units' population may be significant in

26   and of itself, but is all the more significant in light of the concurrent stressors affecting the two

27   Recovery Units. By neglecting to account for aggregate effects, the Service's Recovery Unit "no

28   jeopardy" determination lacks critical context and is arbitrary and capricious. *NWF v. NMFS*, 524

PLS.' MEMO ISO PI - 15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    F.3d at 926 (governing standard requires a "more holistic, aggregate approach"); *Turtle Island*, 878

2    F.3d at 735 (agency failed to explain how annual loss of a single adult female loggerhead turtle

3    would not cause jeopardy where that species was already exposed to a heightened risk of

4    extinction).

5              **2.    The Service's "No Jeopardy" Determination for the Rangewide Scale**
                       **is Arbitrary and Capricious.**

6

7         The Service reached its rangewide "no jeopardy" conclusion based on its opinion that the

8    Project's take of 12 owls "represents less than one percent of the current estimated population at

9    the rangewide scale where the Service has hypothesized there are likely 3,000 or fewer individuals

10   present." FWS-389. Basing the "no jeopardy" conclusion on this simplistic equation (12 out of

11   3,000) was arbitrary and capricious because the Service failed to account for aggregate effects.

12   (Plaintiffs have addressed a host of flaws in the 3,000-owl estimate itself. *See* Pls. SJ Memo at 23–

13   25; Pls. Reply at 14–19.) In short, the Service failed to investigate whether "jeopardy might result

14   from the agency's proposed actions **in the present and future human and natural contexts**."

15   *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. BOR*, 426 F.3d 1082, 1093 (9th Cir. 2005)

16   (emphasis added).

17        The Ninth Circuit has held that a BiOp is unlawful where it "segregate[s] its analysis" of a

18   Project, rather than assessing whether the listed species "would be jeopardized by the aggregate

19   effects of the Project, the environmental baseline, cumulative effects, and current status of the

20   species[.]" *NWF v. NMFS*, 524 F.3d at 926. This is because "where baseline conditions already

21   jeopardize a species," the Service "may not take action that deepens the jeopardy by causing

22   additional harm." *Id.* at 930. Here, the owl population is spiraling downward in an extinction

23   vortex on account of unmitigated, existential threats. The owl population is declining at a rate of at

24   least -5.3% annually, such that the long-term persistence of NSO populations is unlikely. FWS-

25   EX-456. As the population declines and stressors escalate, "NSO populations at [] the rangewide,

26   regional, and local scales have a reduced ability to withstand additional impacts." FWS-525.

27        The Service's "no jeopardy" determination relies on the proportionally small effect of the

28   Project (taking 12 owls out of 3,000), but such a rote comparison fails to situate the jeopardy

PLS.' MEMO ISO PI - 16

1  analysis in the context of the owl's alarming plight. As the Ninth Circuit has held, the Service must

2  "rigorously ensure" that the Project would not "tip [the species] from a state of precarious survival

3  into a state of likely extinction." *Turtle Island*, 878 F.3d at 738.

4      *Turtle Island* is on point. There, the best available science (a population viability model)

5  showed the species (loggerhead turtles) on a path toward extinction, corresponding to the species'

6  uplisting from threatened to endangered. 878 F.3d at 737, 739. The proposed action posed only a

7  relatively small additional threat—the taking of one adult female per year—and the agency

8  premised its "no jeopardy" conclusion on the fact that the project posed "little to no . . . extinction

9  risk" above and beyond the dire baseline conditions. *Id.* at 737. The Ninth Circuit held, however,

10 that it was arbitrary and capricious for the agency to fixate on the "proportionally low risk that the

11 [proposed action] poses to the loggerheads relative to other threats[.]" *Id.* at 738.

12     Thus, the 3,000-owl population estimate (from 2021) is just one data point which lacks

13 critical context. If 3,000 owls were evidence of a healthy population, the taking of 12 owls may not

14 be significant. But the owl population is in fact collapsing on a spiraling downward trend on account

15 of significant threats from the barred owl and habitat loss. Like in *Turtle Island*, the Project would

16 "exacerbate the [owl's] decline," 878 F.3d at 739, by taking 12 owls from long-occupied,

17 reproductively successful territories. The BiOp is unlawful because it "segregate[s] its analysis" of the

18 Project, rather than assessing "aggregate effects." *NWF v. NMFS*, 524 F.3d at 926.

19     **C.    The Forest Service's Reliance on a Legally Flawed BiOp is Arbitrary and Capricious.**

20

21     The Forest Service has an independent duty to "insure" that the Project is "not likely to

22 jeopardize the continued existence" of the NSO. 16 U.S.C. § 1536(a)(2). The Ninth Circuit has

23 made clear that an agency's reliance on a legally flawed BiOp violates this duty. *CBD v. BLM*,

24 698 F.3d at 1127–28; *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 751 (9th Cir.

25 2020) ("Because we conclude that [the BiOp] is, at least in part, invalid, [the action agency's]

26 reliance on it is unlawful."); *Wild Fish* 628 F.3d at 532.

27     As shown above, Plaintiffs have demonstrated that there is a likelihood, or at least a

28 serious question that the BiOp is legally flawed. *See supra* (failure to articulate a rational

PLS.' MEMO ISO PI - 17

connection between its findings about the NSO's dire situation and its no-jeopardy conclusion authorizing take of up to 12 owls). Therefore, there is a likelihood, or at least a serious question that the Forest Service's reliance on the BiOp was arbitrary and capricious. *See Wild Fish*, 628 F.3d at 532 (BiOp's flaw of failing to articulate a rational connection between its findings and its no jeopardy conclusion was "legal in nature," and reliance on it was also arbitrary and capricious).

Plaintiffs need not provide new information undermining the BiOp's conclusions to show unlawful reliance. *CBD v. BLM*, 698 F.3d at 1127–28 ("an agency cannot meet its section 7 obligations by relying on a [BiOp] that is legally flawed **or** by failing to discuss information that would undercut the opinions conclusions.") (emphasis added). Thus, if this Court holds that there is a likelihood, or at least a serious question the BiOp is legally deficient, then it should likewise hold that the Forest Service's reliance on it was arbitrary and capricious. *See Save Our Cabinets v. U.S. FWS*, 255 F. Supp. 3d 1035, 1063 (D. Mont. 2017) (Forest Service's reliance on an unlawful no-jeopardy conclusion was arbitrary and capricious).

## II.    An Injunction Is Necessary to Avoid Irreparable Harm.

To satisfy the irreparable harm prong of the injunction test, plaintiffs must "establish that irreparable harm is **likely**, not just possible." *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 22). Although there is no "presumption" of irreparable harm in ESA cases, however, "establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood*, 789 F.3d at 1091. Indeed, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987). This is especially true in the context of endangered species, "[i]n light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them[.]" *Cottonwood*, 789 F.3d at 1091 (citing 16 U.S.C. § 1531). Plaintiffs do not need to show an "extinction-level threat" to justify an injunction under the ESA. *Nat'l Wildlife Fed'n v. NMFS ("NWF v. NMFS (2018)")*, 886 F.3d 803, 819 (9th Cir. 2018). Rather, a "reasonably

PLS.' MEMO ISO PI - 18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    certain threat of imminent harm to a protected species is sufficient for issuance of an injunction

2    under Section 9 of the ESA." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996);

3    *NWF v. NMFS (2018)*, 886 F.3d at 822 (relying on Section 9 cases for purposes of establishing

4    standard for Section 7 cases).

5          Moreover, plaintiffs "must show that they themselves are likely to suffer irreparable harm

6    absent an injunction. *NWF v. NMFS (2018)*, 886 F.3d at 819. To do so, they may file declarations

7    demonstrating "harm to their own interests stemming from the irreparable harm to the listed

8    species." *Id.*; *see also Cottrell*, 632 F.3d at 1135 (explaining that the loss of ability to view,

9    experience, and use natural areas in their undisturbed state is a cognizable, irreparable injury).

10   **A.     Implementation of the Project Through the Rainbow and Subsequent**
            **Longbow Contract Would Irreparably Harm Owls.**
11

12         The Service in this case determined that implementation of the Project would cause "take"

13   of 12 owls from the Scott and Soapstone territories. FWS-387. In particular, the heavy treatments

14   in and around the Scott territory would impair essential behavioral patterns, rendering the

15   continued occupancy of that territory "uncertain." FWS-379. Unless this Court enjoins

16   implementation of the Project, logging operations will commence, targeting trees in and around

17   the Scott territory that provide important nesting, roosting, and foraging habitat. FWS-386. Once

18   these trees are cut down, the habitat value of the forest will be degraded or removed entirely,

19   irreparably harming owls that comprise a source population important for the recovery and

20   continued persistence of the species. *See NWF v. NMFS (2018)*, 886 F.3d at 818 ("Harm to []

21   members [of a listed species] is irreparable because once a member of an endangered species has

22   been injured, the task of preserving that species becomes all the more difficult.") (citing *FCC v.*

23   *Rosboro Lumber*, 50 F.3d 781, 785 (9th Cir. 1995).

24         Ground-disturbing activities as part of logging operations under the Rainbow Thin

25   contract are set to begin as soon as September 22, 2025. ECF No. 39 ¶ 9. The contract area

26   includes portions of the Scott territory and adjacent nesting, roosting, and foraging habitat. *See*

27   *supra* pp. 9–11. The Longbow contract is set to be awarded in late September, ECF No. 39 ¶¶ 7–

28   8, and overlaps part of the Scott and Morgan territories. *See supra* pp. 9–11. Once the contract is

PLS.' MEMO ISO PI - 19

awarded, trees may be cut at any time. (Defendants have agreed to provide Plaintiffs with 30-days' notice before any ground-disturbing activities commence.). The habitat targeted by these sales supports critical life cycle functions for owls in a territory that has been occupied since the 1990 listing. *See* FWS-388; *see also* Declaration of Debbie Derby ("Derby Decl.") ¶ 9; Declaration of Susan Thomas ("Thomas Decl.") ¶¶ 6–7; Declaration of Lorry Plambeck ("Plambeck Decl.") ¶ 15.

The imminent logging operations in and around the Scott and Morgan territories would irreparably harm owls. This is apparent from the Service's own analysis and confirmed by the concurrently filed declarations of owl biologists and former Forest Service employees who collectively have nearly **100 years of experience** working on the Shasta-Trinity National Forest, including with the specific owl territories affected by the Project. Indeed, as the Service found, the Project's logging operations would remove or degrade nesting, roosting, and foraging habitat to the degree it will impair "breeding, feeding, and sheltering behaviors. *See* FWS-396; FWS-353, FWS-532 (owls will likely use the best available habitat, which is often in a non-circular arrangement, and therefore are not restricted to the 1.3-mile territorial circle); *cf. Marbled Murrelet v. Babbitt*, 83 F.3d at 1067–68 (showing of imminent threat of future harm sufficient for injunction under the ESA section 9 where listed birds were known to breed in area that would be impacted by logging activities, which would impair ability to breed)).

Tonja Chi, a biologist with decades of experience who spent considerable time reviewing Project documents and conducting field surveys in the Project area, expresses her "grave concerns and [certainty] that implementing one or both the Rainbow and Longbow Thin Timber Sales, will substantially degrade the existing northern spotted owl habitat found in the current Scott territory by reducing structure, complexity, and canopy cover for both the short and long term." Declaration of Tonja Chi ("Chi Decl.") ¶ 18. Lorry Plambeck and Susan Thomas, both of whom have worked as owl surveyors in this specific area for 30+ years, observe that the upcoming implementation would "impair [the owls'] survival and is certain to add to the whole species' collapse in this area and across the range." Thomas Decl. ¶ 11; *see also* Plambeck Decl. ¶ 14 (irrevocable harm to NSO). Debbie Derby, the former Forest Service wildlife biologist for

PLS.' MEMO ISO PI - 20

1    this part of the Shasta-Trinity National Forest, states that, "based on decades of work on this

2    Forest and with these owl territories specifically[,] the disturbance to the northern spotted owls

3    will be dire." Derby Decl. ¶ 16.

4        In particular, the two contracts involve FMZ treatments, which the Service found would

5    "remove important habitat features and alter microclimate conditions from part of the currently

6    occupied Scott core and home range[.]" FWS-329; FWS-336 ("Foraging habitat will be removed

7    from the current Scott and Soapstone cores and home ranges, and from the modeled fire refugia

8    between the two sites which affords connectivity between the territories and areas to the west.");

9    FWS-531. This harm is irreparable. *See* FWS-331 ("where nesting/roosting habitat is removed, it

10   is not expected to recover or re-develop these conditions in the future given the follow-up

11   treatments and continual maintenance."); Thomas Decl. ¶ 12 ("The soil in the project area is

12   ultramafic and trees grow at a very slow rate, meaning that removal of this many acres could

13   never regenerate in time to help save the NSO from becoming extinct.").

14       This harm is especially acute because the owls supported by the Scott territory comprise a

15   "source population" providing key demographic support for the California Klamath and

16   California Cascades Recovery Units. FWS-388; Chi Decl. ¶ 22 ("Removing successfully

17   reproducing pairs (current Scott and Soapstone have reported at least one nest each in the past 10

18   years) from this population, at a time when all regional populations continue to plummet, will

19   have far reaching implications to the range wide survival and stability of all northern spotted owl

20   populations.").

21       The Service concluded that, due to the "continuous area of treatment and effects of habitat

22   removal and degradation" in the Scott territory, continued demographic support is uncertain.

23   FWS-379, 387; *see also* Chi Decl. ¶ 18 ("habitat manipulations will result in a significant

24   decrease in prey availability, halt all nesting and reproductive capacities, and will likely result in

25   loss of one or more of the adult pair (abandonment) within the current Scott northern spotted owl

26   territory."); Derby Decl. ¶ 16 ("Implementation of the Project through these and future sales in

27   and around both the Scott and Soapstone territories will cause both pairs to abandon their

28   territories, thus eliminating the last remaining known northern spotted owls on the Shasta side of

PLS.' MEMO ISO PI - 21

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-227-2212

1    the District."); Thomas Decl. ¶ 13 ("Based on my 34 years of experience on the Management

2    Unit, and seeing the effects of similar or even lower impact "thinning" projects, the ability for

3    these owls to remain on the landscape, and continue reproducing and contributing new owls to the

4    population, will be significantly impaired if not completely removed."); *cf. CBD v. USFS*, 670 F.

5    Supp. 3d 1121, 1140 (D. Mont. 2023) ("[t]he record establishes that resiliency of grizzly bears

6    within the [Cabinet Yaak Ecosystem] is low, fecundity is low because of the small population,

7    and . . . and still have not met important recovery targets. . . the record establishes a direct link

8    between adverse effects to individual bears within the CYE and adverse effects on the species.").

9        In sum, the Service found that implementation of the Project is "reasonably certain" to

10    cause the take of 12 owls. FWS-396. Imminent operations under the Rainbow Thin contract, and

11    operations under the forthcoming Longbow Thin contract target nesting, roosting, and foraging

12    habitat in and around the Scott territory. *See supra* pp. 9–11. This imminent logging is likely to

13    cause irreparable harm. *See NWF v. NMFS (2018)*, 886 F.3d at 818–20 (finding no clear error

14    where the district court found irreparable harm relying on evidence of the populations' precarious

15    state and evidence that the dam's operations account for juvenile salmonid mortality during

16    migration).

17        **B.    Implementation of the Project Through the Rainbow and Subsequent
              Longbow Contracts Would Irreparably Harm Plaintiffs.**

18

19        "A plaintiff seeking a preliminary injunction must establish that . . . **he** is likely to suffer

20    irreparable harm in the absence of preliminary relief[.]" *Winter*, 555 U.S. at 19 (emphasis added).

21    According to the Ninth Circuit, Plaintiffs may satisfy this requirement when a project will harm

22    plaintiffs' members' ability to "view, experience, and utilize the areas in their undisturbed state,"

23    and will "prevent [their] use and enjoyment . . . of the forest." *Cottrell*, 632 F.3d at 1135. For the

24    purposes of establishing irreparable harm, "undisturbed" refers to the state of the forest before the

25    challenged activities occur. *See id.*

26        Here, the challenged activities would irreparably harm the ability of Plaintiff

27    organizations and their members to use and enjoy the forests, view owls, and engage in advocacy

28    work to protect owls. ECF No. 30 ¶¶ 10–11; ECF No. 31 ¶ 13–14; ECF No. 32 ¶ 14. Plaintiffs

PLS.' MEMO ISO PI - 22

and their members frequently visit this forest to hike and birdwatch, and have longstanding connections to owls in the Scott territory. *See* Derby Decl. ¶ 13 ("I regularly visit the forests within the South Fork project area for hiking and birdwatching. My last visit was on August 14, and if the logging is enjoined, I plan to return this fall or next summer at the very latest."); Plambeck Decl. ¶¶ 9–11 (stating that she personally discovered the Scott and Soapstone pairs, and describing her frequent visits to the area).

A member of Plaintiff Conservation Congress, Debbie Derby is "deeply committed to the health and recovery of the northern spotted owl"; and states that if an injunction does not issue, "a precious piece of my life—my connection to this forest and the incredible species like the owls— will be irreparably injured." Derby Decl. ¶¶ 17–18. Lorry Plambeck, a member of Plaintiff Mount Shasta Bioregional Ecology Center, has "devoted a lifetime to studying, surveying, and preserving the [owl] in this part of the Shasta-Trinity National Forest," and visits the area regularly to call for owls. Plambeck Decl. ¶¶ 10–11, 14. Project implementation would irreparably damage her relationship to the area and the owls it supports. *Id.* ¶¶ 16–17.

Once the mature forests that comprise suitable NSO habitat are logged, the harm is long-lasting if not permanent. *Cf. LOWD*, 752 F.3d at 764–65 ("The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage."); Chi Decl. ¶ 24 ("Under these conditions and once the habitat has been simplified and removed, the forest is not able to recreate structurally complex spotted owl nesting/roosting/foraging habitat within a biologically meaningful timeframe."). The logging operations would harm Plaintiffs and their members' ability to view and appreciate owls, and utilize the forest in its undisturbed state. Derby Decl. ¶ 18; Plambeck Decl. ¶ 14. The harm to the forest and the owls, and by extension, to Plaintiffs, is irreparable. *See NWF v. NMFS (2018)*, 886 F.3d at 820 ("The district court also properly concluded that plaintiffs had adequately shown harm to themselves as a result of harm to listed salmonids.").

### III.    The Balance of Hardships and Public Interest Favor an Injunction.

As "firmly recognized by the Supreme Court," "courts do not have discretion to balance

PLS.' MEMO ISO PI - 23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1   the parties' competing interests in ESA cases." *Cottonwood*, 789 F.3d at 1090 (citing *TVA v. Hill*,

2   437 U.S. 153, 185 (1978) and *Amoco Prod. Co.*, 480 U.S. at 543 n.9). Thus, the Supreme Court

3   removed from a court's equitable discretion the balance of hardship and public interest factors in

4   the four-factor injunction test. *Id.*; *see also id.* at 1091 ("the equities and public interest factors

5   always tip in favor of the protected species."); *Flathead-Lolo-Bitterroot*, 98 F.4th at 1191 (district

6   court did not abuse its discretion in finding that the last two factors tipped sharply in plaintiffs'

7   favor in an ESA case).

8         Because the balance of hardships and public interest factors tip sharply in Plaintiffs favor

9   in this ESA case, an injunction should issue if this Court finds serious questions going to the

10  merits and a likelihood of irreparable injury. *Cottonwood*, 789 F.3d at 1090–91; *Flathead-Lolo-*

11  *Bitterroot*, 98 F.4th at 1190.

12  **IV.    Scope of Injunction**

13        District courts enjoy "considerable discretion in fashioning suitable relief and defining the

14  terms of an injunction," but "injunctive relief must be tailored to remedy the specific harm

15  alleged." *Flathead-Lolo-Bitterroot*, 98 F.4th at 1195. Here, Plaintiffs have alleged harm in the

16  form of significant disruption of essential behavioral patterns from removal or degradation of

17  nesting, roosting, and foraging habitat. *See supra* pp. 19–23. This is the same harm that the

18  Service found reasonably certain to cause take of owls. FWS-396 ("The degradation, removal,

19  and modification of habitat and continuous spatial extent of the effects of the proposed action is

20  expected to significantly impair the breeding, feeding, and sheltering behavior of the adult owls

21  and their young."). The proposed relief—enjoining the ground and vegetation disturbing activities

22  in nesting, roosting, and foraging habitat—is thus crafted to "remedy the precise harm."

23  *Cottonwood*, 789 F.3d at 1091; *see also* 16 U.S.C. § 1536(d).

24  **V.     No Bond Should Be Required**

25        Federal Rule of Civil Procedure 65(c) ordinarily requires that a party moving for a

26  preliminary injunction provide a security in an amount determined by the court "to pay the costs

27  and damages sustained by any party found to have been wrongfully enjoined or restrained." The

28  Ninth Circuit, however, has long held that courts have discretion to dispense with the requirement

PLS.' MEMO ISO PI - 24

1   "where requiring security would effectively deny access to judicial review." *People of State of*

2   *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985),

3   *amended*, 775 F.2d 998 (9th Cir. 1985). A finding that the plaintiff is likely to succeed on the

4   merits also "tips in favor of a minimal bond or no bond at all." *Id.* at 1326. "Moreover, special

5   precautions to ensure access to the courts must be taken where Congress has provided for private

6   enforcement of a statute." *Id.* at 1325–26 (citing *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d

7   322, 323 (9th Cir. 1975)).

8           No bond should be required here because it "is well established that in public interest

9   environmental cases the plaintiff need not post bonds because of the potential chilling effect on

10  litigation to protect the environment and the public interest." *Cent. Or. Landwatch v.*

11  *Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). "Federal courts have consistently

12  waived the bond requirement in public interest environmental litigation, or required only a

13  nominal bond." *Id.*; *see also Forestkeeper v. USFS*, No. 1:21-cv-01041-DAD-BAM, 2021 U.S.

14  Dist. LEXIS 192443 (E.D. Cal. Oct. 5, 2021) (no additional bond beyond previously ordered

15  $100 bond considering no realistic harm to defendant and public interest nature); *Wildlands v.*

16  *Warnack*, 570 F. Supp. 3d 983, 993 (D. Or. 2021) (no bond on account of "chilling effect"); *cf. E.*

17  *Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868–69 (N.D. Cal. 2018), *aff'd*, 950

18  F.3d 1242 (9th Cir. 2020), *and aff'd*, 950 F.3d 1242 (9th Cir. 2020) (waiving bond).

19          Plaintiffs are each environmental interest non-profit organizations with limited resources;

20  imposition of a bond would have a "chilling effect." *Landwatch*, 905 F. Supp. 2d at 1198; Second

21  Declaration of Denise Boggs ¶¶ 2–3; Second Declaration of Nick Joslin ¶¶ 2–4; Second

22  Declaration of Kimberly Baker ¶¶ 2–5.

                                    **CONCLUSION**

23

24          For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant their Motion

25  for Preliminary Injunction.

26  ///

27  ///

28  ///

PLS.' MEMO ISO PI - 25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-227-2212*

1    DATED this 20th day of August, 2025

2          Respectfully submitted,

3              /s/ Oliver J. H. Stiefel
               Oliver J. H. Stiefel (OR Bar # 135436)
4              (503) 227-2212 | oliver@crag.org
               Meriel L. Darzen (OR Bar # 113645)
5              (503) 525-2725 | meriel@crag.org
               Kelsey Y. Dunn (OR Bar No. 244709)
6              (503) 234-0788 | kelsey@crag.org
               CRAG LAW CENTER
7              3141 E. Burnside St.
               Portland, Oregon 97214
8              Fax: (503) 296-5454
               *Pro Hac Vice*

9
               /s/ Thomas E. Wheeler
10             Thomas E. Wheeler (CA Bar No. 304191)
               (707) 446-9027 | tom@wildcalifornia.org
11             ENVIRONMENTAL PROTECTION INFORMATION CENTER
               145 G. Street, Suite A
12             Arcata, CA 95521

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      PLS.' MEMO ISO PI -

1

**CERTIFICATE OF SERVICE**

2         I hereby certify that on August 20, 2025, I electronically filed the foregoing with the Clerk

3    of the Court using the CM/ECF system, which will send electronic notification of such filing to

4    all counsel of record.

5              /s/ Oliver J. H. Stiefel
              Oliver J. H. Stiefel (OR Bar # 135436)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' MEMO ISO PI - II