1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KLAMATH FOREST ALLIANCE, et al.,          No. 2:24-cv-02347-DC-CSK

12                   Plaintiffs,

13            v.                                ORDER GRANTING PLAINTIFFS' MOTION
                                                FOR PRELIMINARY INJUNCTION
14   U.S. FISH AND WILDLIFE SERVICE, et
     al.,                                       (Doc. No. 41)
15
                     Defendants.
16

17          This matter came before the court on September 19, 2025 for a hearing on Plaintiffs'

18   motion for preliminary injunction. (Doc. No. 41.) Attorneys Oliver Stiefel and Kelsey Dunn

19   appeared on behalf of Plaintiffs Klamath Forest Alliance ("Klamath"), Conservation Congress,

20   Environmental Protection Information Center ("EPIC"), and Mount Shasta Bioregional Ecology

21   Center ("Mount Shasta Center") (collectively, "Plaintiffs"). Attorney Alison Finnegan appeared

22   on behalf of Defendants U.S. Fish and Wildlife Service ("FWS") and U.S. Forest Service ("FS")

23   (collectively, "Defendants"), alongside Kerry O'Hara, agency counsel for Defendant FWS, Ritu

24   Ahuja, agency counsel for Defendant FS, Joseph Rodarme, district ranger for the Shasta-Trinity

25   National Forest, and Keli McElroy, natural resources staff officer. For the reasons explained

26   below, Plaintiffs' motion for preliminary injunction will be granted.

27                                        **BACKGROUND**

28          This action arises from Defendant FWS's issuance of a Biological Opinion ("BiOp")

1

1  pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, for the South Fork

2  Sacramento Public Safety and Forest Restoration Project ("SFS Project"), located in the Shasta-

3  Trinity National Forest and authorized by Defendant FS. In the BiOp, Defendant FWS concluded

4  that the SFS Project is not likely to jeopardize the continued existence of the northern spotted owl

5  ("NSO"), which is listed as a threatened species under the ESA. Plaintiffs challenge Defendant

6  FWS's conclusion that the SFS Project is not likely to jeopardize the continued existence of the

7  NSO, and Defendant FS's reliance thereon to proceed with the SFS Project, as arbitrary and

8  capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

9  **A.    Statutory Background**

10      The ESA is "the most comprehensive legislation for the preservation of endangered

11  species ever enacted by any nation" and reflects "a conscious decision by Congress to give

12  endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*

13  *v. Hill*, 437 U.S. 153, 180, 185 (1978). The purpose of the ESA is to "provide a means whereby

14  the ecosystems upon which endangered species and threatened species depend may be conserved"

15  and "to provide a program for the conservation of such endangered species and threatened

16  species." 16 U.S.C. § 1531(b). Accordingly, the ESA requires "all [f]ederal departments and

17  agencies" to "seek to conserve endangered species and threatened species." *Id.* § 1531(c)(1).

18      Under the ESA, "the Secretary of the Interior . . . [is] charged with identifying threatened

19  and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council*

20  *v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (citing 16 U.S.C. § 1533). Defendant FWS

21  administers the ESA for species under the jurisdiction of the Secretary of the Interior, meaning

22  Defendant FWS lists "endangered" and "threatened" species and designates their "critical

23  habitat." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007) (citing 50

24  C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b)). A species is endangered if it "is in danger of

25  extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and is

26  threatened if it "is likely to become an endangered species within the foreseeable future

27  throughout all or a significant portion of its range," *id*. § 1532(20). A species' critical habitat

28

includes those areas "essential to the conservation of the species." *Id.* § 1532(5)(A)(i).[1]

Section 7(a)(2) of the ESA requires each federal agency to ensure, "in consultation with and with the assistance of [Defendant FWS],"[2] that "any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of any endangered or threatened species" or "destr[oy] or adverse[ly] modif[y]" critical habitat. *Id.* § 1536(a)(2). To jeopardize means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

Consultation with Defendant FWS can be informal or formal. *Id.* §§ 402.13, 402.14. To determine whether informal or formal consultation is required, the agency proposing an action must assess whether the action may affect a listed endangered or threatened species or critical habitat. *Id.* § 402.14(a). If a listed species or critical habitat might be present in the proposed action area, the agency must prepare a biological assessment to determine whether the listed species is likely to be affected by the proposed agency action. 16 U.S.C. § 1536(c)(1). If an agency determines its proposed action "'is not likely to adversely affect any listed species or critical habitat' and the consulting agency agrees in writing, informal consultation is complete and no further action is required." *White v. United States Army Corps of Eng'rs*, 659 F. Supp. 3d 1045, 1048 (N.D. Cal. 2023) (citing 50 C.F.R. § 402.13(a)). "But if either the acting agency or [Defendant FWS] deems the action is 'likely to adversely affect' a listed species or its critical

---

[1] "Conservation" is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

[2] In addition to the Secretary of the Interior, the Secretary of Commerce is charged "with identifying threatened and endangered species and designating critical habitats for those species" pursuant to the ESA. *Nat. Res. Def. Council*, 749 F.3d at 779 (citing 16 U.S.C. § 1533). The National Marine Fisheries Service ("NMFS") administers the ESA for species under the jurisdiction of the Secretary of Commerce. *Nat'l Ass'n of Home Builders*, 551 U.S at 651 (citing 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b)). Accordingly, each federal agency must consult with NMFS rather than Defendant FWS for species under the jurisdiction of the Secretary of Commerce.

1   habitat, the agency considering an action must engage in 'formal consultation' with the

2   [Defendant FWS]." *Id.* (citing 50 C.F.R. § 402.14(b)(1)).

3       Formal consultation with Defendant FWS culminates in the issuance of a BiOp "detailing

4   how the [proposed] agency action affects the species or its critical habitat." 16 U.S.C. §

5   1536(b)(3)(A). In formulating a BiOp, Defendant FWS must use the "best scientific and

6   commercial data available" to "review all relevant information provided by the [f]ederal agency,"

7   "evaluate the current status and environmental baseline of the listed species or critical habitat,"

8   "evaluate the effects of the action and cumulative effects on the listed species or critical habitat,"

9   and "add the effects of the action and cumulative effects to the environmental baseline." 50

10  C.F.R. § 402.14(g). Based on this analysis, Defendant FWS determines "whether the action is

11  likely to jeopardize the continued existence of listed species or result in the destruction or adverse

12  modification of critical habitat." *Id.*

13      If Defendant FWS's BiOp concludes that the proposed agency action will jeopardize the

14  continued existence of listed species or result in the destruction or adverse modification of critical

15  habitat, then the action may not go forward unless the wildlife agency can suggest a "reasonable

16  and prudent alternative[ ]" that avoids jeopardy, destruction, or adverse modification. 16 U.S.C. §

17  1536(a)(2), (b)(3)(A). On the other hand, if Defendant FWS's BiOp concludes that the proposed

18  agency action will not jeopardize the continued existence of listed species or result in the

19  destruction or adverse modification of critical habitat, Defendant FWS must determine whether

20  the action is likely to result in any incidental take of endangered or threatened species. *Id.* §

21  1536(b)(4). To "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

22  collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). If Defendant FWS

23  determines that an action "is reasonably certain" to result in an incidental take of that species, it

24  must issue an incidental take statement. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(g)(7). In an

25  incidental take statement, Defendant FWS

26      (i) specifies the impact of such incidental taking on the species,

27      (ii) specifies those reasonable and prudent measures that the
        Secretary considers necessary or appropriate to minimize such
28      impact . . . [and]

4

1
2
3

> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the [f]ederal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

4    16 U.S.C. § 1536(b)(4)(C). "Any taking in compliance with an incidental take statement's terms

5    and conditions is [] exempt" from Section 9 of the ESA, which generally prohibits take. *White*,

6    659 F. Supp. 3d at 1049 (citing 16 U.S.C. § 1536(b)(4)(iv), (o)(2)).

7    **B.    Factual Background[3]**

8            1.    The Northern Spotted Owl

9            The listed species at issue in this case is the NSO. The NSO is a dark brown, medium-

10   sized bird with a barred tail, white spots on its head and breast, and dark brown eyes surrounded

11   by prominent facial discs. (FWS-421.) NSOs are nocturnal and spend most of their lives

12   underneath the forest canopy. (*Id.*) The current range of the NSO extends from southwest British

13   Columbia to Marin County, California. (*Id.*) The NSO is extirpated or uncommon in areas such as

14   Washington and British Columbia due to habitat reduction caused by timber harvest activities.

15   (*Id.*)

16           NSOs rely on older forest habitat structures that provide for nesting, roosting, foraging,

17   and dispersal. (FWS-424–25.) Nesting and roosting habitat provides the structural features

18   necessary for nesting, protection from adverse weather, and cover to reduce predation risks.

19   (FWS-471.) Foraging habitat provides a food supply for NSO survival and reproduction. (FWS-

20   425.) "Dispersal habitat is habitat that both juvenile and adult [NSO] must use when looking to

21   establish new territory." (FWS-23257.) Dispersal habitat is "essential to maintaining stable

22   populations by filling territorial vacancies when resident NSO die or leave their territories, and to

23   providing adequate gene flow across the range of the species." (FWS-425.)

24           NSOs have a wide territorial range but are typically anchored to a nest site during the

25

26   ──────────
     [3] On February 4, 2025, Defendants FWS and FS each lodged administrative records with the
27   court. (Doc. No. 20.) In the briefing on the pending motion, the parties cite to the administrative
     record using document bates stamp numbers omitting leading zeros (*e.g.*, "FWS-xxx" or "FS-
28   xxx"). To maintain consistency with the parties' briefing, the court will cite to the administrative
     record using document bates stamp numbers omitting leading zeros throughout this order.

breeding season. (FWS-423.) NSO nesting and roosting sites are found in older, complex forests with large diameter trees and high canopy closure. (FWS-424–25.) NSOs nest almost exclusively in trees. (FWS-425.) The half-mile or 500-acre radius surrounding the nest site is called the "core" area. (FWS-353.) Defendant FWS recommends maintaining at least 400 acres of nesting, roosting, and foraging habitat in the core. (*Id*.)

The NSO's "home range" or "territory" is the area traversed by an NSO pair or individual during their breeding, feeding, and sheltering activities. (FWS-423.) The home range extends 1.3 miles or 3,398 acres out circularly from the nest site. (FWS-353.) The circular analysis is a reasonable approximation of the area within which territorial NSOs obtain resources, though actual core use areas conform to the distribution of high-quality habitat. (*Id*.) FWS recommends maintaining a minimum of 1,336 acres of nesting, roosting, and foraging habitat in the home range. (*Id*.)

In 1990, Defendant FWS listed the NSO as threatened due to habitat loss and modification and lack of protective regulatory mechanisms. (FWS-288.) NSO critical habitat was designated in 1992 and revised in 2021. (FWS-25933.) In 2020, Defendant FWS determined that "uplisting" the species to endangered was warranted but precluded by higher priority listing decisions. (FWS-288.)

The barred owl's movement into NSO territory may be the most significant contributor to the NSO's decline. (FWS-318.) In response to barred owl competition and occupation, NSOs shift their locations. (FWS-300.) Logging and wildfires also contribute to NSO habitat loss. (FWS-288.) Though the rate of habitat removal from logging has declined in the NSO's range, the practice continues to have negative local effects and "lag" effects from past logging. (FWS-25600.) Large scale wildfire is now the primary source of NSO habitat loss on federal land. (FWS-434.) Wildfire is also considered a primary threat because of its potential to rapidly alter NSO habitat. (*Id*.) Current indications suggests that hotter, drier summers due to climate change will likely result in larger, more intense fires. (FWS-435.) The effects of projects designed to reduce fire-suppressed vegetation and mimic the effects of historical fire regimes are "uncertain and highly debated in the literature." (*Id*.)

The NSO population has declined at an average annual rate of -5.3 percent from 1995 through 2016. (FWS-430.) The most recent meta-analysis found that estimates of annual rates of population change, occupancy rates, and realized population change show continuing declines across the range and in Northern California specifically. (FWS-466.) While demographic trends of the NSO are well-studied, current estimates of the rangewide NSO population are not available. (*Id.*) There are likely 3,000 or fewer individual NSOs in the rangewide population as of 2021. (FWS-468.) Overall, the NSO population is in decline because of decades of habitat loss, habitat degradation from timber harvest and wildfire, and the recent expansion of barred owl populations. (FWS-499.) According to Defendant FWS, the only way to stop the NSO population decline and prevent extinction is to manage the barred owl threats and conserve adequate amounts of high-quality habitat. (FWS-361.)

### 2. Northern Spotted Owl Recovery Plan

In 2011, Defendant FWS published a Revised Recovery Plan ("Recovery Plan") for the NSO in accordance with the ESA. (FWS-10968.) The stated recovery goal in the Recovery Plan is to improve the status of the NSO such that it can be removed from ESA protection. (FWS-10992.) The stated recovery objectives are (1) NSO populations that are sufficiently large and distributed enough to warrant no longer listing the NSO under the ESA, (2) adequate habitat that is available to NSOs and will continue to exist to allow the species to persist without protection of the ESA; and (3) reduction or elimination of threats such that NSO populations stabilize or increase and are unlikely to become threatened again in the foreseeable future. (*Id.*) The stated relevant recovery criteria are (1) stable population trend, (2) adequate population distribution, (3) continued maintenance and recruitment of NSO habitat, and (4) post-delisting monitoring. (FWS–10992–93.)

The Recovery Plan also includes 33 Recovery Actions. (FWS-10976.) Recovery Actions 10 and 32 are most relevant to the lands managed by Defendant FS. (FWS-269.) Recovery Action 10 is designed to conserve NSO sites and high value NSO habitat for demographic support to the population. (FWS-11046.) Recovery Action 32 directs land managers to prioritize the maintenance and restoration of well-distributed, older, and structurally complex multi-layered

forests on federal and non-federal lands across the NSO range. (FWS-11070.) Overall, the Recovery Plan recommends conserving occupied NSO sites, especially those containing habitat conditions to support reproduction. (FWS-11045.)

The Recovery Plan establishes 12 recovery units to assist managers in re-establishing or maintaining the NSO population and habitat distribution and meeting the overall recovery criteria. (FWS-11004.) Of particular relevance to this case are the California Cascades and California Klamath recovery units.

The California Cascades recovery unit is located in the eastern area of the NSO range in California and covers 2.5 million acres. (FWS-500.) "It lies south of the Oregon Eastern and Western Cascades, and east of the California Klamath Province." (FWS-501.) The area is recognized as providing an important contribution to NSO conservation. (*Id*.) Suitable habitat in the California Cascades recovery unit is limited, which makes conserving the available habitat more important to the continued use of the area by the NSO for demographic support, gene flow, and connectivity. (*Id*.)

The California Klamath recovery unit "encompasses approximately [6] million acres and extends from the Oregon border with California, south to the Clear Lake Basin within the Inner Coast Range." (FWS-511.) "It lies between the California Coast and California Cascades Provinces and is bordered to the north by the Oregon Klamath Province." (*Id*.) The population data of the NSO is not available for this region, but estimates range from 1,142 to 1,304 NSOs. (*Id*.) The California Klamath recovery unit is a stronghold for the rangewide NSO population and plays a key role in maintaining population stability. (*Id*.) The California Klamath recovery unit also contains a "'source' population of NSO." (*Id*.)

3.    The South Fork Sacramento Public Safety and Forest Restoration Project

The SFS Project is located in the Shasta-Trinity National Forest, above Lake Siskiyou and approximately three miles west of Mount Shasta City, California. (FWS-274, 295.) The SFS Project was authorized by Defendant FS to "improve public safety in the event of a wildfire, improve fire resilience of forests, and improve recreational opportunities." (FWS-274.) The SFS Project area consists of 16,285 acres of land intended for "vegetation and fuel management

8

treatment" activities, including silvicultural habitat thinning treatment (8,022 acres), prescribed fire and mechanical fuels treatment (14,172 acres), fuel management zones ("FMZ") treatment (6,473 acres), Port Orford Cedar tree treatment (90 acres), fire resilience treatment (592 acres), and recreation improvement and expanded camping opportunities. (FWS-257, 274–79.)

The SFS Project "action area" is defined as "all areas to be affected directly or indirectly by the [f]ederal action and not merely the immediate area involved in the action." (FWS-283) (citing 50 CFR § 402.02). For the NSO, the action area consists of a 1.3-mile buffer of all proposed treatments, resulting in 47,411 acres. (FWS-283, 300.) Most of the NSO action area is located in the California Cascades province and recovery unit, with a small portion in the California Klamath province and recovery unit. (FWS-294, 384.)

Within the SFS Project action area, there are five NSO territories: Soapstone, current Scott, Morgan, historic Scott, and Boulder. (FWS-301.) While the Morgan, historic Scott, and Boulder territories are considered historic, the Soapstone and current Scott territories are considered occupied by territorial pairs. (*Id.*) The current Scott and Soapstone territories are "two of the longest occupied NSO territories in the California Cascades recovery unit" since the species was listed as threatened in 1990 and "contribute to the local population . . . in both recovery units." (FWS-388.) The Scott and Soapstone territories represent source populations for both recovery units. (*Id.*)

4.    The Biological Opinion

Pursuant to the ESA, Defendant FS formally consulted with Defendant FWS over the SFS Project's impact on NSOs. (FWS-257.) Defendant FWS finalized the BiOp for the SFS Project on November 20, 2023. (FWS-265.) In formulating the BiOp for the SFS Project, Defendant FWS considered factors including (1) the status and current condition of NSO critical habitat, (2) the environmental baseline for NSO critical habitat in the action area, (3) the effects of the SFS Project on the NSO, (4) the cumulative effects of other actions that are reasonably certain to occur in the action area, and (5) the incidental take of NSOs in the action area. (FWS-323–56; 360–83.)

In its jeopardy analysis for NSOs, Defendant FWS found that "adverse effects are anticipated from habitat loss, reduction, and continuous areas of effects in currently occupied sites

and connectivity areas." (FWS-385.) Of the approximately 52 percent of NSO nesting, roosting

and foraging habitat in the action area that will be treated and variously maintained, degraded,

downgraded, or removed under the SFS Project, approximately 28 percent will be "adversely

affected." (FWS-386.) Defendant FWS also found that "the effects of the action are expected to

impair NSO breeding, feeding, and sheltering behaviors in two occupied core use areas and home

ranges, and connectivity areas between the two sites" and "[t]he effects in the Scott and

Soapstone home range are predicted to result in reduced productivity and fitness of NSOs during

the first 1-10 years of management actions in these locations." (*Id*.)

Further, Defendant FWS determined that the "[r]eproduction, numbers, and distribution of

NSO in the action area will be reduced over the first ten years of implementation." (FWS-387.)

The SFS Project is reasonably certain to cause the incidental takes of twelve NSOs. (FWS-396.)

Specifically, the SFS Project is likely to cause the incidental take of four adult and eight young,

juvenile, or subadult NSOs. (*Id*.) The take of NSOs will likely be caused by the removal,

modification, and degradation of nesting, roosting and foraging habitat and disturbance during the

first one to five years of project activity in the Scott and Soapstone territories. (FWS-396–97.)

Defendant FWS opined that while the "reproductive behaviors and production of young from the

territorial NSO pairs in the action area will be reduced or delayed," "the reproductive output at

the rangewide scale will not be appreciably harmed" by the SFS Project. (FWS-391.)

Ultimately, Defendant FWS concluded that the implementation of the SFS Project is "not

likely to jeopardize the continued existence of the [NSO] by reducing their reproduction,

numbers, or distribution." (FWS-392–93.) In the BiOp's jeopardy analysis, Defendant FWS

discussed both the effects at the province level and recovery unit scale and the effects at the

rangewide scale. (FWS-387–89.) In its recovery unit analysis, Defendant FWS determined that

"in terms of species reproduction, numbers, or distribution, the impacts to and take of individuals

that contribute to the California Cascades and California Klamath recovery units will not

appreciably impair or preclude the conservation role provided by these recovery units to the

survival and recovery of the species as a whole." (FWS-388.) In its rangewide analysis,

Defendant FWS determined that "in terms of species reproduction, numbers, or distribution,

while the impacts to and take of individuals is considered significant at the action area scale, it represents less than one percent of the current estimated population at the rangewide scale where [Defendant FWS] has estimated there are likely 3,000 or fewer individuals present." (FWS-389.)

On December 21, 2023, after receiving Defendant FWS's BiOp, Defendant FS released its Decision Notice approving the SFS Project. (FS-128, 138.)

### 5. Rainbow Thin and Longbow Thin Contracts

The Rainbow Thin MP contract ("Rainbow Thin"), a commercial timber sale under the SFS Project, was awarded on January 26, 2024. (Doc. No. 43-2 at ¶ 4.) The Rainbow Thin contract was authorized under Defendant FWS's December 2023 Decision Notice for the SFS Project. (*Id.* at ¶ 3.) The Rainbow Thin contract encompasses 278 acres of thinning along high use roads. (*Id.* at ¶ 4.) It also includes, among other activities, the removal of roughly 2.5 million board feet of sawtimber and 4,000 tons of biomass. (*Id.* at ¶ 4.) The contract area is located southwest of Lake Siskiyou and includes NSO nesting, roosting, and foraging habitat in the eastern portion of the current Scott territory. (Doc. No. 43-3 at ¶ 6.) Rainbow Thin contract activities are expected to begin as early as September 22, 2025 and will be completed by January 31, 2026, the contract termination date. (Doc. No. 43-1 at ¶ 23.)

Defendant FWS advertised a second sale under the SFS Project, the Longbow Thin MP Integrated Resource Timber contract ("Longbow Thin") on July 30, 2025. (Doc. No. 43-2 at ¶ 5.) The Longbow Thin contract was expected to be awarded on September 15, 2025.[4] (*Id.*) Per the Longbow Thin contract, approximately 297 acres along high use roads will be thinned and more than 225 acres south of the South Fork Sacramento River will be treated. (Doc. Nos. 42-3 at 1–2; 43-2 at ¶ 6.) It also includes the removal of roughly 6 million board feet of sawtimber and 1,500 tons of biomass, with 5,000 tons of biomass as an optional part of the contract. (Doc. No. 43-2 at ¶ 6.) The Longbow Thin contract overlaps with NSO nesting, roosting, and foraging habitat in the northern portion of the current Scott territory and the southern portion of the Morgan territory. (Doc. No. 42-3 at 1–2; FWS-520.)

[4] At the hearing on Plaintiffs' motion for preliminary injunction, Defendants confirmed that the Longbow Thin contract was awarded on September 15, 2025.

11

1    **C.    Procedural Background**

2          On August 28, 2024, Plaintiffs filed a complaint initiating this action against Defendants,

3    challenging Defendants' final administrative actions with respect to the SFS Project on the

4    Shasta-Trinity National Forest. (Doc. No. 1.) Specifically, Plaintiffs challenge the BiOp issued by

5    Defendant FWS for the SFS Project, upon which Defendant FS relied. (*Id.* at 34–37.) In their

6    complaint, Plaintiffs assert that: (1) Defendant FWS's BiOp and "no jeopardy" conclusion are

7    arbitrary and capricious under the APA, 5 U.S.C. §§ 701–06, and not in accordance with the

8    ESA, 16 U.S.C. §§ 1531–44; and (2) Defendant FS violated the APA and its duties under ESA

9    Section 7 by relying on an unlawful and "legally flawed" BiOp for the SFS Project. (*Id.*)

10         On February 21, 2025, Plaintiffs filed a motion for summary judgment. (Doc. Nos. 28,

11   29.) On March 28, 2025, Defendants filed a cross-motion for summary judgment. (Doc. Nos. 33,

12   34.) On April 25, 2025, Plaintiffs filed an opposition to Defendants' cross-motion for summary

13   judgment and a reply in support of their motion for summary judgment. (Doc. No. 36.) On May

14   23, 2025, Defendants filed a reply in support of their cross-motion for summary judgment. (Doc.

15   No. 38.) The court took the parties' motions for summary judgment under submission to be

16   decided on the papers pursuant to Local Rule 230(g). (Doc. No. 37.)

17         On August 20, 2025, Plaintiffs filed a motion for preliminary injunction based on the

18   impending implementation of the Rainbow Thin and Longbow Thin contracts.[5] (Doc. Nos. 41,

19   41-1.) Plaintiffs seek to enjoin "commercial logging operations" in NSO nesting, roosting, and

20   foraging habitat in the action area.[6] (Doc. No. 45 at 22.) On September 3, 2025, Defendants filed

---

21   [5] At the hearing on Plaintiffs' motion for preliminary injunction, Defendants clarified that the
22   Rainbow Thin contract is not set to begin until September 29, 2025, at the earliest. In addition,
     Defendants confirmed that a 30-day notice will be provided to Plaintiffs prior to implementation
23   of the Longbow Thin contract. Plaintiffs have not yet received a 30-day notice regarding
     implementation of the Longbow Thin contract.
24
25   [6] In their notice for the pending motion, Plaintiffs request that the court "enjoin any ground or
     vegetation disturbing operations—including roadwork, tree felling, and site preparation—within
26   [NSO] nesting, roosting, or foraging habitat in the action area, as mapped in the BiOp." (Doc. No.
     41 at 4.) In their reply, Plaintiffs clarify that they seek to enjoin "commercial logging operations"
27   in NSO nesting, roosting, or foraging habitat in the action area. (Doc. No. 45 at 22.) At the
     hearing on Plaintiffs' motion, Plaintiffs confirmed that they seek to enjoin "commercial logging
28   operations."

1 an opposition to Plaintiffs' motion for preliminary injunction. (Doc. No. 43.) On September 8,

2 2025, Defendants filed a notice of errata regarding their opposition. (Doc. No. 44.) On September

3 10, 2025, Plaintiffs filed their reply thereto. (Doc. No. 45.)

## LEGAL STANDARD

5 "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as

6 of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quoting *Winter v. Natural*

7 *Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, a plaintiff

8 must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the

9 absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an

10 injunction is in the public interest. *Id.* at 346 (quoting *Winter*, 555 U.S. at 20). A plaintiff seeking

11 a preliminary injunction bears the burden of proving these elements. *Klein v. City of San*

12 *Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).

13 The Ninth Circuit has adopted a "'sliding scale test,' which allows a strong showing on

14 the balance of hardships to compensate for a lesser showing of likelihood of success." *Where Do*

15 *We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022) (citing *All. for the*

16 *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)). "[W]hen plaintiffs establish

17 that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury,

18 and the injunction is in the public interest, they need only show 'serious questions' on the merits."

19 *Id.* (citing *Cottrell*, 632 F.3d at 1135). "[T]he serious questions standard is 'a lesser showing than

20 likelihood of success on the merits.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,

21 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211,

22 1217 (9th Cir. 2017)). "Serious questions are 'substantial, difficult and doubtful, as to make them

23 a fair ground for litigation and thus for more deliberative investigation.'" *Republic of the*

24 *Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation omitted). Although

25 "[s]erious questions need not promise a certainty of success, nor even present a probability of

26 success, [they] must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National*

27 *Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

28 "In cases involving the ESA, Congress removed from the courts their traditional equitable

1   discretion in injunction proceedings of balancing the parties' competing interests." *Flathead-*

2   *Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190 (quoting *Nat'l Wildlife Fed'n v. Burlington*

3   *N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994)). "[W]hen applying the 'serious questions' test to

4   ESA claims, the last two factors—balance of hardships and the public interest—always 'tip[]

5   heavily in favor of protected species.'" *Id.* Thus, a court considering ESA claims on a motion

6   for preliminary injunction need only consider (1) serious questions on the merits and (2)

7   likelihood of irreparable injury. *Id.* at 1190 (citing *Cottrell*, 632 F.3d at 1135).

8                                    **ANALYSIS**

9   **A.    *Winter* Factors**

10          Plaintiffs seek a preliminary injunction enjoining commercial logging operations in NSO

11  nesting, roosting, and foraging habitat to preserve the status quo before the court reaches a

12  decision on the merits, given the impending implementation of the Rainbow Thin and Longbow

13  Thin contracts. (Doc. No. 41-1.) Plaintiffs contend a preliminary injunction is warranted because

14  they have demonstrated (1) a likelihood of success, or at least serious questions, on the merits of

15  their APA claims, and (2) an injunction is necessary to avoid irreparable harm to NSOs and

16  Plaintiffs. (*Id.* at 20–32.) The court begins by addressing serious questions on the merits, before

17  turning to irreparable harm.

18          1.    <u>Serious Questions on the Merits</u>

19          The APA governs the court's review of agency decisions under the ESA. *Ctr. for*

20  *Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012).

21  Pursuant to the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action,

22  findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise

23  not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if

24  the agency has:

25              relied on factors which Congress has not intended it to consider,
                entirely failed to consider an important aspect of the problem, offered
26              an explanation for its decision that runs counter to the evidence
                before the agency, or is so implausible that it could not be ascribed
27              to a difference in view or the product of agency expertise.

28  *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028,

                                           14

1  1034 (9th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

2  U.S. 29, 43 (1983)).

3      "Under the arbitrary and capricious standard, the scope of review is deferential and

4  narrow, and the court is not to substitute its judgment for the agency's judgment." *Friends of*

5  *Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021) (citation omitted). "Nevertheless, the

6  agency must examine the relevant data and articulate a satisfactory explanation for its action

7  including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463

8  U.S. at 43. A court may not accept an agency's *post hoc* rationalizations for its action. *Id.* at 50.

9  "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by

10  the agency itself." *Id.*

11      Here, Plaintiffs contend that Defendant FWS's BiOp for the SFS Project is arbitrary and

12  capricious under the APA.[7] (Doc. No. 41-1 at 10, 20.) Specifically, Plaintiffs argue that

13  Defendant FWS failed to rationally explain why the SFS Project would not appreciably impair the

14  NSO's recovery prospects, and why the SFS Project is "not likely to jeopardize the continued

15  existence of the [NSO] by reducing their reproduction, numbers, or distribution." (*Id.* at 20–26;

16  FWS-392–93.) With respect to Defendant FWS's determination that the SFS Project is "not likely

17  to jeopardize the continued existence of the [NSO]," Plaintiffs challenge Defendant FWS's

18  analysis regarding the SFS Project's effects on NSOs at both the recovery unit scale and the

19  rangewide scale. (Doc. No. 41-1 at 23–26.) Because the court finds that Plaintiffs have raised a

20  serious question on the merits of their claim that Defendant FWS acted arbitrarily and

21  capriciously in determining that the SFS Project is "not likely to jeopardize the continued

22  existence of the [NSO]" based on its analysis of effects at the recovery unit scale, the court will

23  not address Plaintiffs' remaining arguments.

24      In the BiOp, Defendant FWS conducted a recovery unit assessment for two NSO recovery

25  units impacted by the SFS Project: California Cascades and California Klamath. (*See* FWS-497–

26

---

27  [7] Defendant FWS's issuance of a BiOp for the SFS Project is considered a final agency action and
   is therefore subject to judicial review under the APA. *See Nat'l Wildlife Fed'n v. Nat'l Marine*
28  *Fisheries Serv.*, 524 F.3d 917, 925 (9th Cir. 2008).

519.) As summarized in the BiOp's jeopardy analysis for NSOs (FWS-384–88), Defendant FWS found that "[a]t the scale of the California Cascades and California Klamath recovery units, the affected [nesting, roosting, and foraging] habitat in the action area represents approximately 1 and 0.3 percent of the available [nesting, roosting, and foraging] habitat in each recovery unit, respectively." (FWS-388.) "Despite the small amount of habitat affected at the scale of these recovery units," Defendant FWS found that "the watershed and action area contain two of the longest occupied NSO territories in the California Cascades recovery unit since the 1990 listing" of the NSO as a threatened species—the Scott and Soapstone territories. (*Id.*) Both the Scott and Soapstone territories "contribute to the local population and populations in both [the California Cascades and California Klamath] recovery units." (*Id.*) "While the Scott and Soapstone NSO territories do not represent the sole source population to either recovery unit, their breeding, feeding, and sheltering behaviors will be impaired by the effects of the action," "result[ing] in a likely reduced contribution of future owls (numbers) and subsequent reduced distribution in the two recovery units for one to five years." (*Id.*) Overall, Defendant FWS determined that "adverse impacts from the action may influence approximately 21 percent of the estimated population" of NSOs in the California Cascades and California Klamath recovery units. (*Id.*)

Defendant FWS concluded, as part of its jeopardy analysis for NSOs, that the SFS Project is "not expected to preclude the survival or recovery of the species at the scale of the California Cascades and California Klamath provinces and recovery units." (*Id.*) Defendant FWS opined that "while the proposed action will affect important habitats that contribute to the successful reproduction and survival of the NSOs and their long-term recovery in the action area, these effects are not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function of each recovery unit, as defined in the Recovery Plan" for NSOs. (*Id.*) Defendant FWS further opined that "in terms of species reproduction, numbers, or distribution, the impacts to and take of individuals that contribute to the California Cascades and California Klamath recovery units will not appreciably impair or preclude the conservation role provided by these recovery units to the survival and recovery of the species as a whole." (*Id.*)

In the pending motion, Plaintiffs argue that Defendant FWS failed to rationally explain why the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function" of the California Cascades and California Klamath recovery units if "adverse impacts from the [SFS Project] may influence approximately 21 percent" of NSOs in those recovery units. (*See* Doc. Nos. 41-1 at 22–24; 45 at 11–13) (citing FWS-388). Plaintiffs further argue that Defendant FWS "failed to consider an important aspect of the problem: the health and stability of other owl territories in the [r]ecovery [u]nits to compensate for the loss of one-fifth [or 21 percent] of the population." (Doc. No. 41-1 at 23–24.)

In their opposition to the pending motion, Defendants argue the BiOp articulated multiple facts to support Defendant FWS's conclusion that the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function" of the California Cascades and California Klamath recovery units. (Doc. No. 43 at 17.) Namely, "the Scott and Soapstone territories 'do not represent the sole source population to either recovery unit,'" "the reduction in fitness [to NSOs] that is likely to result from the SFS Project is not expected to be permanent," "the California Klamath population, as a whole, is a 'stronghold for the rangewide population,'" and "'it is possible that floater owls may utilize portions of the action area." (*Id.*) (citing FWS-303, 385–88, 511).

In their reply, Plaintiffs argue that the "BiOp fails to substantiate" Defendant FWS's "conclusory statement" that "the Scott and Soapstone NSO territories do not represent the sole source population" to either the California Cascades or California Klamath recovery unit, which implies that the "[SFS] Project will not appreciably diminish reproductive output." (Doc. No. 45 at 12.) Plaintiffs contend the BiOp does not include an analysis of "other source populations, let alone whether they would be able to compensate for the [SFS Project's take" of twelve NSOs from the Scott and Soapstone NSO territories. (*Id.*) In Plaintiff's view, Defendant FWS's "[r]ecovery [u]nit 'no jeopardy' conclusion cannot be sustained on the record because it implicitly relies on the health and stability of other populations within the [r]ecovery [u]nits, which [Defendant FWS] never analyzed." (*Id.*)

17

1    Based on the court's review of Defendant FWS's BiOp for the SFS Project, Defendant

2  FWS's deduction that the "Scott and Soapstone NSO territories do not represent the sole source

3  population to either recovery unit" is not supported by evidence in the record. Although the BiOp

4  explains that the California Klamath recovery unit contains a source population of NSO (FWS-

5  511), at no point does the BiOp explain that the "Scott and Soapstone NSO territories do not

6  represent the sole source population to either recovery unit." The first time this fact appears in the

7  BiOp is in Defendant FWS's jeopardy analysis for NSOs, and no supporting citation is provided.

8  (*See* FWS-388.) Further, the BiOp does not discuss any other "source populations" for the

9  California Cascades and California Klamath recovery units besides the Scott and Soapstone NSO

10  territories. Finally, the court notes that contrary to Defendant FWS's characterization of the BiOp,

11  the jeopardy analysis for NSOs in Defendant FWS's BiOp does not explicitly state that the SFS

12  Project is "not expected to measurably influence the provincial baseline or constitute an

13  appreciable reduction in the 'recovery support' function of each recovery unit" *because* the Scott

14  and Soapstone NSO territories do not represent the sole source population to either recovery unit.

15  In actuality, the BiOp states that "[w]hile the Scott and Soapstone NSO territories do not

16  represent the sole source population to either recovery unit, their breeding, feeding, and sheltering

17  behaviors will be impaired" by the SFS Project. (*Id.*)

18    At the hearing on the pending motion, the court provided defense counsel an opportunity

19  to direct the court to portions of the BiOp discussing "source populations" of NSOs in the

20  California Cascades and California Klamath recovery units. Counsel for Defendants was unable

21  to do so, providing citations to facts other than those relating to "source populations." *See* (FWS-

22  303) (noting floater owls may utilize portions of the action area); (FWS-385) (describing "a long

23  history of NSO occupancy in the action area"); (FWS-511) (stating that the California Klamath

24  recovery unit is a "stronghold[] for the rangewide population). Indeed, Defendants have not cited

25  to any sections of the BiOp explaining that (1) the "Scott and Soapstone NSO territories do not

26  represent the sole source population to either recovery unit" or (2) discussing other "source

27  populations" for the California Cascades and California Klamath recovery units. Nevertheless,

28  Defendant FWS asserts it concluded that the SFS Project is "not expected to measurably

influence the provincial baseline or constitute an appreciable reduction in the 'recovery support'

function" of the California Cascades and California Klamath recovery units, at least in part,

because "the Scott and Soapstone territories do not represent the sole source population to either

recovery unit." (Doc. No. 43 at 15, 17.)

"The touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061,

1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 52); *see also Pac. Coast Fed'n of*

*Fishermen's Associations v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005)

("It is a basic principle of administrative law that the agency must articulate the reason or reasons

for its decision."). The lack of analysis on "source populations" in the BiOp suggests Defendant

FWS has not articulated a rational connection between the facts and its conclusion that the SFS

Project is "not expected to measurably influence the provincial baseline or constitute an

appreciable reduction in the 'recovery support' function" of the California Cascades and

California Klamath recovery units. Therefore, the court concludes that Plaintiffs have raised a

serious question on the merits of their claim that Defendant FWS's "no jeopardy" conclusion for

NSOs based on its analysis at recovery unit scale, and Defendant FS's reliance thereon, was

arbitrary and capricious under the APA.

    2.    <u>Irreparable Harm</u>

The court now turns to whether Plaintiffs have demonstrated they are likely to suffer

irreparable harm in the absence of the court granting the requested preliminary injunctive relief.

To obtain a preliminary injunction, Plaintiffs must show that the risk of irreparable harm

is "likely, not just possible." *All. for the Wild Rockies*, 632 F.3d at 1131. Though "there is no

presumption of irreparable injury where there has been a procedural violation in ESA cases,"

"establishing irreparable harm should not be an onerous task for plaintiffs" given that the ESA's

purpose is to "conserv[e] endangered and threatened species . . . ." *Cottonwood Env't L. Ctr. v.*

*U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015); *see also Nat'l Wildlife Fed'n v. Nat'l*

*Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) ("The 'plain intent' of Congress in

enacting the ESA was 'to halt and reverse the trend toward species extinction, whatever the

1    cost.'") (*quoting Tenn. Valley Auth.*, 437 U.S. at 184). Further, "[e]nvironmental injury, by its

2    nature, can seldom be adequately remedied by money damages and is often permanent or at least

3    of long duration, i.e., irreparable." *Env't Democracy Project v. Green Sage Mgmt., LLC*, No. 22-

4    cv-03970-JST, 2022 WL 4596616, at *3 (N.D. Cal. Aug. 23, 2022) (quoting *Sierra Club v. U.S.*

5    *Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (citations omitted)).

6                    *a.    Irreparable Harm to NSOs*

7            Plaintiffs are not required to show an "extinction-level threat" to the NSO to demonstrate

8    irreparable harm. *Nat'l Wildlife Fed'n*, 886 F.3d at 819. What is required is a showing of "a

9    definitive threat of future harm to protected species, not mere speculation." *Id.* (quoting *Nat'l*

10   *Wildlife Fed'n*, 23 F.3d at 1512 n.8). Further, the fact that Section 7 of the ESA "permits some

11   incidental take of listed species does not establish that harm to individual members of a species

12   cannot be irreparable," especially where "the BiOp violates the ESA." *Id.*

13           Plaintiffs argue in their motion that the implementation of the Rainbow Thin and

14   Longbow Thin contracts, and specifically the imminent logging operations in the Scott and

15   Morgan territories, would irreparably harm the NSOs. (Doc. No. 41-1 at 29.) Plaintiffs emphasize

16   that in the BiOp, Defendant FWS found that the proposed activity under the contracts would

17   "remove important habitat features and alter microclimate conditions from part of the currently

18   occupied Scott core and home range." (*Id.* at 30) (citing FWS-329, 336). Plaintiffs contend this

19   harm is irreparable because NSOs "supported by the Scott territory comprise a source population

20   providing key demographic support for the [] [r]ecovery [u]nits," and that after the

21   implementation of the SFS Project, continued demographic support in the Scott territory is

22   uncertain. (*Id.*) (citing FWS-331, 388).

23           Defendants argue in their opposition that because the Longbow Thin and Rainbow Thin

24   contract activities are not scheduled to begin until the end of the NSO's critical breeding and

25   nesting season, sounds levels from the activities do meet the definition of harassment. (Doc. No.

26   43 at 23) (citing FWS-343, 315–17). Defendants further aver that activities under the near-term

27   contracts cannot form the basis of an irreparable injury when the entire SFS Project will lead to

28   "reduction in quantity and quality of nesting, roosting, foraging, and dispersal" of less than one

1  percent of the total habitat available to the rangewide population. (*Id.*) (citing FWS-384–89).

2  Defendants also note that the anticipated incidental take of twelve NSOs that is likely to occur

3  because of the SFS Project "represents less than one percent of the current estimated population at

4  the rangewide scale." (*Id.* at 23) (citing FWS-396.) Finally, Defendants argue that at most,

5  Plaintiffs can show a possibility of harm to individual NSOs in the action area but cannot show

6  irreparable harm is certain to occur "given the BiOp's assessment that NSOs are expected to

7  occupy the Soapstone territory . . . and the uncertainties associated with the [continued]

8  occupancy of the Scott territory." (*Id.* at 25.)

9          In reply, Plaintiffs argue that while the "implementation of the contracts themselves may

10  not reduce habitat in the Scott home range below minimum thresholds," Defendant FWS found

11  that the "continuous area of treatment across the territory and effects from habitat removal and

12  degradation" threaten demographic support. (Doc. No. 45 at 18) (citing FWS-379.) Plaintiffs note

13  that the expected incidental take of NSOs is expected to occur from habitat degradation and

14  removal, rather than direct injury or mortality. (*Id.*) (citing FWS-325–27). Plaintiffs reiterate that

15  Defendant FWS concluded in the BiOp that due to SFS Project activities, "continued

16  demographic support is uncertain in the Scott territory. . . ." though it is currently defined as

17  "occupied." (*Id.* at 18 n. 4) (citing FWS-379.)

18          The court agrees with Plaintiffs that Defendants' argument that no irreparable harm will

19  occur in the absence of an injunction is undermined by Defendant FWS's own discussion of the

20  Scott territory's future in the BiOp. Under both the Rainbow Thin and Longbow Thin contracts,

21  commercial logging is authorized in portions of the Scott territory and would remove NSO

22  nesting, roosting, and foraging habitat therein. (Doc. No. 41-1 at 19–20.) Contrary to Defendants'

23  assertion, the BiOp states that the "Scott and Soapstone [territories] are currently occupied" by

24  NSOs. (FWS-303.) Further, after the implementation of the SFS Project, "barely sufficient

25  nesting, roosting, and foraging habitat will remain available in portions of the home range" in the

26  Scott territory. (FWS-353.) As a result of the effects of "habitat removal and degradation" and the

27  displacement of NSO prey, the continued occupancy and demographic support of the Scott

28  territory is not predictable. (FWS-379, 387.) The SFS Project may affect up to 100 percent of the

1  NSO habitat in the Scott territory. (FWS-396.) The BiOp is clear in that the SFS Project will have

2  significant and lasting effects on the NSO habitat in the Scott territory.

3      Though the Longbow Thin and Rainbow Thin contracts are not scheduled to begin until

4  after the critical breeding and nesting season (Doc. No. 43 at 23), the BiOp found that the SFS

5  Project will have significant and lasting effects on NSO habitat in the Scott territory. (FWS-353,

6  379, 387.) Further, both contracts include commercial logging operations within the Scott

7  territory and will contribute to the degradation of NSO habitat therein. (Doc. No. 41-1 at 29.) At

8  the very least, Plaintiffs have shown that there is a "definitive threat of future harm" to the NSOs

9  through the degradation of their critical habitat within the Scott territory. *See Nat'l Wildlife*

10 *Fed'n*, 886 F.3d at 819 (holding that the district court did not err or abuse its discretion when it

11 based an injunction off a finding of lesser harm than extinction level threat).

12     Accordingly, Plaintiffs have demonstrated that the NSO is likely to suffer irreparable

13 harm in the absence of a preliminary injunction.

14                   *b.    Irreparable Harm to Plaintiffs*

15     To obtain a preliminary relief, Plaintiffs must also "show that they themselves are likely to

16 suffer irreparable harm absent an injunction." *Nat'l Wildlife Fed'n*, 886 F.3d at 822 (citations

17 omitted). Plaintiffs may "show[] irreparable harm to their own interests stemming from the

18 irreparable harm to the listed species." *Id.*

19     Plaintiffs argue that the implementation of the Rainbow Thin and Longbow Thin contracts

20 "would irreparably harm the ability of Plaintiff organizations and their members to use and enjoy

21 forests, view owls, and engage in advocacy work to protect owls." (Doc. No. 41-1 at 31–32.) In

22 support of their argument, Plaintiffs cite to several declarations from their members, which were

23 filed with Plaintiffs' motion for preliminary injunction. (*Id.*) Plaintiffs further argue that "[o]nce

24 the mature forests that compromise suitable NSO habitat are logged, the harm is long-lasting if

25 not permanent." (*Id.*)

26     In their opposition, Defendants argue that the BiOp's conclusions demonstrate "there is no

27 merit to [Plaintiffs'] argument that work pursuant to the Rainbow Thin and Longbow [Thin]

28 contracts will harm [Plaintiffs'] interests to 'enjoy the forests and view owls.'" (Doc. No. 43 at

26.) Defendants further assert "Plaintiffs' declarants cannot credibly argue that their connection to NSOs in the action area will be 'irreparably injured' [] when no lethal take of NSOs is anticipated and one of the impacted territories is anticipated to continue to be occupied in both the short- and long-term." (*Id.*) Finally, Defendants aver that Plaintiffs' asserted harms are generic allegations that do not establish a particularized injury. (*Id.*)

In their reply, Plaintiffs argue that despite Defendants' claim, "lethal take has never been the issue in this case about habitat modification." (Doc. No. 45 at 19.) Plaintiffs argue that a finding of irreparable harm where Plaintiffs affirm that "logging operations will irreparably impair their use and enjoyment" of a specific area is supported by Ninth Circuit authority. (*Id.*)

The court agrees with Plaintiffs that they are likely to suffer irreparable harm in the absence of a preliminary injunction. Members from Plaintiff organizations submitted detailed declarations attesting to the harm that would be caused to them personally by implementation of the Rainbow Thin and Longbow Thin contracts. (Doc. Nos. 41-3; 41-4.)

For example, a member of Plaintiff Conservation Congress, a retired wildlife biologist with Shasta-Trinity National Forest, affirmed she "regularly visit[s] the forests within the [SFS] Project area for hiking and birdwatching" and plans to "return this fall or next summer at the very latest." (Doc. No. 41-3 at ¶¶ 6, 13.) She also stated that the "presence of [NSO] in the Scott and Soapstone territories is one of the primary reasons" she returns to the area and understands that the Rainbow Thin and Longbow Thin contract operations will "overlap portions of the Scott territory, and will log important nesting, roosting, and foraging habitat." (*Id.* at ¶¶ 14–15.) She further affirms that she is "deeply committed to the health and recovery of the [NSO]" and that "a precious piece of my life—my connection to this forest and the incredible species like the [NSOs] will be irreparably injured." (Doc. No. 41-3 at ¶¶ 6, 19.)

Another member of Plaintiff Mount Shasta Center is a former field research and surveyor for Defendant FS in the Shasta-Trinity National Forest. (Doc. No. 41-4 at ¶¶ 3, 5.) She affirms that "the portions of the Shasta-Trinity National Forest covered by the Project[] are special and precious places" as she has "devoted a liftetime to studying, surveying, and preserving the [NSO] in this part of the Shasta-Trinity National Forest." (*Id.* at ¶ 7.) She also "spend[s] all of [her] spare

1    time hiking, exploring, and swimming" in the Scott and Soapstone territories. (*Id.* at ¶ 11.)

2    Further, she "personally discovered the Soapstone and Scott NSO pairs" and "hoot[s]" for the

3    Scott pair when she visits the area. (*Id.* at ¶¶ 9–10.)

4         In their declarations, Plaintiffs identify the near-term contract activities that will harm

5    their interests as commercial logging activity under SFS Project. (Doc. No. 41-3 at ¶¶ 14–15.)

6    Plaintiffs discuss how the loss of NSO habitat caused by commercial logging will inhibit their

7    ability to observe NSOs in the project area, and more specifically, in the Scott territories which

8    will be affected by the Longbow Thin and Rainbow Thin contract activities. (Doc. Nos. 41-4 at ¶

9    11; 41-3 at ¶¶ 14–15); *see also Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1111

10   (E.D. Cal. 2013) ("To show such an injury, a plaintiff must identify specifically planned tree-

11   cutting, link the proposed tree-cutting to its members' specific interests, and demonstrate how the

12   proposed tree-cutting will harm those interests."). Plaintiffs also discuss their plans to visit Scott

13   and Soapstone territories in the near future, and specifically when contract activities will take

14   place. (Doc. No. 41-3 at ¶¶ 6, 13); *see also All. for the Wild Rockies*, 632 F.3d at 1135; *Sierra*

15   *Forest Legacy*, 951 F. Supp. 2d at 1111 ("[plaintiff] must identify tree-cutting within a particular

16   area of a [n]ational [f]orest that its members plan to use in the future and demonstrate that the

17   proposed tree-cutting will harm their interests").

18        Finally, Defendants' argument that Plaintiffs cannot reasonably argue that they will be

19   irreparably harmed because no lethal take of NSOs is anticipated is unavailing. Defendant FWS

20   concluded in the BiOp that continued occupancy of NSOs in the Scott territory is unpredictable

21   because "barely sufficient nesting, roosting, and foraging will remain available" after the SFS

22   Project is implemented. (FWS-353, 387.) Indeed, implementation of the SFS project "may affect

23   100 percent of the [nesting, roosting, and foraging] and dispersal habitat in the Scott" territory.

24   (FWS-396.) The BiOp is unequivocal in its discussion that the effects of the SFS Project activities

25   on the Scott territory will be significant, and "given the scale and magnitude of effects," the

26   NSOs presence in the territory in the future is uncertain. (FWS-387.) Given this conclusion in the

27   BiOp, it appears that even if no lethal take of NSOs is anticipated, a significant number of NSOs

28   are likely to leave the Scott territory. As a result, Plaintiffs future ability to observe NSOs in the

1   Scott territory as a result of the SFS Project's implementation, including the Rainbow Thin and

2   Longbow Thin contracts, is at least uncertain.

3        Accordingly, the court finds that Plaintiffs have demonstrated they will be irreparably

4   harmed in the absence of a preliminary injunction.

5   **3.    Scope of Preliminary Injunction**

6        Injunctive relief "must be tailored to remedy the specific harm alleged" despite the district

7   court's "considerable discretion in fashioning suitable relief and defining the terms of an

8   injunction." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1195 (citations omitted).

9   "The scope of the injunction must be no broader and no narrower than necessary to redress the

10  injury shown by the plaintiffs." *Id.*

11       As mentioned above, Plaintiffs seek to enjoin "commercial logging operations" in NSO

12  nesting, roosting, and foraging habitat in the action area. (Doc. No. 45 at 22.) Defendants request

13  that any injunction should be narrowly tailored, and "enjoin[] only ground-disturbing work under

14  the Rainbow Thin and Longbow [Thin] contracts" within the Scott home range. (Doc. No. 43 at

15  29.) Although the court finds that Plaintiffs have raised a serious question on the merits and are

16  likely to suffer irreparable harm in the absence of a preliminary injunction, Plaintiffs' requested

17  injunction is overly broad as it is not tailored to the specific harm likely to be caused by

18  commercial logging activity under the Rainbow Thin and Longbow Thin contracts. Accordingly,

19  the court will enjoin any commercial logging operations authorized under the Rainbow Thin and

20  Longbow Thin contracts until this court reaches a decision on the merits in this action.

21  **4.    Bond**

22       Federal Rule of Civil Procedure 65(c) enables a district court to issue a preliminary

23  injunction "only if the movant gives security in an amount that the court considers proper to pay

24  the costs and damages sustained by any party found to have been wrongfully enjoined or

25  restrained." Fed. R. Civ. P. 65. "Rule 65(c) invests the district court 'with discretion as to the

26  amount of security required, if any.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

27  (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). District courts have

28  "discretion to dispense with the security requirement, or to request mere nominal security, where

1    requiring security would effectively deny access to judicial review." *Chang v. Cnty. of Siskiyou*,

2    No. 2:22-cv-01378-KJM-AC, 2024 WL 5159653, at *5 (E.D. Cal. Dec. 18, 2024) (quoting

3    *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325

4    (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985)). In exercising this discretion, district courts

5    "routinely impose either no bond or a minimal bond in public interest environmental cases." *City

6    of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999) (citing *People of State of

7    Cal. ex rel. Van De Kamp*, 766 F.2d at 1325)).

8           Here, Plaintiffs request that no bond be imposed (Doc. No. 41-1 at 34), while Defendants

9    request the court "require Plaintiffs to post a security of $25,000, which represents [Defendant

10   FS]'s best estimation" of the financial loss due to project delay. (Doc. No. 43 at 30.) Plaintiffs are

11   all environmental non-profit organizations and submitted declarations affirming that their limited

12   financial resources render them unable to pay a substantial bond. (Doc. No. 41-7 at ¶¶ 2–3)

13   (Plaintiff Mount Shasta Center is a "non-profit organization" whose grant funding is "expressly

14   forbidden from being used to fund legal challenges" and "does not have additional funds to post a

15   bond in this case."); (Doc. No. 41-8 at ¶ 2) (Plaintiff Conservation Congress is a "non-profit

16   organization with a staff of [one]." Due to its "an extremely limited budget," "the imposition of a

17   bond would be a significant and insurmountable hurdle" that "would effectively stop [its] ability

18   to participate in this case."); (Doc. No. 41-9 at ¶¶ 3–4) (Plaintiffs Klamath and EPIC are "small[]

19   non-profit[s]" with "extremely limited" budgets, and "are unable to post anything other than a

20   nominal bond in this litigation."). The court declines to require Plaintiffs to post Defendants'

21   requested bond amount given Plaintiffs' demonstrated inability to pay. *See Save Strawberry

22   Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1191 (N.D. Cal. 2009), *adhered to*, No. 08-cv-

23   03494-WHA, 2009 WL 1098888 (N.D. Cal. Apr. 22, 2009) (court did not require bond where

24   plaintiff was a non-profit that would have difficulty posting bond and "the proposed bond

25   requirement would effectively deny access to judicial review"); *see also Landwatch v.

26   Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012) ("It is well established that in public

27   interest environmental cases the plaintiff need not post bonds because of the potential chilling

28   effect on litigation to protect the environment and the public interest."). Instead, the court will

1    require Plaintiffs to post only a $100.00 nominal bond.

2                                        **CONCLUSION**

3           For the reasons explained above,

4           1.        Plaintiffs' motion for a preliminary injunction (Doc. No. 41) is GRANTED;

5           2.        The court ENJOINS any commercial logging operations authorized under the

6                     Rainbow Thin and Longbow Thin contracts until this court reaches a decision on

7                     the merits; and

8           3.        Plaintiffs must post a $100.00 bond on or before October 3, 2025.

9

10

11          IT IS SO ORDERED.

12   Dated:   **September 26, 2025**                     _____

13                                                        Dena Coggins
                                                          United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28