UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KLAMATH FOREST ALLIANCE, et al.,

Plaintiffs,

v.

U.S. FISH AND WILDLIFE SERVICE, et al.,

Defendants.

No. 2:24-cv-02347-DC-CSK

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

(Doc. Nos. 28, 33)

This matter is before the court on Plaintiffs Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, and Mount Shasta Bioregional Ecology Center's motion for summary judgment, (Doc. No. 28), and Defendants U.S. Fish and Wildlife Service and U.S. Forest Service's cross-motion for summary judgment (Doc. No. 33). Pursuant to Local Rule 230(g), the court took the motions under submission to be decided on the papers. (Doc. No. 37.) For the reasons stated below, the court will grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion for summary judgment.

**BACKGROUND**

This action arises from Defendant U.S. Fish and Wildlife Service's ("FWS") issuance of a Biological Opinion ("BiOp") pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, for the South Fork Sacramento Public Safety and Forest Restoration Project ("SFS

Project"), located in the Shasta-Trinity National Forest and authorized by Defendant U.S. Forest Service ("Forest Service"). In the BiOp, Defendant FWS concluded that the SFS Project is not likely to jeopardize the continued existence of the northern spotted owl ("NSO"), which is listed as a threatened species under the ESA. Plaintiffs Klamath Forest Alliance, Conservation Congress, Environmental Protection Information Center, and Mount Shasta Bioregional Ecology Center (collectively, "Plaintiffs") challenge Defendant FWS's conclusion that the SFS Project is not likely to jeopardize the continued existence of the NSO, and Defendant Forest Service's reliance thereon to proceed with the SFS Project, as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

**A. Statutory Background**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" and reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 185 (1978). The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Accordingly, the ESA requires "all [f]ederal departments and agencies" to "seek to conserve endangered species and threatened species." *Id.* § 1531(c)(1).

Under the ESA, "the Secretary of the Interior . . . [is] charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (citing 16 U.S.C. § 1533). Defendant FWS administers the ESA for species under the jurisdiction of the Secretary of the Interior, meaning Defendant FWS lists "endangered" and "threatened" species and designates their "critical habitat." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007) (citing 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b)). A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). A species' critical habitat

includes those areas "essential to the conservation of the species." *Id.* § 1532(5)(A)(i).[1]

Section 7(a)(2) of the ESA requires each federal agency to ensure, "in consultation with and with the assistance of [Defendant FWS],"[2] that "any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or "destr[oy] or adverse[ly] modif[y]" critical habitat. *Id.* § 1536(a)(2). To jeopardize means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

Consultation with Defendant FWS can be informal or formal. *Id.* §§ 402.13, 402.14. To determine whether informal or formal consultation is required, the agency proposing an action must assess whether the action may affect a listed endangered or threatened species or critical habitat. *Id*. § 402.14(a). If a listed species or critical habitat might be present in the proposed action area, the agency must prepare a biological assessment to determine whether the listed species is likely to be affected by the proposed agency action. 16 U.S.C. § 1536(c)(1). If an agency determines its proposed action "'is not likely to adversely affect any listed species or critical habitat' and the consulting agency agrees in writing, informal consultation is complete and no further action is required." *White v. U. S. Army Corps of Eng'rs*, 659 F. Supp. 3d 1045, 1048 (N.D. Cal. 2023) (citing 50 C.F.R. § 402.13(a)). "But if either the acting agency or [Defendant FWS] deems the action is 'likely to adversely affect' a listed species or its critical

---

[1] "Conservation" is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

[2] In addition to the Secretary of the Interior, the Secretary of Commerce is charged "with identifying threatened and endangered species and designating critical habitats for those species" pursuant to the ESA. *Nat. Res. Def. Council*, 749 F.3d at 779 (citing 16 U.S.C. § 1533). The National Marine Fisheries Service ("NMFS") administers the ESA for species under the jurisdiction of the Secretary of Commerce. *Nat'l Ass'n of Home Builders*, 551 U.S at 651 (citing 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b)). Accordingly, each federal agency must consult with NMFS rather than Defendant FWS for species under the jurisdiction of the Secretary of Commerce.

habitat, the agency considering an action must engage in 'formal consultation' with the [Defendant FWS]." *Id.* (citing 50 C.F.R. § 402.14(b)(1)).

Formal consultation with Defendant FWS culminates in the issuance by Defendant FWS of a biological opinion "detailing how the [proposed] agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). In formulating a biological opinion, Defendant FWS must use the "best scientific and commercial data available" to "[r]eview all relevant information provided by the [f]ederal agency," "[e]valuate the current status and environmental baseline of the listed species or critical habitat," "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat," and "[a]dd the effects of the action and cumulative effects to the environmental baseline." 50 C.F.R. § 402.14(g). Based on this analysis, Defendant FWS determines "whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.*

If Defendant FWS's biological opinion concludes that the proposed agency action will jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat, then the action may not go forward unless there is  a "reasonable and prudent alternative[ ]" that avoids jeopardy, destruction, or adverse modification. 16 U.S.C. § 1536(a)(2), (b)(3)(A). On the other hand, if Defendant FWS's biological opinion concludes that the proposed agency action will not jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat, Defendant FWS must determine whether the action is likely to result in any incidental take of endangered or threatened species. *Id.* § 1536(b)(4). To "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). If Defendant FWS determines that an action "is reasonably certain" to result in an incidental take of that species, it must issue an incidental take statement. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(g)(7). In an incidental take statement, Defendant FWS

> (i) specifies the impact of such incidental taking on the species,
>
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact . . . [and]

> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the [f]ederal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4)(C). "Any taking in compliance with an incidental take statement's terms and conditions is [] exempt" from Section 9 of the ESA, which generally prohibits take. *White*, 659 F. Supp. 3d at 1049 (citing 16 U.S.C. § 1536(b)(4)(iv), (o)(2)).

**B. Factual Background**[3]

1. <u>The Northern Spotted Owl</u>

The listed species at issue in this case is the NSO. The NSO is a dark brown, medium-sized bird with a barred tail, white spots on its head and breast, and dark brown eyes surrounded by prominent facial discs. (FWS-421.) NSOs are nocturnal and spend most of their lives underneath the forest canopy. (*Id.*) The current range of the NSO extends from southwest British Columbia to Marin County, California. (*Id.*) The NSO is extirpated or uncommon in areas such as Washington and British Columbia due to habitat reduction caused by timber harvest activities. (*Id.*)

NSOs rely on older forest habitat structures that provide for nesting, roosting, foraging, and dispersal. (FWS-424–25.) Nesting and roosting habitat provides the structural features necessary for nesting, protection from adverse weather, and cover to reduce predation risks. (FWS-471.) Foraging habitat provides a food supply for NSO survival and reproduction. (FWS-425.) "Dispersal habitat is habitat that both juvenile and adult [NSO] must use when looking to establish new territory." (FWS-23257.) Dispersal habitat is "essential to maintaining stable populations by filling territorial vacancies when resident NSO die or leave their territories, and to providing adequate gene flow across the range of the species." (FWS-425.)

NSOs have a wide territorial range but are typically anchored to a nest site during the breeding season. (FWS-423.) NSO nesting and roosting sites are found in older, complex forests

---

[3] This factual background is derived from the administrative record lodged with the court on February 4, 2025. (*See* Doc. No. 20.) In this order, the court cites to pages of the administrative record utilizing the Bates stamp convention employed by the parties, i.e., FWS-xxx.

with large diameter trees and high canopy closure. (FWS-424–25.) NSOs nest almost exclusively in trees. (FWS-425.) The half-mile or 500-acre radius surrounding the nest site is called the "core" area. (FWS-353.) Defendant FWS recommends maintaining at least 400 acres of nesting, roosting, and foraging habitat in the core. (*Id.*)

The NSO's "home range" or "territory" is the area traversed by an NSO pair or individual during their breeding, feeding, and sheltering activities. (FWS-423.) The home range extends 1.3 miles or 3,398 acres out circularly from the nest site. (FWS-353.) The circular analysis is a reasonable approximation of the area within which territorial NSOs obtain resources, though actual core use areas conform to the distribution of high-quality habitat. (*Id.*) FWS recommends maintaining a minimum of 1,336 acres of nesting, roosting, and foraging habitat in the home range. (*Id.*)

In 1990, Defendant FWS listed the NSO as threatened due to habitat loss and modification and lack of protective regulatory mechanisms. (FWS-288.) NSO critical habitat was designated in 1992 and revised in 2021. (FWS-25933.) In 2020, Defendant FWS determined that "uplisting" the species to endangered was warranted but precluded by higher priority listing decisions. (FWS-288.)

The barred owl's movement into NSO territory may be the most significant contributor to the NSO's decline. (FWS-318.) In response to barred owl competition and occupation, NSOs shift their locations. (FWS-300.) Logging and wildfires also contribute to NSO habitat loss. (FWS-288.) Though the rate of habitat removal from logging has declined in the NSO's range, the practice continues to have negative local effects and "lag" effects from past logging. (FWS-25600.) Large scale wildfire is now the primary source of NSO habitat loss on federal land. (FWS-434.) Wildfire is also considered a primary threat because of its potential to rapidly alter NSO habitat. (*Id.*) Current indications suggests that hotter, drier summers due to climate change will likely result in larger, more intense fires. (FWS-435.) The effects of projects designed to reduce fire-suppressed vegetation and mimic the effects of historical fire regimes are "uncertain and highly debated in the literature." (*Id.*)

The NSO population declined at an average annual rate of -5.3 percent from 1995 through

2016. (FWS-430.) The most recent meta-analysis found that estimates of annual rates of population change, occupancy rates, and realized population change show continuing declines across the range and in Northern California specifically. (FWS-466.) While demographic trends of the NSO are well-studied, current estimates of the rangewide NSO population are not available. (*Id.*) There are likely 3,000 or fewer individual NSOs in the rangewide population as of 2021. (FWS-468.) Overall, the NSO population is in decline because of decades of habitat loss, habitat degradation from timber harvest and wildfire, and the recent expansion of barred owl populations. (FWS-499.) According to Defendant FWS, the only way to stop the NSO population decline and prevent extinction is to manage the barred owl threats and conserve adequate amounts of high-quality habitat. (FWS-361.)

2. The Northern Spotted Owl Recovery Plan

In 2011, Defendant FWS published a Revised Recovery Plan ("Recovery Plan") for the NSO in accordance with the ESA. (FWS-10968.) The stated recovery goal in the Recovery Plan is to improve the status of the NSO such that it can be removed from ESA protection. (FWS-10992.) The stated recovery objectives are: (1) NSO populations that are sufficiently large and distributed enough to warrant no longer listing the NSO under the ESA, (2) adequate habitat that is available to NSOs and will continue to exist to allow the species to persist without protection of the ESA; and (3) reduction or elimination of threats such that NSO populations stabilize or increase and are unlikely to become threatened again in the foreseeable future. (*Id.*) The stated relevant recovery criteria are: (1) stable population trend, (2) adequate population distribution, (3) continued maintenance and recruitment of NSO habitat, and (4) post-delisting monitoring. (FWS–10992–93.)

The Recovery Plan also includes 33 Recovery Actions. (FWS-10976.) Recovery Actions 10 and 32 are most relevant to the lands managed by Defendant Forest Service. (FWS-269.) Recovery Action 10 is designed to conserve NSO sites and high value NSO habitat for demographic support to the population. (FWS-11046.) Recovery Action 32 directs land managers to prioritize the maintenance and restoration of well-distributed, older, and structurally complex multi-layered forests on federal and non-federal lands across the NSO range. (FWS-11070.)

Overall, the Recovery Plan recommends conserving occupied NSO sites, especially those containing habitat conditions to support reproduction. (FWS-11045.)

The Recovery Plan establishes 12 recovery units to assist managers in re-establishing or maintaining the NSO population and habitat distribution and meeting the overall recovery criteria. (FWS-11004.) Of relevance to this action are the California Cascades and California Klamath recovery units.

The California Cascades recovery unit is located in the eastern area of the NSO range in California and covers 2.5 million acres. (FWS-500.) “It lies south of the Oregon Eastern and Western Cascades, and east of the California Klamath Province.” (FWS-501.) The area is recognized as providing an important contribution to NSO conservation. (*Id.*) Suitable habitat in the California Cascades recovery unit is limited, which makes conserving the available habitat more important to the continued use of the area by the NSO for demographic support, gene flow, and connectivity. (*Id.*)

The California Klamath recovery unit “encompasses approximately [6] million acres and extends from the Oregon border with California, south to the Clear Lake Basin within the Inner Coast Range.” (FWS-511.) “It lies between the California Coast and California Cascades Provinces and is bordered to the north by the Oregon Klamath Province.” (*Id.*) The population data of the NSO is not available for this region, but estimates range from 1,142 to 1,304 NSOs. (*Id.*) The California Klamath recovery unit is a stronghold for the rangewide NSO population and plays a key role in maintaining population stability. (*Id.*) The California Klamath recovery unit also contains a “‘source’ population of NSO.” (*Id.*)

3. <u>The South Fork Sacramento Public Safety and Forest Restoration Project</u>

The SFS Project is located in the Shasta-Trinity National Forest, above Lake Siskiyou and approximately three miles west of Mount Shasta City, California. (FWS-274, 295.) The SFS Project was authorized by Defendant Forest Service to “improve public safety in the event of a wildfire, improve fire resilience of forests, and improve recreational opportunities.” (FWS-274.) The SFS Project area consists of 16,285 acres of land intended for “vegetation and fuel management treatment” activities, including silvicultural habitat thinning treatment (8,022 acres),

prescribed fire and mechanical fuels treatment (14,172 acres), fuel management zones ("FMZ") treatment (6,473 acres), Port Orford Cedar tree treatment (90 acres), fire resilience treatment (592 acres), and recreation improvement and expanded camping opportunities. (FWS-257, 274–79.)

The SFS Project "action area" is defined as "all areas to be affected directly or indirectly by the [f]ederal action and not merely the immediate area involved in the action." (FWS-283) (citing 50 CFR § 402.02). For the NSO, the action area consists of a 1.3-mile buffer of all proposed treatments, resulting in 47,411 acres. (FWS-283, 300.) Most of the NSO action area is located in the California Cascades province and recovery unit, with a small portion in the California Klamath province and recovery unit. (FWS-294, 384.)

Within the SFS Project action area, there are five NSO territories: Soapstone, current Scott, Morgan, historic Scott, and Boulder. (FWS-301.) While the Morgan, historic Scott, and Boulder territories are considered historic, the Soapstone and current Scott territories are considered occupied by territorial pairs. (*Id.*) The current Scott and Soapstone territories are "two of the longest occupied NSO territories in the California Cascades recovery unit" since the species was listed as threatened in 1990 and "contribute to the local population . . . in both recovery units." (FWS-388.) The Scott and Soapstone territories represent source populations for both recovery units. (*Id.*)

4. <u>The Biological Opinion</u>

Pursuant to the ESA, Defendant Forest Service formally consulted with Defendant FWS over the SFS Project's impact on NSOs. (FWS-257.) Defendant FWS finalized the BiOp for the SFS Project on November 20, 2023. (FWS-265.) In formulating the BiOp for the SFS Project, Defendant FWS considered factors including: (1) the status and current condition of NSO critical habitat, (2) the environmental baseline for NSO critical habitat in the action area, (3) the effects of the SFS Project on the NSO, (4) the cumulative effects of other actions that are reasonably certain to occur in the action area, and (5) the incidental take of NSOs in the action area. (FWS-323–56; 360–83.)

In its jeopardy analysis for NSOs, Defendant FWS found that "adverse effects are anticipated from habitat loss, reduction, and continuous areas of effects in currently occupied sites

and connectivity areas." (FWS-385.) Of the approximately 52 percent of NSO nesting, roosting and foraging habitat in the action area that will be treated and variously maintained, degraded, downgraded, or removed under the SFS Project, approximately 28 percent will be "adversely affected." (FWS-386.) Defendant FWS also found that "the effects of the action are expected to impair NSO breeding, feeding, and sheltering behaviors in two occupied core use areas and home ranges, and connectivity areas between the two sites," and "[t]he effects in the Scott and Soapstone home range are predicted to result in reduced productivity and fitness of NSOs during the first 1–10 years of management actions in these locations." (*Id.*)

Further, Defendant FWS determined that the "[r]eproduction, numbers, and distribution of NSO in the action area will be reduced over the first ten years of implementation." (FWS-387.) The SFS Project is reasonably certain to cause the incidental takes of twelve NSOs. (FWS-396.) Specifically, the SFS Project is likely to cause the incidental take of four adult and eight young, juvenile, or subadult NSOs. (*Id.*) The take of NSOs will likely be caused by the removal, modification, and degradation of nesting, roosting and foraging habitat and disturbance during the first one to five years of project activity in the Scott and Soapstone territories. (FWS-396–97.) Defendant FWS opined that while the "reproductive behaviors and production of young from the territorial NSO pairs in the action area will be reduced or delayed," "the reproductive output at the rangewide scale will not be appreciably harmed" by the SFS Project. (FWS-391.)

Ultimately, Defendant FWS concluded that the implementation of the SFS Project is "not likely to jeopardize the continued existence of the [NSO] by reducing their reproduction, numbers, or distribution." (FWS-392–93.) In the BiOp's jeopardy analysis, Defendant FWS discussed both the effects at the province level and recovery unit scale and the effects at the rangewide scale. (FWS-387–89.) In its recovery unit analysis, Defendant FWS determined that "in terms of species reproduction, numbers, or distribution, the impacts to and take of individuals that contribute to the California Cascades and California Klamath recovery units will not appreciably impair or preclude the conservation role provided by these recovery units to the survival and recovery of the species as a whole." (FWS-388.) In its rangewide analysis, Defendant FWS determined that "in terms of species reproduction, numbers, or distribution,

while the impacts to and take of individuals is considered significant at the action area scale, it represents less than one percent of the current estimated population at the rangewide scale where [Defendant FWS] has estimated there are likely 3,000 or fewer individuals present." (FWS-389.)

On December 21, 2023, after receiving Defendant FWS's BiOp, Defendant Forest Service released its Decision Notice approving the SFS Project. (FS-128, 138.)

**C. Procedural Background**

On August 28, 2024, Plaintiffs filed a complaint initiating this action against Defendants, challenging Defendants' final administrative actions with respect to the SFS Project in the Shasta-Trinity National Forest. (Doc. No. 1.) Specifically, Plaintiffs challenge the BiOp issued by Defendant FWS for the SFS Project, upon which Defendant Forest Service relied in approving the SFS Project. (*Id.* at 34–37.) In their complaint, Plaintiffs assert that: (1) Defendant FWS's BiOp and "no jeopardy" conclusion are arbitrary and capricious under the APA, 5 U.S.C. §§ 701–06, and not in accordance with the ESA, 16 U.S.C. §§ 1531–44; and (2) Defendant Forest Service violated the APA and its duties under ESA Section 7 by relying on an unlawful and "legally flawed" BiOp for the SFS Project. (*Id.*)

On February 21, 2025, Plaintiffs filed a motion for summary judgment. (Doc. Nos. 28, 29.) On March 28, 2025, Defendants filed a cross-motion for summary judgment. (Doc. Nos. 33, 34.) On April 25, 2025, Plaintiffs filed an opposition to Defendants' cross-motion for summary judgment and a reply in support of their motion for summary judgment. (Doc. No. 36.) On May 23, 2025, Defendants filed a reply in support of their cross-motion for summary judgment. (Doc. No. 38.) The court took the parties' motions for summary judgment under submission to be decided on the papers pursuant to Local Rule 230(g). (Doc. No. 37.)

On August 20, 2025, Plaintiffs filed a motion for a preliminary injunction based on the impending implementation of the Rainbow Thin MP and Longbow Thin MP Integrated Resource

/////

/////

/////

/////

Timber contracts.[4] (Doc. Nos. 41, 41-1.) Specifically, Plaintiffs sought to enjoin "commercial logging operations" in NSO nesting, roosting, and foraging habitat in the action area. (Doc. No. 45 at 22.) On September 26, 2025, the court granted Plaintiffs' motion for preliminary injunction. (Doc. No. 47.) The court found that Plaintiffs raised a serious question on the merits of their claim that Defendant FWS's "no jeopardy" conclusion for NSOs based on its analysis at the recovery unit scale, and Defendant Forest Service's reliance thereon, was arbitrary and capricious under the APA. (*Id.* at 19.) The court also found that the NSOs, and Plaintiffs themselves, would suffer irreparable harm in the absence of injunctive relief. (*Id.*) The court thus enjoined "commercial logging operations" authorized under the Rainbow Thin and Longbow Thin contracts until the court reached a decision on the merits. (*Id.* at 25.)

## LEGAL STANDARD

The APA governs the court's review of agency decisions under the ESA. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012). Pursuant to the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[4] The Rainbow Thin MP contract, a commercial timber sale under the SFS Project, was awarded on January 26, 2024. (Doc. No. 43-2 at ¶ 4.) The Rainbow Thin contract was authorized under Defendant FWS's December 2023 Decision Notice for the SFS Project. (*Id.* at ¶ 3.) The Rainbow Thin contract encompasses 278 acres of thinning along high use roads. (*Id.* at ¶ 4.) It also includes, among other activities, the removal of roughly 2.5 million board feet of sawtimber and 4,000 tons of biomass. (*Id.* at ¶ 4.) The contract area is located southwest of Lake Siskiyou and includes NSO nesting, roosting, and foraging habitat in the eastern portion of the current Scott territory. (Doc. No. 43-3 at ¶ 6.) Defendant FWS advertised a second sale under the SFS Project, the Longbow Thin MP Integrated Resource Timber contract on July 30, 2025. (Doc. No. 43-2 at ¶ 5.) The Longbow Thin contract overlaps with NSO nesting, roosting, and foraging habitat in the northern portion of the current Scott territory and the southern portion of the Morgan territory. (Doc. No. 42-3 at 1–2; FWS-520.)

*Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

"Under the arbitrary and capricious standard, the scope of review is deferential and narrow, and the court is not to substitute its judgment for the agency's judgment." *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021) (citation omitted). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. A court may not accept an agency's *post hoc* rationalizations for its action. *Id.* at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

## ANALYSIS

Plaintiffs contend that Defendant FWS's BiOp for the SFS Project is arbitrary and capricious under the APA.[5] (Doc. No. 29 at 10.) Specifically, Plaintiffs argue that Defendant FWS failed to rationally explain why the SFS Project would not appreciably impair the NSO's recovery prospects, and why the SFS Project is "not likely to jeopardize the continued existence of the [NSO]." (*Id.* at 22; 28–34; FWS-392–93.) With respect to Defendant FWS's determination that the SFS Project is "not likely to jeopardize the continued existence of the [NSO]," Plaintiffs challenge Defendant FWS's analysis regarding the SFS Project's effects on NSOs at both the recovery unit scale and the rangewide scale. (Doc. No. 29 at 28–34.)

### A. The BiOp's Recovery Analysis

Plaintiffs first argue that the FWS's "no jeopardy" conclusion in the context of recovery is arbitrary and capricious because Plaintiffs assert that the BiOp does not separately analyze recovery as required. (Doc. No. 29 at 37.) Defendants in their cross-motion for summary judgment counter that while Defendant FWS must consider the NSO's survival and recovery

[5] Defendant FWS's issuance of a BiOp for the SFS Project is considered a final agency action and is therefore subject to judicial review under the APA. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 925 (9th Cir. 2008).

prospects, there is no requirement that these two issues are separately analyzed. (Doc. No. 34 at 31.) The court is not aware of, nor do Plaintiffs identify, any authority requiring that Defendant FWS analyze recovery and survival in discrete sections of the BiOp. The relevant regulation obligates the agency to determine whether a proposed action would "reduce appreciably the likelihood of both the survival and recovery" of a species, 50 C.F.R. § 402.2, but does not require the agency to analyze these two issues separately. Though the court agrees, as outlined in more detail below, that there are deficiencies with the analysis supporting the overall "no jeopardy" determination as to recovery, the court disagrees with Plaintiffs' assertion that the BiOp failed to address recovery at all. (*See* FWS-387–89.)

Plaintiffs also argue that the "no jeopardy" determination is unlawful because the SFS Project is inconsistent with Recovery Actions 10 and 32 from the 2011 Recovery Plan for the NSO. (Doc. No. 29 at 36, 38.) Defendants argue that ESA Section 7 "does not require an action to be consistent with a recovery plan or even that it follow all recovery plan recommendations in order to avoid jeopardy to the listed species." (Doc. No. 34 at 34.) Indeed, Plaintiffs' arguments regarding recovery of the NSO expand the government's obligations beyond what is required by the ESA. As stated by the Ninth Circuit, "[r]ecovery [p]lans are prepared in accordance with section 1533(f) of the Endangered Species Act for all endangered and threatened species, and while they provide guidance for the conservation of those species, they are not binding authorities." *Conservation Cong. v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014). Though Defendant FWS has a duty to prepare recovery plans for an endangered species where doing so would advance the conservation goals for that species, Defendant FWS is not mandated by the ESA to act in accordance with such recovery plans. *See Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1114 n.8 (9th Cir. 2015) ("It is undisputed that, generally, FWS recovery plans are not mandatory. The Endangered Species Act does not mandate compliance with recovery plans for endangered species."); *Ctr. for Biological Diversity v. Jewell*, No. 15-cv-00019-TUC-JGZ, 2018 WL 1586651, at *15 n. 14 (D. Ariz. Mar. 31, 2018) ("Recovery plans do not govern all aspects of recovery under the ESA, but rather are non-binding statements of intention with regards to the agency's long-term goal of conservation."). "The purpose of the [r]ecovery [p]lan

is evident—promote recovery of the spotted owl," and "[a]lthough they are not necessarily mutually exclusive, recovery and jeopardy are two distinct concepts." *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1244 (9th Cir. 2015). Here, Defendant FWS expressly acknowledged in the BiOp that the SFS Project was inconsistent with Recovery Actions 10 and 32 from the 2011 Recovery Plan. (FWS-375–76; FWS–384.) Defendant FWS's approach is permissible, however, because "declining to adopt particular recommendations in a recovery plan or a study—neither of which is binding on an agency—does not constitute failing to consider them under 50 C.F.R. § 402.16." *Finley*, 774 F.3d at 620. Accordingly, the court does not find that the BiOp was arbitrary and capricious as to the recovery analysis based on either of the bases identified by Plaintiffs.

**B. The BiOp's Recovery Unit Analysis**

Next, Plaintiffs challenge the BiOp's recovery unit analysis. (Doc. No. 29 at 29.)

In the BiOp, Defendant FWS conducted a recovery unit assessment for two NSO recovery units impacted by the SFS Project: California Cascades and California Klamath. (*See* FWS-497–519.) As summarized in the BiOp's jeopardy analysis for NSOs (FWS-384–88), Defendant FWS found that "[a]t the scale of the California Cascades and California Klamath recovery units, the affected [nesting, roosting, and foraging] habitat in the action area represents approximately 1 and 0.3 percent of the available [nesting, roosting, and foraging] habitat in each recovery unit, respectively." (FWS-388.) "Despite the small amount of habitat affected at the scale of these recovery units," Defendant FWS found that "the watershed and action area contain two of the longest occupied NSO territories in the California Cascades recovery unit since the 1990 listing" of the NSO as a threatened species—the Scott and Soapstone territories.[6] (*Id.*) Both the Scott and Soapstone territories "contribute to the local population and populations in both [the California Cascades and California Klamath] recovery units." (*Id.*) "While the Scott and Soapstone NSO territories do not represent the sole source population to either recovery unit, their breeding, feeding, and sheltering behaviors will be impaired by the effects of the action," "result[ing] in a likely reduced contribution of future owls (numbers) and subsequent reduced distribution in the

[6] The use of Scott in reference to occupied NSO territories discussed in the BiOp herein refers to the current Scott territory.

two recovery units for one to five years." (*Id.*) Overall, Defendant FWS determined that "adverse impacts from the action may influence approximately 21 percent of the estimated population" of NSOs in the California Cascades and California Klamath recovery units. (*Id.*)

Defendant FWS concluded, as part of its jeopardy analysis for NSOs, that the SFS Project is "not expected to preclude the survival or recovery of the species at the scale of the California Cascades and California Klamath provinces and recovery units." (*Id.*) Defendant FWS opined that

> while the proposed action will affect important habitats that contribute to the successful reproduction and survival of the NSOs and their long-term recovery in the action area, these effects are not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function of each recovery unit, as defined in the Recovery Plan" for NSOs.

(*Id.*) Defendant FWS further opined that "in terms of species reproduction, numbers, or distribution, the impacts to and take of individuals that contribute to the California Cascades and California Klamath recovery units will not appreciably impair or preclude the conservation role provided by these recovery units to the survival and recovery of the species as a whole." (*Id.*)

In their pending motion for summary judgment, Plaintiffs argue that Defendant FWS failed to rationally explain its conclusions and opinions. (Doc. No. 29 at 29.) Plaintiffs aver that Defendant FWS did not explain why the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function" of the California Cascades and California Klamath recovery units if "adverse impacts from the [SFS Project] may influence approximately 21 percent" of NSOs in those recovery units. (*Id.*) (citing FWS-388). Plaintiffs argue that it is not permissible for this court to "imply an analysis that is not shown on the record." (Doc. No. 29 at 30) (citing *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1074 (9th Cir. 2004) *amended*, 387 F.3d 968 (9th Cir. 2004)). Plaintiffs further argue that the 21 percent figure is "devoid of critical context" because it does not consider the "other significant stressors" impacting the recovery units. (Doc. No. 29 at 30.) Plaintiffs also assert that Defendant FWS has "offered an explanation for its decision that runs counter to the evidence before the agency," because Defendant FWS "opined, without support,

that the [SFS] Project would not 'appreciably impair or preclude the conservation role' provided by the [r]ecovery [u]nits." (*Id.* at 37–38) (citing FWS-388).

In their cross motion for summary judgment, Defendants argue the BiOp articulated multiple facts to support Defendant FWS's conclusion that the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function" of the California Cascades and California Klamath recovery units. (Doc. No. 34 at 25) (citing FWS-388). Namely, "the Scott and Soapstone territories 'do not represent the sole source population to either recovery unit,'" "the reduction in fitness [to NSOs] that is likely to result from the SFS Project is not expected to be permanent," "the California Klamath population, as a whole, is a 'stronghold for the rangewide population,'" and "'it is possible that floater owls may utilize portions of the action area." (*Id.* at 22) (citing FWS-303, 385–88, 511).

In Plaintiffs' opposition to Defendants' cross-motion for summary judgment, Plaintiffs argue that the "BiOp fails to substantiate" Defendant FWS's "conclusory statement" that the "Scott and Soapstone NSO territories do not represent the 'sole' source population" to either the California Cascades or California Klamath recovery unit, which implies that the "[SFS] Project will not appreciably diminish reproductive output." (Doc. No. 36 at 19.) Plaintiffs contend the BiOp does not include an analysis of "other source populations in the two [r]ecovery [u]nits, let alone whether they would be able to compensate for the [SFS] Project's take" of twelve NSOs from the Scott and Soapstone NSO territories. (*Id.*) In Plaintiffs' view, Defendant FWS in the BiOp "failed to address an important aspect of the problem: the stability and continued persistence of those other populations." (*Id.*) (citing *State Farm*, 463 U.S. at 43.)

Based on the court's review of Defendant FWS's BiOp for the SFS Project, Defendant FWS's deduction that the "Scott and Soapstone NSO territories do not represent the sole source population to either recovery unit" is not supported by evidence in the administrative record. Although the BiOp explains that the California Klamath recovery unit contains a source population of NSO (FWS-511), at no point does the BiOp explain that the "Scott and Soapstone NSO territories do not represent the sole source population to either recovery unit." The first time

this fact appears in the BiOp is in Defendant FWS's jeopardy analysis for NSOs, and no supporting citation is provided. (*See* FWS-388.) Further, the BiOp does not discuss any other "source populations" for the California Cascades and California Klamath recovery units besides the Scott and Soapstone NSO territories. Finally, the court notes that contrary to Defendant FWS's characterization of the BiOp, the jeopardy analysis for NSOs in Defendant FWS's BiOp does not explicitly state that the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function of each recovery unit" *because* the Scott and Soapstone NSO territories do not represent the sole source population to either recovery unit. Rather, the BiOp states that "[w]hile the Scott and Soapstone NSO territories do not represent the sole source population to either recovery unit, their breeding, feeding, and sheltering behaviors will be impaired" by the SFS Project.[7] (*Id.*)

Indeed, Defendants in their briefing have not cited to any sections of the BiOp supporting the assertion that "Scott and Soapstone NSO territories do not represent the sole source population to either recovery unit" or discussing other "source populations" for the California Cascades and California Klamath recovery units. Nevertheless, Defendant FWS asserts it concluded that the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function" of the California Cascades and California Klamath recovery units, at least in part, because "the Scott and Soapstone territories do not represent the sole source population to either recovery unit." (Doc. No. 34 at 17, 22.)

"The touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061,

[7] At the hearing on Plaintiffs' motion for preliminary injunction, in which the same arguments were raised regarding NSO source populations, the court provided defense counsel an opportunity to direct the court to portions of the BiOp discussing "source populations" of NSOs in the California Cascades and California Klamath recovery units. Defense counsel was unable to do so, providing citations to facts other than those relating to "source populations." *See* (FWS-303) (noting floater owls may utilize portions of the action area); (FWS-385) (describing "a long history of NSO occupancy in the action area"); (FWS-511) (stating that the California Klamath recovery unit is a "stronghold[] for the rangewide population").

1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 52); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) ("It is a basic principle of administrative law that the agency must articulate the reason or reasons for its decision."). The lack of analysis on alternative "source populations" in the BiOp demonstrates Defendant FWS has not articulated a rational connection between the facts and its conclusion that the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function" of the California Cascades and California Klamath recovery units. The BiOp does not contain any discussion of what the other source populations are, or their capacity to compensate for the adverse impacts from the SFS Project on approximately 21 percent of the estimated affected NSO population in the California Cascades and California Klamath recovery units. The court is mindful that "[a]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 529 (9th Cir. 2010) (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation,* 426 F.3d 1082, 1090 (9th Cir. 2005)). Accordingly, the court finds that Defendant FWS's "no jeopardy" conclusion for NSOs based on its analysis at the recovery unit scale was arbitrary and capricious under the APA.

**C. The BiOp's Rangewide Analysis**

Plaintiffs also challenge Defendant FWS's range jeopardy analysis in the BiOp. (Doc. No. 29 at 32.). As summarized in the BiOp's jeopardy analysis for NSOs (FWS-384–88), Defendant FWS concluded that "while the impacts to and take of individuals is considered significant at the action area scale, it represents less than one percent of the current estimated population at the rangewide scale where the [Defendant FWS] has estimated there are likely 3,000 or fewer individual[] [NSOs] present." (FWS-389.) Defendant FWS based this conclusion on its findings that "the action affects an insignificant proportion of habitat," "[t]he negative effects to the two occupied territories in the action area are not expected to appreciably diminish" survival rangewide, and long-term benefits from the SFS Project, including "areas of improved forest health and reduced risk and severity of wildfire" can help maintain the NSO's habitat. (*Id.*) Defendant FWS also noted that the reduction in quality habitat for the NSO caused by the SFS

project represents "less than one percent of the habitat available for the species across its range." (*Id.*)

Plaintiffs aver that Defendant FWS ignored the "aggregate" effects in its rangewide jeopardy analysis. (Doc. No. 29 at 32.) Defendant FWS opined that the Project's take of 12 NSOs "represents less than one percent of the current estimated population at the rangewide scale where [Defendant FWS] has hypothesized there are likely 3,000 or fewer individual[] [NSOs] present." (*Id.* at 32) (citing FWS-389.) Plaintiffs argue that this conclusion is flawed for two reasons. (*Id.* at 32.) First, Plaintiffs argue that the "3,000 or fewer" estimate is a guess, noting that Defendant FWS itself admits "[t]here is little information regarding the total number of NSO within their range." (*Id.* at 32) (citing FWS-498–99.) Plaintiffs assert that Defendant FWS should instead have applied a rate of decline of -5.3 percent per year from the 2021 population estimate of 3,000 NSOs. (*Id.* at 32–33) (citing FWS-419). Second, Plaintiffs contend that the approach of comparing the SFS Project's take to the total NSO population "impermissibly isolates the Project's take from the larger relevant context." (*Id.* at 33.) Plaintiffs assert that Defendant FWS failed to rationally connect the signs of population collapse, other stressors on the population, concurrent take from other projects to the "no jeopardy" conclusion. (*Id.*) Plaintiffs argue that therefore, the "no jeopardy" conclusion based on the rangewide analysis is arbitrary and capricious.

In their cross-motion for summary judgment, Defendants note that the BiOp acknowledges NSO rangewide estimates "are lacking" and that "[s]ince the mid-1990s, rangewide demographic data from eleven long-term monitoring areas has been used as a surrogate to evaluate NSO population trends." (Doc. No. 34 at 27) (citing FWS-498–99; FWS-465–68.) Defendants assert that Defendant FWS used the "best science available to the agency, in full compliance with the ESA," relying on model simulations in scientific literature to reach its hypothesis that 3,000 or fewer NSOs were present in the rangewide population as of 2021. (Doc. No. 34 at 27.) Defendants argue that "accepting Plaintiffs' invitation to lop percentages from [Defendant] FWS's population hypothesis would put the [c]ourt in the impermissible role of 'act[ing] as a panel of scientists, instructing the agency, choosing among scientific studies, and

ordering the agency to explain every possible scientific uncertainty.'" (*Id.*) (quoting *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010)). Defendants urge the court to reject Plaintiffs' argument, as Plaintiffs have "failed to identify a superior rangewide population dataset . . . ." (Doc. No. 34 at 28.)

Plaintiffs' argument as to the reliability of Defendant FWS's estimate of the current rangewide NSO population is unavailing. Unlike the recovery unit determination, Defendant FWS's conclusion in the BiOp that "while the impacts to and take of individuals is considered significant at the action area scale, it represents less than one percent of the current estimate population at the rangewide scale where the Service has estimated there are likely 3,000 or fewer individual[] [NSOs] present," is expressly sourced to Appendix A in the BiOp. (FWS-389.) The methodology underlying the estimate—which Plaintiffs take issue with—is explained in detail in Appendix A. Defendant FWS's estimate appears to be an extrapolation from two population estimation methods and the "most recent demographic meta-analysis" demographic study, though Defendant FWS acknowledges that "[c]urrent estimates of the rangewide NSO population are not available." (FWS-466–67.) Although Plaintiffs suggest that Defendant FWS should have used a different methodology to estimate the rangewide NSO population, Plaintiffs do not identify an alternative, superior rangewide population dataset, nor do they identify any available evidence or studies that Defendant FWS entirely disregarded or ignored in its assessment. *See* 16 U.S.C. § 1536(a)(2). And while Plaintiffs argue that Defendant FWS should have assumed a rate of decline of -5.3 percent per year from the 2021 population estimate of 3,000 NSOs (Doc. No. 29 at 32–33), Defendant FWS emphasizes that the BiOp discusses the limitations of its survey-based estimates and notes that rates of decline are not always consistent. (Doc. No. 34 at 28).

The court's role is to "'review all agency choices with respect to models, methodologies, and weighing scientific evidence' to ensure that the agency's 'choices [are] supported by reasoned analysis.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014) (quoting *Ecology Ctr. v. Castaneda,* 574 F.3d 652, 665 (9th Cir. 2009)). Here, Defendant FWS outlined its methodology and described how it reached its hypothesis that "there are likely 3,000 or fewer individual[] [NSOs] present in the rangewide population as of 2021."

(FWS-466–67.) Although the court recognizes Plaintiffs' concern over the possibility that Defendant FWS may have overestimated the rangewide NSO population given the uncertainty in the underlying data, the ESA's best-available-data requirement obligates Defendant FWS only to not "disregard available scientific evidence that is in some way better than the evidence it relies on." *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 925 (9th Cir. 2020) (citation omitted). Nor can the court "insist on perfection," where, as here, "the information is not readily available." *Id.* (quoting *Jewell*, 747 F.3d at 602); *see also Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) ("[S]o long as an agency considers all relevant data, it may rely on that available evidence even when it is imperfect, weak, and not necessarily dispositive.") (citation omitted).

Further, the determination of "what constitutes the best scientific and commercial data available itself is a scientific determination" that "belongs to the agency's special expertise and warrants substantial deference." *Nat'l Fam. Farm Coal.*, 966 F.3d at 925 (citation omitted). Even though the data Defendant FWS relied on in formulating its population hypothesis was limited and uncertain, it appears that Defendant FWS considered the available scientific evidence in compliance with its statutory obligation under the ESA. Accordingly, the court finds that as to the rangewide analysis, the BiOp was reasonable and complied with the standards set forth in both the ESA and APA.

**D. Defendant Forest Service's Reliance on the BiOp**

Finally, Plaintiffs maintain that Defendant Forest Service's Decision Notice approving the SFS Project (FS-128, 138) must be set aside because it relied on Defendant FWS's flawed BiOp. (Doc. No. 29 at 38–39.) Section 7(a)(2) of the ESA imposes a substantive duty on Defendant Forest Service to ensure that its actions are not likely to jeopardize the continued survival of the NSO or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). Though an agency's reliance on a biological opinion that is based on "admittedly weak" information satisfies its Section 7 obligations, an agency may not rely on a biological opinion where the opinion's flaws are "legal in nature." *Wild Fish Conservancy*, 628 F.3d at 532.

Here, Defendant FWS committed legal error by failing to articulate a rational connection

between the facts and its conclusion that the SFS Project is "not expected to measurably influence the provincial baseline or constitute an appreciable reduction in the 'recovery support' function" of the California Cascades and California Klamath recovery units. (*See* FWS-388.) Accordingly, Defendant Forest Service's reliance on the BiOp to satisfy its independent ESA Section 7(a)(2) duty was likewise arbitrary and capricious. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1128 (9th Cir. 2012) (finding agency's reliance on a legally flawed biological opinion to be in violation of "its substantive duty to ensure that its authorization of the [p]roject would not jeopardize the survival of the" species or "adversely modify the species' critical habitat.").

**E. Remedy**

Plaintiffs request that this court hold unlawful and set aside the BiOp, and to "remand for renewed Section 7 consultation that complies with the ESA." (Doc. No. 29 at 39.) Defendants request that the court not vacate the BiOp. (Doc. No. 34 at 37.) Defendants request an opportunity to further brief the appropriate remedy if the court finds any error in the BiOp, especially if the court finds a "limited error that could be rectified with further explanation by Defendant FWS." (*Id.*) Because the court finds that the Defendant FWS 2023 SFS Project Biological Opinion is unlawful for the limited reasons outlined in the recovery unit section of this opinion, the court will grant Defendants' request for supplemental briefing on the appropriate remedy.

**CONCLUSION**

For the reasons stated above,

1. Plaintiffs' motion for summary judgment (Doc. No. 28) is GRANTED;
2. Defendants' cross-motion for summary judgment (Doc. No. 33) is DENIED;
3. The parties shall meet and confer to determine the appropriate remedy that is consistent with this order, the ESA, and the APA. If the parties agree on a remedy, the parties shall file a joint supplemental brief regarding remedy by no later than September 1, 2026; and

/////

/////

4. If the parties cannot agree on a proper remedy, then each party shall file supplemental briefing regarding remedy by no later than September 1, 2026.

IT IS SO ORDERED.

Dated: **August 18, 2026**

Dena Coggins
United States District Judge